**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
Telephone: (212) 603-6300
**A. Mitchell Greene**

*Proposed Attorneys for the Debtors and
Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Return Date: May 24, 2011
at 10:00 a.m.

-------------------------------------------------- X
                           :
In re:                            :

                            :
**WEST END FINANCIAL ADVISORS,
LLC, et al.,**                :

                            :
               Debtors.     :
                            :
-------------------------------------------------- X

Chapter 11

Case No.: 11-11152 (SMB)
through 11-11167 (SMB)
(Jointly Administered)

## NOTICE OF MOTION FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C § 105, DIRECTING THE SUBSTANTIVE CONSOLIDATION OF EACH OF THE DEBTORS' ESTATES AND FOR RELATED RELIEF

     **PLEASE TAKE NOTICE,** that upon the annexed application of **West End Financial Advisors, LLC, et al.,** and its affiliates, the debtors and debtors in possession herein (the "Debtors"), by their proposed attorneys, **Robinson Brog Leinwand Greene Genovese & Gluck P.C.,** dated May 4, 2011, a hearing (the "Hearing") will be held before **the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 on May 24, 2011 at 10:00 a.m.** in the forenoon of that day, or as soon thereafter as counsel can be heard, for entry of an

order pursuant to Section 105 of the Bankruptcy Code directing the substantive consolidation of the Debtors' chapter 11 estates and for such other and further relief as this Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE**, that objections, if any, to the relief sought in the application, must be in writing setting forth the facts and authorities upon which an objection is based, filed with the Clerk of the Court, United States Bankruptcy Court, The Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, with a copy to Chambers, provided, however, that pursuant to *general order* No. M-182 re Electronic Case Filing Procedures (as amended from time to time), entities with Internet access shall file objections (formatted with Adobe Acrobat) at http://www.nysb.uscourts.gov., and served so as to be received by the proposed attorneys for the Debtors, Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Floor, New York, New York 10022, Attention: A. Mitchell Greene, Esq. and the United States Trustee's Office, Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Brian Masumoto, Esq. no later than **seven (7) days** prior to the Hearing Date.

**PLEASE TAKE FURTHER NOTICE**, that the Hearing may be adjourned from time to time without further notice except by announcement of such adjournment in open court on the date scheduled for the Hearing.

**DATED:** New York, New York
May 4, 2011

> **ROBINSON BROG LEINWAND GREENE**
> **GENOVESE & GLUCK P.C.**
> **Proposed Attorneys for Debtors**
> 875 Third Avenue, 9th Floor
> New York, New York 10022
> Tel. No.: 212-603-6300
>
> By: _____
> A. Mitchell Greene

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date: May 24, 2011
Hearing Time: 10:00 a.m.

--------------------------------------------------------x

In re:

Chapter 11

**WEST END FINANCIAL ADVISORS LLC**
*et al.,*

Case Nos. 11-11152 (SMB)
through 11-11167 (SMB)
(Jointly Administered)

Debtors.

--------------------------------------------------------x

## APPLICATION FOR AN ORDER PURSUANT TO 11 U.S.C. SECTION 105(a) DIRECTING THE SUBSTANTIVE CONSOLIDATION OF EACH OF THE DEBTORS' RELATED CHAPTER 11 ESTATES

West End Financial Advisors LLC ("WEFA") and its affiliated debtors and debtors in possession (collectively, the "Debtors")[1] seek the entry of an order pursuant to 11 U.S.C. Section 105(a) directing the substantive consolidation of the Debtors' estates and in support thereof, respectfully set forth and represent:

1.     On March 15, 2011 (the "Petition Date") the Debtors filed petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.     The Debtors' cases have been procedurally consolidated and are currently being jointly administered. By this application, the Debtors seek the substantive consolidation of their estates. As will be detailed herein, and as described in the *Declaration of Raymond J. Heslin in*

---

[1] The estates to be substantively consolidated are the following: West End Financial Advisors LLC (Case No. 11-11152); Amagansett Realty SPV 1 LLC (Case No. 11-11167); Benedek Development Group, LLC (Case No. 11-11155); L/C Family Limited Partnership (Case No. 11-11157); Sentinel Investment Management Corp.(Case No. 11-11153); SIMCO SPV 1 LP (Case No. 11-11158); West End Absolute Return Fund I, LP (Case No. 11-11161); West End Capital Management LLC (Case No. 11-11154); West End Fixed Income Partners LP (Case No. 11-11159); West End Income Strategies Fund LP (Case No. 11-11160); West End Mortgage Finance Fund I LP (Case No. 11-11162); West End Private Client Fund L.P.(Case No. 11-11163); West End Real Estate Fund 1 LP (Case No. 11-11164); West End Special Opportunity Fund II, LP (Case No. 11-11166); West End Special Opportunity Fund, LP (Case No. 11-11165); West End/Mercury Short-Term Mortgage Fund, LP. (Case No. 11-11156).

1

{00527108.DOC;7 }

*Support of the Debtors' Motion Pursuant to 11 U.S.C. § 105 directing the Substantive Consolidation of the Debtors' Related Chapter 11 Estates* (the "Heslin Decl."), the facts and circumstances of these cases warrant substantive consolidation, which the Debtors submit will provide the most equitable resolution of these cases for all of the Debtors' creditors and equity holders.

3.    This court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1334. This is a core proceeding with the meaning of 28 U.S.C. Section 157(b)(2)(A) and (O). Venue is proper before this Court pursuant to 28 U.S.C. Sections 1408 and 1409.

### Background

4.    Debtors also respectfully refer the Court to the Declaration of Raymond J. Heslin ("Heslin") Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York and In Support of First Day Motions, (ECF No. 1)[2] (the "First Day Declaration") and Debtors' Proposed Findings of Fact, (ECF No. 33)(the "Proposed Findings of Fact"), which are incorporated by this reference, for a complete recitation of the facts of these cases.

5.    As set forth in the Heslin Declaration, the First Day Declaration and the Debtors' Proposed Findings of Fact, William Landberg ("Landberg"), created WEFA in 2000 as an investment and financial management company and exercised total day-to-day control over all of the activities of the various Debtors, whether they were formed as limited partnerships or limited liability companies. Landberg's domination included, but was not limited to, determining the investments each fund would make, what management and investment fees each fund would pay and what distributions each fund would make to its various limited partners. Heslin Decl. at ¶12.

---

[2] The designation "ECF" indicates the document number of the Court's Electronic Case Filing system, or electronic docket, on the West End Financial Advisors case (Case No. 11-11152).

{00527108.DOC;7 }

6.      Landberg controlled the flow of funds between and among the various Debtors entities and ignored the corporate formalities that should have existed between and among the funds. *Id.*

7.      Heslin, who was recruited by Landberg to join WEFA as General Counsel and Chief Compliance Officer, and joined WEFA in January 2009, soon became suspicious about the source and use of funds in connection with several loan transactions as well as other apparent improprieties by Landberg in his capacity as the individual who exercised day to day control over the funds' activities (the "Suspicious Transactions").

8.      Heslin commenced an investigation and soon determined that Landberg, amongst other improprieties, frequently utilized funds from an interest reserve account maintained at Signature Bank to pay overdrafts in other funds, personal expenses and distributions to limited partners; that Landberg transferred funds from a collection account maintained at Signature Bank into other fund accounts and into his personal accounts in violation of applicable bank agreements; and that Landberg diverted funds advanced from a credit facility and failed to provide West End's required equity participation as consideration for the advance. *See, Heslin Decl. at ¶22.*

9.      When confronted, Landberg admitted his improprieties and was subsequently terminated from any and all of his involvement in the management and operation of WEFA and its affiliates.

10.     Soon thereafter Heslin met with representatives of the United States Attorney's Office, the Securities and Exchange Commission ("SEC") and the Federal Bureau of Investigation to disclose the facts he learned as a result of his investigation concerning the Suspicious Transactions.

11.     On January 20, 2011 the SEC filed a complaint ("Complaint") in the United States District Court for the Southern District of New York against certain of the Debtors and their former management in the matter captioned: <u>Securities and Exchange Commission v. William Landberg, Kevin Kramer, Steven Gould, Janis Barsuk, West End Financial Advisors, LLC, et al.</u>, 11 Civ. 0404 (PKC). The case was referred to the Honorable P. Kevin Castel for all purposes. A copy of the Complaint is attached to hereto as Exhibit "A".

12.     Paragraph 4 of the Complaint alleges that: "During 2009 alone, West End raised over $4.7 million from investors by touting false positive returns, while concealing its failed investment strategy, its cash flow problems, Landberg's fraud in connection with the $8.5 million in loans, and the misuse of investor assets"

13.     Paragraph 42 of the Complaint alleges that: "to deal with [investor capital] shortfalls, Landberg at first improperly treated all of the funds under his management as one large pool of cash, using the commingled assets to satisfy obligations as they occurred – regardless of which fund incurred the obligation."

14.     Paragraph 49 of the Complaint alleges that: "from April to May 2009, Landberg ignored the investment parameters of the Income Strategies Fund and treated investments in that fund as another piggy bank."

15.     While an answer to the Complaint has not yet been interposed, certain facts contained in the Complaint are based upon information provided from Heslin's review of the Debtors' book and records as outlined in the Heslin Declaration and the First Day Declaration. Landberg completely disregarded corporate formalities and utilized funds entrusted to him by investors to fund his own personal expenses and freely co-mingled the assets of the West End entities to cover shortfalls in other of the business' accounts and to pay distributions to

redeeming limited partners, note holders and holders of Risk Adjusted Debt Certificates ("RAD"). Heslin Decl. at ¶¶5, 7-9. The end result is a commingling of funds, assets and liabilities that is too vast and complex to practically or economically unravel.

16.     Debtors submit that Landberg's actions fit within the Second Circuit's description and definition of a "Ponzi Scheme." According to the Second Circuit, "[a] 'Ponzi' or 'Pyramid' scheme is a fraudulent investment scheme in which money contributed by later investors is used to pay artificially high dividends to the original investors, creating an illusion of profitability, thus attracting new investors. " Ades-Berg Investors v. Breeden (In re The Bennet Funding Group, Inc.), 439 F.3d 155, 157 n.2 (2d Cir. 2006)(citing Black's Law Dictionary 1198 (the d. 2004)); see also Hirsch v. Arthur Anderson & Co., 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)(" A Ponzi Scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors.") Jobin v. McKay (In re M & L Business Mach. Co., Inc.), 84 F.3d 1330, 1332 n. 1 (10th Cir. 1996)("We have defined a Ponzi Scheme as an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken for principal sums of newly attracted investments.")

17.     The massive co-mingling that took place under Landberg's term has resulted in the Debtors' funds being so entangled that it would be impossible to unravel the transactions. Even if it were possible to do so, the costs would be so prohibitive that any attendant benefit to creditors and equity holders would not be recovered by them, but would instead go to satisfy the administrative expense incurred by any forensic accountant engaged to unravel the affairs of the funds from one another. Heslin Decl. ¶¶18-21. In addition, while investments by RAD holders,

5

note holders and Limited Partners may have been designated for a specific fund, once the funds were provided, there is no basis or ability to conclude that the monies were in fact used for their intended purpose. Heslin Decl. ¶7-8. Therefore, distribution of any recovered assets to investors should be "pooled" or consolidated so that there is no prejudice to investment creditors. In the bankruptcy forum, consolidation of the Debtors' estates into one unit will provide for the maximum return to all of the Debtors' creditors and promote the most economical and expeditious liquidation process.

18.     Debtors have drafted a plan of reorganization based on these principles which plan provides for treatment to creditors in accordance with the priorities established by the Bankruptcy Code. Specifically, after payment to Administration, Secured and Priority creditors, the plan classifies unsecured creditors into two (2) classes: a general unsecured creditor class and an investor unsecured creditor class. Heslin Decl. ¶11.The investor unsecured creditor class groups the Debtors' RAD holders, note holders and limited partners together and provides for payment on account of their respective investment amounts, in cash, on a pro rata basis, subsequent to payments to the general unsecured creditor class. Treating these investors equally is the most fair and equitable manner in which to classify these types of claims and appropriately preserves priorities amongst the various creditor classes. A draft of such Plan of Reorganization, without exhibits, is annexed hereto as Exhibit "B".

## Relief Requested

19.     Debtors request that this Court exercise its equitable powers to substantively consolidate the Debtors' estates indicated in footnote 1 for all purposes in these chapter 11 cases,

including in connection with the filing of schedules, fixing a bar date, soliciting acceptances of a plan and making distributions to creditors.[3]

20.     Substantive consolidation is appropriate where "the interrelationships of the debtors are hopelessly obscured and the time and expense necessary to unscramble them is substantial as to threaten any net assets for all creditors." First Nat'l Bank of Barnesville v.Raforth (In re Baker & Getty Financial Services, Inc.), 974 F.2d 712, 720 (6th Cir. 1992). In the case of Augie/Restivo, the United States Court of Appeals for the Second Circuit articulated a two-prong test for analyzing a request for substantive consolidation. If either of the following factors is satisfied, then substantive consolidation is appropriate: (i) whether creditors dealt with the debtors as a single economic unit and did not rely on their separate identity in extending credit, or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515 (2d Cir. 1988); Colonial Realty, 966 F.2d at 61; In re WorldCom, 2003 WL 23861928, at *35-36. The Second Circuit has recently reaffirmed the importance of these two factors and the notion that the propriety of substantive consolidation must "be determined solely in light of the principles and rules of equity." FDIC v. Colonial Realty Co., 966 F.2d 57, 60 (2d Cir. 1992).

21.     As several courts applying the two-prong test have articulated, the Second Circuit used the disjunctive "or," indicating that "the two cited factors are alternatively sufficient criteria" for substantive consolidation. In re 599 Consumer Electronics, Inc., 195 B.R. 244, 248 (S.D.N.Y. 1996); see also In re Continental Vending Machine Corp., 517 F.2d 997, 1001 (2d Cir.

---

[3] The Debtors have considered seeking the substantive consolidation of certain non-debtor entities with the Debtors but have determined not to seek such relief at this time, although the Debtors do reserve all rights to seek additional or supplemental relief in the future. A narrative of the non-debtor entities which were considered for substantive consolidation and the reasons for not seeking such relief presently are set forth in paragraph 25 of the Heslin Declaration.

1975) (noting that substantive consolidation "does not require that the creditors knowingly deal with the corporations as a unit . . ."); In re Derivium Capital, LLC, 380 B.R. 429, 442 (Bankr. D.S.C. 2006) (following the Second Circuit test and denying a motion to dismiss by finding sufficient allegations that only went to "substantial pre-petition entanglement," "fraud," and "alter ego behavior").

22.    Landberg, the perpetrator of the underlying fraud and Ponzi Scheme in these cases, as enumerated above and in the Heslin Declaration submitted herewith, failed to observe corporate formalities and customary legal distinctions between and among the various Debtor entities. As such, assets that were originally intended to be kept separate were commingled as well as used for unauthorized purposes. This deliberate avoidance of the corporate form erased traditional legal boundaries between and among the various entities such that it appears that they became alter egos of one another. The Supreme Court noted in the original Ponzi Scheme case that such cases "call strongly for the principle that equality is equity." Cunningham v Brown, 265 U.S. 1, 13 (1924). Thus, the fairest and most reasonable approach to distributing the remaining funds in these cases is to substantively consolidate all of the entities involved in this scheme into one consolidated entity.

23.    The West End Funds were operated as a single, unified fraudulent scheme, thus satisfying the second prong of the Augie/Restivo test for substantive consolidation. As shown in the Heslin Declaration, the assets of the Debtors were commingled to a degree that they cannot be unwound, or the unwinding of which would be prohibitively expensive, and the Debtors were operated as an integrated fraud. Heslin Decl. at ¶18-22. See, e.g., In re The Bayou Group LLC, 396 B.R. at 828, 832, 834 (Bankr. S.D.N.Y. 2008).

24.    The uncontroverted factual basis demonstrated in the Heslin Declaration for

substantive consolidation is dispositive. Prior to May 2009, the Debtors in these administratively

consolidated cases operated a fraudulent investment scheme where assets of the various entities

were freely co-mingled, erasing the fiscal separateness of the West End entities. Heslin Decl. at

¶18-22. The West End entities are interrelated entities that were jointly operated by common

principals on a consolidated basis in furtherance of a scheme. Prior to their replacement by

Heslin, Landberg and Kevin Kramer were the officers, directors, and managers of each of the

West End entities and the functions of the entities were totally dominated by Landberg.

Landberg's inducements to individual investors to provide funds to the Debtors were done with

the intent and purpose of deceitfully inducing present investors to retain their accounts and

prospective investors to invest." Heslin Decl. at ¶¶6-9, 11, 15.

25.     Because there has been a commingling of assets and business functions of the

Debtors, all creditors, as opposed to select creditors, will benefit from substantive consolidation.

Augie/Restivo, 860 F.2d at 518. In In re WorldCom, the bankruptcy court

concluded that the second prong of the Augie/Restivo test was satisfied where "the Debtors'

operational and financial affairs are so entangled that the accurate identification and allocation

of assets and liabilities either could never be accomplished or, even if it could be accomplished,

would take so long and be so costly such that creditors as a whole would be substantially

harmed by the effort." In re WorldCom, 2003 WL 23861928, at *37; see also In re Bonham,

229 F.3d 750, 766-67 (9th Cir. 2000) (holding that entanglement factor of Augie/Restivo test is

satisfied if disentangling the debtors' affairs would be "needlessly expensive and possibly

futile"); In re Drexel Burnham Lambert Group, 138 B.R. 723, 766 (Bankr. S.D.N.Y. 1992)

(ordering substantive consolidation where "[e]stablishing to [which of the Debtors] actual

liability, if any, should be allocated would be a Herculean task consuming years of costly

9

professional services, thereby draining significant amounts of value from the Debtors' Estates").

26.     One of the first decisions supporting the use of substantive consolidation in bankruptcy proceedings involved a fraud case. The Supreme Court approved the "use of summary proceedings to absorb the corporate assets into the bankruptcy estate of the stockholder" where the stockholder had fraudulently transferred significant assets to the corporation and held that "[t]he power of the bankruptcy court to subordinate the claims or to adjudicate equities arising out of the relationship between the several creditors is complete." Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219 (1941).

27.     In Bonham, the Ninth Circuit addressed the propriety of substantively consolidating multiple entities involved in a fraudulent investment scheme. As may be the case here, the principal assets of the Bonham estate were the funds recovered through the avoidance of fraudulent transfers. Bonham, 229 F.3d at 759. The Ninth Circuit adopted the Second Circuit Augie/Restivo test and, applying it to that case, determined that the bankruptcy court's granting of substantive consolidation was warranted because consolidation would "allow a truly equitable distribution of assets by treating the corporate shells as a single economic unit." Id. at 766-68.

28.     The Heslin Declaration provides the irrefutable factual support for the legal conclusion that such consolidation is appropriate. Heslin, with the assistance of employees who were familiar with Landberg's activities within the funds, determined from his review of the bank statements and other financial documents, that financial aggregation is necessary and appropriate because the assets of the West End Funds were extensively commingled. As Heslin concluded, it is probably impossible and certainly cost- prohibitive to identify the particular assets belonging to any one of the West End Funds and segregate those assets on a fund-by-fund basis. Moreover, even if it were possible for the company to devote the resources to come up

10

with a mathematically correct reconstruction, without evidence that the books were accurately maintained at all times while the fraud was ongoing, all that would result, in the best case, would be an analysis which might be correct mathematically in some respects, but not one which would necessarily be accurate factually.

29.     In light of the commingling of the West End Funds' assets, the liabilities of each fund include inter-fund claims by each of the other funds. It would be absurdly inequitable to distribute the West End entities assets to investors based on the mere fortuity of which fund had larger fraudulent conveyance claims (as a percentage of unredeemed investors' capital) and without recognizing that there is no way to sort out whose money was used to pay which redemption. Substantive consolidation of the West End Funds will eliminate all inter-company claims and hence will benefit all creditors of the West End Funds, rather than preferring certain creditors over others for no discernable equitable reason.

30.     An alternative approach to substantive consolidation would require individual tracing analysis to determine the specific entity, investment project, and/or expenditure funded by each dollar invested and the actual returns on such investments. In other words, using one of several tracing methods to establish whether certain assets can be identified with particular victims for the purpose of distributing such assets preferentially to those individuals. This alternative has already been explored through the preliminary report prepared by Daylight Forensic and Advisory LLC and has been rejected by the Debtors. Daylight, who was engaged by the Debtors to conduct a preliminary analysis to assess whether tracing methods would produce meaningful results in the circumstances of these cases, and to determine the feasibility and cost of applying such methods. The effort to undertake such a disentangling of the finances of the Debtors was ultimately an academic exercise which did not result in any useful data. The

11

Debtors have concluded that, in light of the systematic and pervasive commingling of assets in

these cases and avoidance of corporate formalities by the former management of the Debtors, a

complete tracing analysis would be impossible.

31.     As noted above, not only will substantive consolidation result in bypassing the

arbitrary and costly application of tracing rules, it also prevents some investors from recovering

more than others simply because of the "merely fortuitous fact that the defrauders spent the

money of the other victims first" or that there are insufficient records to trace some victims'

funds to after-acquired property. Credit Bancorp, 290 F.3d at 89.  Similarly, there is no basis to

favor one set of investors over another based upon the form their investment took. The Debtors

believe that the economic substance of all of the investments in the Debtors' entities, whether the

investment took the form of a RAD, an unsecured note or a limited partnership interest was the

same and should be treated the same. *See*, Heslin. Decl. at ¶¶6-7, 9.

32.     Setting aside the cost prohibitive factor of a tracing analysis, equity favors

substantive consolidation.  A tracing analysis has the potential to result in a greater return to

some investors over others without basis.  Unlike cases where assets were properly segregated

and maintained in separate accounts, the funds and investments under Landberg's control were

inextricably interwoven.  (see, SEC v. Bancorp, 290 F.2d 80 (2d Cir. 2002), "[i]n those cases the

reason the assets were returned was not merely because they were traceable, but because the

assets had somehow been segregated in the manner of true trust accounts and/or had never been

placed in the defrauder's control." ). Similarly, it defies logic to believe, the Debtors submit, that

the investor-creditors relied on the creditworthiness of any particular fund when "choosing" to

become victims of the West End fraudulent scheme.  The investor-creditors' which will be Class

4 claims under the proposed plan are based on the scheme Landberg perpetrated,  not on an

12

entity-by-entity basis but as an integrated fraudulent scheme involving all of the West End Funds indiscriminately. Such claims are appropriately asserted against the funds as an integrated whole and are another reason why substantive consolidation is necessary in this case. Therefore, to treat investors as anything other than equal in a consolidated case, which may reward some investors with a greater return over others is simply unfair and inequitable.

33.     Where there has been fraud and massive comingling, courts and commentators have roundly criticized the use of tracing methods. For example the court in <u>United States v. 13328 and 13324 State Highway 75 North</u>, 85 F. 3d 551 (9th Cir. 1996), rejected the application of tracing fictions where funds of fraud victims were commingled, and opined "to allow one claimant to better its position over other victims would frustrate equity". In addition Dan D. Dobbs wrote that "tracing principals have been soundly rejected as a basis upon which to accord greater compensation to one class of victim over another') 2 Dan B. Dobbs, Law Of Remedies (2d ed. 1993) Section 6.1(3), 6.1(4).

34.     Debtors submit that facts of these cases support substantive consolidation and that creditors will benefit from, and not be prejudiced by, substantive consolidation. Further, the substantive consolidation of the Debtors' estates is administratively efficient and economical.

35.     For all the foregoing reasons, the Debtors assert that substantive consolidation is in the best interest of these estates and their creditors.

<u>**Notice**</u>

36.     The Debtors have served notice of this application upon the Office of the United States Trustee and all known creditors and parties in interest to the Debtors' bankruptcy cases and the Debtors respectfully request that such notice be deemed fair and adequate notice of the instant application.

{00527108.DOC;7 }

37.     No prior application for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that the application be granted, that an order directing the substantive consolidation of the Debtors' estates in substantially the same form as that annexed hereto as Exhibit "C" be approved, and that the Debtors be granted such other and further relief as is just.

Dated New York New York
May 4, 2011

                                        **ROBINSON BROG LEINWAND GREENE**
                                        **GENOVESE & GLUCK P.C.**
                                        **Proposed Counsel to West End Financial**
                                        **Advisors LLC, et al,**
                                        Debtors and Debtors in Possession

                                        By:_____
                                        A Mitchell Greene
                                        875 Third Avenue, 9th Floor
                                        New York, New York 10022
                                        Tel. No.: (212) 603-6300

{00527108.DOC;7 }

Exhibit A

11 CV 0404

JUDGE CASTEL

George S. Canellos
REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Howard Fischer, Senior Trial Counsel)
Email: Fischerh@sec.gov



RECEIVED
JAN 20 2011
U.S.D.C. S.D. N.Y.
COMPLETED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM LANDBERG, KEVIN KRAMER, STEVEN GOULD, JANIS BARSUK, WEST END FINANCIAL ADVISORS LLC, WEST END CAPITAL MANAGEMENT LLC, and SENTINEL INVESTMENT MANAGEMENT CORPORATION,<br><br>Defendants,<br><br>and<br><br>LOUISE CRANDALL and L/C FAMILY LIMITED PARTNERSHIP,<br><br>Relief Defendants. | 11 Civ. No. ____<br><br>COMPLAINT |

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against

William Landberg ("Landberg"), Kevin Kramer ("Kramer"), Steven Gould ("Gould"), Janis

Barsuk ("Barsuk"), West End Financial Advisors LLC ("WEFA"), West End Capital

Management LLC ("WECM"), and Sentinel Investment Management Corporation ("Sentinel")

(collectively, "Defendants"), and Louise Crandall ("Crandall") and L/C Family Limited

Partnership ("L/C Family") (collectively, "Relief Defendants") alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action involves a fraudulent scheme led by Landberg, the former chief

executive of a number of related entities, including WEFA and WECM, that collectively did

business as West End Financial Advisors ("West End"), and carried out by Landberg and other

senior executives at West End, including Kramer, Gould, and Barsuk.  West End is a New York-

based, unregistered investment adviser that Landberg owned and controlled.  West End is

affiliated with Sentinel, a registered investment adviser for which Landberg served as the

President and Chief Compliance Officer until June 2009.  Kramer served as West End's

President/Chief Operating Officer, Gould as its Chief Financial Officer, and Barsuk as its

Controller.  As of May 2009, Landberg managed over $66 million, primarily in three funds that

specialized in making real estate investments and loans to restaurant franchisees (the "West End

funds").

2.      From at least January 2008 through May 2009, by means of offering documents

and other correspondence, Landberg, Kramer, and West End misled fund investors into believing

that their money was held in stable, safe investment vehicles designed to provide steady streams

of income.  In reality, throughout most of that period, West End faced deepening financial

problems stemming from Landberg's failed investment strategies.  Starved for cash to meet

obligations of the West End funds or various personal needs, Landberg misused investor assets,

fraudulently obtained over $8.5 million from WestLB AG ("WestLB"), a German bank that

provided loans to finance certain investments by West End, and used millions of dollars from an

interest reserve account for unauthorized purposes.  Landberg used substantial amounts of the

2

fraudulently obtained loan proceeds to make distributions to certain West End fund investors, thereby sustaining the illusion that West End's investments were performing well. At the same time that he was committing these frauds, Landberg misappropriated at least $1.5 million for himself and his family, including Crandall and L/C Family.

3.  Gould and Barsuk knew, or were reckless in not knowing, that Landberg was defrauding WestLB by, among other things, misusing funds in the interest reserve account. They nevertheless participated in the fraud by facilitating Landberg's misappropriations from that account. Kramer knew, or was reckless in not knowing, that West End faced severe financial problems and had difficulty obtaining sufficient financing to sustain its investment strategy. Nevertheless, Kramer failed to disclose those material facts to investors as he continued to market the funds to new and existing investors through April 2009.

4.  During 2009 alone, West End raised over $4.7 million from investors by touting false positive returns, while concealing its failed investment strategy, its cash flow problems, Landberg's fraud in connection with the $8.5 million in loans, and the misuse of investor assets.

5.  As a result of the fraudulent scheme, Defendants jeopardized the West End funds' access to financing and its ability to fulfill fund obligations. WestLB refused to extend additional loans to West End. Another German bank, DZ Bank AG ("DZ Bank"), which provided loans to a West End fund, issued a notice of default.

## VIOLATIONS AND RELIEF SOUGHT

6.  By virtue of the conduct alleged herein:

a.  Landberg, Kramer, Gould, WEFA, WECM, and Sentinel, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 17(a) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b.    Barsuk, directly or indirectly, singly or in concert, has engaged in acts, practices, and courses of business that constitute aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

c.    Landberg, WEFA, WECM, and Sentinel, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

d.    Kramer, Gould, and Barsuk, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

e.    Landberg, WEFA, and WECM, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 206(4)-8];

f.    Kramer, Gould, Barsuk, and Sentinel, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute aiding and abetting violations of Section 206(4) of the Advisers

Act [15 U.S.C. §§ 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R.

§ 206(4)-8]; and

g.      Crandall and L/C Family obtained ill-gotten proceeds of Defendants'

fraudulent conduct that they have no legitimate claim to retain.

7.      Unless permanently restrained and enjoined, Defendants will again engage in the

acts, practices, transactions and courses of business set forth in this Complaint and in acts,

practices, transactions and courses of business of similar type and object.

8.      The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act

[15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking

a final judgment: (i) restraining and permanently enjoining Defendants from engaging in the acts,

practices, transactions, and courses of business alleged herein; (ii) requiring Landberg, WEFA,

WECM, and Sentinel, on a joint and several basis, to disgorge the ill-gotten gains they received,

if any, as a result of their violations, and to pay prejudgment interest thereon; (iii) requiring

Kramer to disgorge the ill-gotten gains he received, if any, as a result of his violations, and to

pay prejudgment interest thereon; (iv) imposing civil monetary penalties upon Landberg,

Kramer, Gould, and Barsuk pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)],

and/or Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and/or Section 209(e) of the

Advisers Act [15 U.S.C. § 80b-9(e)]; (v) requiring the Relief Defendants to disgorge any and all

ill-gotten gains they received, and to pay prejudgment interest thereon; and (vi) appointing an

independent monitor with respect to WEFA, WECM, and Sentinel.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of

the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], Sections 21(d) and 27 of the Exchange Act

[15 U.S.C. §§ 78u(d) and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§

80b-9 and 80b-14].

10.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of

the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and

Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain of the transactions, acts, practices

and courses of business alleged in this Complaint occurred in the Southern District of New York.

Specifically, Defendants operated from West End's office, which is located in New York, New

York.

11.     In connection with the transactions, acts, practices and courses of business alleged

in this Complaint, Defendants, directly or indirectly, singly or in concert, have made use of the

means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a

national securities exchange.

## DEFENDANTS AND RELIEF DEFENDANTS

12.     **Landberg**, age 58, resides in New York, New York.  Landberg is the former chief

executive of West End and was primarily responsible for managing all West End funds prior to

June 2009.  Landberg was also the President and Chief Compliance Officer of Sentinel.

13.     **Kramer**, age 59, resides in Wilmington, Delaware.  Kramer was the President

and Chief Operating Officer of West End from at least 2006 through June 2009.

6

14.   **Gould**, age 45, resides in Plainview, New York. Gould is a certified public accountant licensed in New York, and was the Chief Financial Officer of West End from September 2006 through May 2009.

15.   **Barsuk**, age 59, resides in Tenafly, New Jersey. Barsuk was the Controller of West End from January 2006 to at least May 2009.

16.   **WEFA** is a Delaware Limited Liability Company formed in 2000 with its principal place of business in New York, New York. WEFA served as investment manager and/or general partner to various West End limited partnerships. WEFA is wholly-owned by L/C Family. Neither WEFA nor its securities is registered with the Commission.

17.   **WECM** is a Delaware Limited Liability Company formed in 2006 with its principal place of business in New York, New York. WECM served as the general partner to at least one West End limited partnership. At all relevant times, WEFA and WECM did business as West End. Neither WECM nor its securities is registered with the Commission.

18.   **Sentinel** is a New York corporation formed in 1986 with its principal place of business in New York, New York. Sentinel, an affiliate of West End, has been registered with the Commission as an investment adviser since 1986. Landberg served as Sentinel's President and Chief Compliance Officer. Landberg and Crandall co-owned the firm through L/C Family.

19.   **Crandall**, age 68, resides in New York, New York. Crandall, a Relief Defendant, is Landberg's wife.

20.   **L/C Family**, a Relief Defendant, is a New York domestic limited partnership with its principal place of business in New York, New York. L/C Family, which is comprised solely of Landberg and Crandall, is the entity through which Landberg and Crandall owned WEFA and Sentinel. L/C Family is not registered with the Commission.

## RELATED PARTIES

21.     **West End/Mercury Short Term Mortgage Fund (the "Hard Money Fund")** is a Delaware limited partnership formed in 2007 with its principal place of business in New York, New York.  Landberg and Kramer marketed the Hard Money Fund to investors as a safe investment fund whose assets would be primarily invested in short-term commercial real estate mortgages.

22.     **West End Mortgage Finance Fund I LP (the "Franchise Fund")** is a Delaware limited partnership formed in 2004 with its principal place of business in New York, New York. Landberg and Kramer marketed the Franchise Fund to investors as a safe investment fund whose assets would be primarily invested in loans to restaurant franchisees.

23.     **West End Income Strategies Fund LP (the "Income Strategies Fund")** is a Delaware limited partnership formed in 2007 with its principal place of business in New York, New York.  The Income Strategies Fund was a fund-of-funds set up primarily as a conduit for investment in the Hard Money Fund and the Franchise Fund.

## FACTS

24.     In the early 2000s, Landberg managed assets of clients through the registered investment adviser Sentinel, which he owned and controlled.  At various times, Sentinel managed as many as 70 separate client accounts, including various Individual Retirement Accounts.  Beginning in at least 2003, Landberg created, and solicited investors for, a series of unregistered, private limited partnerships aimed at generating returns for investors by following a variety of investment strategies.

25.     Over time, Landberg transferred many of his Sentinel clients' assets into these unregistered limited partnerships.  By 2008, Landberg had invested the majority of these clients'

assets in three funds that he created at the end of 2007 and the beginning of 2008. In two of these funds, the Franchise Fund and the Hard Money Fund, Landberg used investor money and loans from financial institutions to invest in the restaurant franchise and real estate markets. The third fund, the Income Strategies Fund, was a fund-of-funds that invested in both the Franchise Fund and the Hard Money Fund. As of May 2009, the West End funds had approximately 94 investors who invested a total of approximately $66.7 million in the funds.

West End's Leveraged Funds

26.     Landberg designed the Hard Money Fund to achieve short-term, high-yield interest income through participations in short-term commercial real estate mortgage loans. The fund targeted annual returns of eleven to thirteen percent. A "hard money" loan is typically a short-term loan to a real estate developer, for the purpose of funding construction or other aspects of an ongoing real estate investment. Such loans are typically collateralized by the property under development.

27.     From approximately December 2007 to May 2009, a German bank, WestLB, provided eighty percent of the capital for the loans that the Hard Money Fund made to real estate developers. Hard Money Fund investors contributed the remaining twenty percent.

28.     Income earned from the Hard Money Fund's investments was required to first be used to repay the eighty percent loan from WestLB, with any remainder (after WECM's fees and expenses) distributed to West End investors.

29.     The Hard Money Fund's limited partnership agreement specifically provided that the General Partner could not do any act which would make it impossible to carry on the ordinary business of the Partnership.

9

30.     WEFA served as the investment manager to the Hard Money Fund and was entitled to an annual two percent management fee based on the assets invested by the fund's limited partners. WECM served as the fund's general partner and was entitled to an annual fifteen percent "carried interest allocation" of any net profit of the fund.

31.     Landberg was primarily responsible for the Hard Money Fund's investment decisions. Marketing materials for the Hard Money Fund advertised returns with "low levels of volatility" and steady growth over time.

32.     Landberg signed a "Credit and Security Agreement" (the "Agreement") that set forth the terms of WestLB's loans to the Hard Money Fund. The Agreement provided for the creation of an "Interest Reserve Account." Certain Hard Money Fund agreements with real estate developers required the developers to deposit money into the Interest Reserve Account, a means of reducing some of WestLB's risks because the bank was authorized to draw upon funds in the account in the event that the borrower missed an interest payment. The Agreement required West End to maintain the account in trust for WestLB and prohibited the commingling of funds in the Interest Reserve Account with any other account.

33.     In addition to signing the Agreement, Landberg acknowledged in a June 2008 email that he was not supposed to "touch" the money in the Interest Reserve Account.

34.     Landberg designed the Franchise Fund to generate returns primarily through commercial loans to restaurant franchisees, including franchisees affiliated with Yum! Brands and Burger King Corporation. These loans were collateralized by the underlying franchise property and equipment. Marketing materials for the Franchise Fund promoted the fund's objective "to achieve consistent levels of current income and stability of principal" and advertised annual returns of seven to nine percent.

35.     Similar to the Hard Money Fund, the Franchise Fund obtained eighty percent of its capital from a German bank, DZ Bank, with the remaining twenty percent coming from West End investors.

36.     The Franchise Fund was required to use income earned from its investments first to repay the eighty percent loan from DZ Bank, with the remainder (after WEFA's fees and expenses) distributed to investors.

37.     WEFA served as the Franchise Fund's general partner and was entitled to collect an annual one percent fee based on the percentage of gross assets (including loan proceeds) of the Franchise Fund.  Landberg was primarily responsible for investment decisions made on behalf of the Franchise Fund.

38.     Landberg designed the Income Strategies Fund as a fund-of-funds that invested in the Franchise and Hard Money Funds.  The Income Strategies Fund offering materials provided that the fund's objective was "to achieve superior returns with relatively low volatility." Marketing materials for the Fund stated that the fund was designed to generate a "stable stream of income" of "9 to 11% annually" with "low levels of volatility."

39.     WEFA served as the Income Strategies Fund's general partner.  Landberg controlled the fund's day-to-day operations and was responsible for its investment decisions. The Income Strategies Fund was charged the same management and incentive fees that the Hard Money Fund and Franchise Fund charged to their other investors.

Landberg Defrauds West End Investors

40.     Prior to 2008, Landberg created and managed over 30 different funds and related investment entities, with names like the Special Opportunity Fund and the Absolute Return Fund. By early 2008, the primary investments of these other funds consisted of loans to, and investments in, the Franchise Fund and Hard Money Fund.

41.     In 2008, as a result of Landberg's mismanagement, West End's overall financial condition was poor and worsening. Only the Franchise Fund and the Hard Money Fund had any potential of earning positive returns for investors, and these returns were not enough to satisfy West End's obligations, such as paying distributions to investors in those funds and the firm's operating expenses. In addition, the Franchise Fund had contractual commitments to fund loans to certain franchisees. However, Landberg did not have, and often could not obtain, a sufficient stream of investor capital with which to fund such loans.

42.     To deal with these shortfalls, Landberg at first improperly treated all of the funds under his management as one large pool of cash, using the commingled assets to satisfy obligations as they occurred – regardless of which fund incurred the obligation. Barsuk, who was West End's Controller and had control over the fund accounts, facilitated Landberg's improper use of fund assets by moving money between various funds, sometimes at Landberg's direction.

43.     Beginning in at least April 2008, Landberg orchestrated a further fraud to deal with West End's financial difficulties. Landberg used the Interest Reserve Account, which was to be held for the benefit of WestLB alone, as just another source of cash to meet any of the financial needs of West End. Landberg took money from the Interest Reserve Account as needed. For example, on at least two occasions, Landberg, Barsuk and Gould used Interest

Reserve Account funds to cover overdrafts in other West End fund accounts. Specifically, in April and again in May 2008, Barsuk transferred approximately $500,000 from the Interest Reserve Account to cover overdrafts in other West End accounts. On another occasion, Landberg and Gould used Interest Reserve Account funds to make a $1.5 million investment in a Florida bank.

44.    Landberg, Barsuk and Gould concealed these improper withdrawals by transferring money into the Interest Reserve Account at the end of each month – when WestLB drew upon funds in the account – so that WestLB would not know of the pilfering that occurred from the account. The money used to cover the shortfall in the Interest Reserve Account came from wherever Landberg, Barsuk and Gould could find it, including various fund accounts. For example, to cover anticipated shortfalls in the Interest Reserve Account in July 2008, Landberg and/or Barsuk transferred approximately $1.755 million into that account from ten fund accounts, including accounts of the Finance Fund and the Income Strategies Fund.

45.    A forensic analysis completed at West End's direction in September 2009 found approximately $3.3 million in improper withdrawals from the Interest Reserve Account from January 2008 to April 2009. As of May 2009, after Landberg left West End, approximately $400,000 was missing from the account and had to be repaid by West End.

46.    In addition, Landberg submitted three fraudulent loan requests to WestLB in 2009 and obtained a total of over $8.5 million. In January 2009, Landberg submitted a request to WestLB on behalf of the Hard Money Fund for a loan of $3.948 million. Landberg misrepresented to WestLB that the Hard Money Fund would use the proceeds to fund a loan to develop real property on Long Island. However, upon receiving the $3.948 million loan, Landberg misappropriated most of the money and used it for the benefit of other funds and for

himself.  He used $2 million of the loan proceeds to fund commitments of the Franchise Fund,
paid $350,000 to investors as purported earnings on their investments, and diverted over
$100,000 to his own personal accounts.

47.     In February 2009, Landberg submitted a second fraudulent loan request to
WestLB on behalf of the Hard Money Fund for a $3.08 million loan.  Landberg misrepresented
to WestLB that the Hard Money Fund would use the proceeds to fund a loan to develop
commercial real estate in Florida.  Upon receipt of this second loan from WestLB, Landberg
again diverted the loan proceeds for various other purposes, including an approximate $2 million
mortgage payment on an unrelated property.

48.     In April 2009, Landberg submitted a third fraudulent loan request to WestLB, this
time for $1.68 million.  Landberg misrepresented to WestLB that the Hard Money Fund would
use the  proceeds to fund a loan to develop commercial real estate in Alabama.  Instead of using
the proceeds to make the loan, Landberg diverted the entire proceeds to fund a loan made by the
Franchise Fund.

49.     From April 2008 to May 2009, Landberg also ignored the investment parameters
of the Income Strategies Fund and treated investments in that fund as another piggy bank.
Landberg represented to investors that the Income Strategies Fund was a fund-of-funds that
would, at least initially, invest in the Hard Money Fund and Franchise Fund.  Instead, Landberg
used money in the Income Strategies Fund for whatever purpose he wished.

50.     For example, in April 2008, West End's CFO Gould emailed Landberg that the
Income Strategies Fund had lent the West End Special Opportunities Fund ("WESOF"), one of
Landberg's older funds, approximately $1.8 million.  Gould informed Landberg that this loan to
WESOF did not comply with the stated investment objectives and parameters of the Income

Strategies Fund. According to Gould's email, "[the Income Strategies Fund] should be making investments in [the Franchise Fund] as part of the objective of the fund." Gould was aware that Landberg had regularly orchestrated a number of transactions between the various West End funds, so Gould designed a way for West End to, in Gould's words, "clean up" its accounting for certain related party loans. Gould's efforts facilitated Landberg's fraud by disguising certain improper transactions between the West End funds.

51.     In addition, in April 2009, Landberg misappropriated money from the Income Strategies Fund bank account to make a $50,000 investment in a public company with which Landberg had substantial ties.

52.     A forensic analysis completed at West End's direction in September 2009 found at least $2.5 million in net transfers out of the Income Strategies Fund bank account to other West End accounts unrelated to the Hard Money Fund or the Franchise Fund.

53.     Landberg's fraud enabled West End to continue to market the West End funds to new investors throughout 2008 and 2009, while sustaining the illusion that the returns generated from the funds' investments were in line with defendants' representations to investors. Hard Money Fund offering materials provided to investors in that time period specifically stated that money borrowed from WestLB would only be used to fund investments made by the Hard Money Fund (and certain reserve and fee obligations related to such investments). Thus, Landberg had no authority to use loans obtained from WestLB for any other purpose, such as the payment of distributions to investors or the funding of investments by the Franchise Fund.

54.     In the Hard Money Fund Limited Partnership Agreement, Landberg, on behalf of WECM, also promised investors not to do any act "which would make it impossible to carry on

15

the ordinary business" of the Hard Money Fund, a promise he reneged on as soon as he began plundering the Interest Reserve Account.

55.     Further, certain marketing materials that West End sent to its fund investors falsely showed that the West End funds were earning steady monthly returns. For example, marketing materials sent to investors in March 2009 showed steady monthly returns for the West End funds for the period January 2009 of 1.09% for the Hard Money Fund and 0.81% for the Income Strategies Fund. These returns were false and misleading because they did not result from successful investment but rather were obtained only because Landberg diverted proceeds of a loan he had fraudulently obtained from WestLB. Specifically, Landberg used $350,000 from a $3.9 million loan from WestLB in January 2009 to pay investor distributions. Gould aided in the preparation of these marketing materials.

56.     Landberg also informed multiple investors that West End's goal was preservation of investor capital. He emphasized how West End's investments were not tied to the stock market and thus investor money was safe, when in reality he was commingling investor funds and using them for inappropriate purposes.

57.     As a result of West End's ongoing solicitation efforts, nineteen investors invested at least $4.7 million in the Income Strategies Fund in 2009.

58.     Landberg, Crandall, and their limited partnership L/C Family personally benefitted from the fraud. Between January 2008 and April 2009 alone, Landberg, Crandall, and L/C Family received at least $1.5 million from the West End funds. Landberg and Crandall used this money to enjoy a lavish lifestyle, including a luxury apartment on Fifth Avenue in Manhattan, a house in the Hamptons, an apartment in Palm Beach, and several luxury automobiles.

Gould Participated in and Barsuk Facilitated Landberg's Fraudulent Scheme

59.     Gould, a certified public accountant since 1991, served as West End's Chief

Financial Officer and reported directly to Landberg beginning in September 2006.  Gould was

responsible for the content of account statements sent to West End investors and for certain other

communications designed for West End investors, such as marketing materials summarizing the

monthly performance of the Hard Money Fund, Franchise Fund, and Income Strategies Fund.

60.     Throughout the period of Landberg's fraud in 2008 and 2009, Gould issued

account statements to West End investors that Gould knew, or was reckless in not knowing,

showed investment returns that were false and not solely the result of investments made on

behalf of the respective West End fund.  As West End's CFO, Gould had access to, and

responsibility for maintaining, all West End financial records.  Gould was therefore aware that

the returns on investments by West End funds were not adequate to meet the funds' obligations,

and he was aware of and complicit in the steps West End took to conceal this fact from investors.

61.     By April 2008, Gould knew, or was reckless in not knowing, that Landberg was

plundering the Interest Reserve Account.  Gould at times directed money transfers to and from

the Interest Reserve Account.

62.     In addition, in February or March 2009, Landberg caused West End to make an

illicit $1.5 million investment in a Florida-based bank – an investment that bore no connection to

the stated investment objectives of the Franchise Fund and the Hard Money Fund, that was

outside the scope of the investments described in the funds' offering documents, and that was not

otherwise disclosed to or authorized by the fund investors.

63.     The Hard Money Fund's limited partnership agreement prohibited the general

partner from taking any actions that would make it impossible to carry on the ordinary business

17

of the partnership. Landberg breached this provision by using money from the Interest Reserve Account and by fraudulently obtaining loans from WestLB as described above, thereby violating the Hard Money Fund's agreements with WestLB, which made it impossible to carry on the ordinary business of the partnership. In the case of the investment in the Florida-based bank, Gould took money from the Interest Reserve Account to make the investment, and then disguised the fact that the money had come from that account by, in Gould's words, "reclassifying" the improper loan as an investment by the Hard Money Fund in the Franchise Fund.

64.     Although West End's investment in the bank ended up on the Franchise Fund books, the certificate issued to document the investment was issued to Landberg or Crandall personally, not to the Franchise Fund, thus calling into doubt the Franchise Fund's right to its investment. West End's outside auditor for the Franchise Fund later told Gould that he was not comfortable with the method by which Gould accounted for the purported investment on behalf of the Franchise Fund in the Florida-based bank.

65.     Gould also knew, or was reckless in not knowing, that Landberg was using investments in the Income Strategies Fund for purposes other than those set forth in that fund's offering documents. On at least one occasion, Gould devised an accounting treatment to help Landberg disguise his misuse of Income Strategies Fund investments. Gould conceived a transaction involving the Franchise Fund and a third West End fund to "clean up" a "related party loan" that the Income Strategies Fund had made to the third West End fund.

66.     In addition, Gould maintained the Income Strategies Fund balance sheet which shows for December 2008 over $11 million in interparty receivables, including investments in other West End funds such as the Absolute Return Fund I (over $2.5 million), the Fixed Income

18

Fund (over $1.9 million), and the Special Opportunity Fund (over $2.5 million). These interparty receivables were improper because West End represented to investors that the Income Strategies Fund was going to invest in the Franchise Fund and Hard Money Fund, not in any other West End funds.

67.     Barsuk served as West End's Controller from January 2006 through at least May 2009. Beginning in at least April 2008, Barsuk knew, or was reckless in not knowing, that West End faced constant cash shortfalls and that Landberg was tapping funds in the Interest Reserve Account to meet these financial needs. For example, in an August 2008 email, Barsuk informed Landberg that they needed to put over $1.25 million back into the Interest Reserve Account by the end of the month. Barsuk at times transferred money from the Interest Reserve Account on her own initiative to pay obligations due in other West End accounts.

68.     Gould and Barsuk also knew, or were reckless in not knowing, that Landberg was treating West End as his personal piggy bank. At times, Barsuk facilitated Landberg's use of investor money to cover his personal obligations. On April 27, 2009, mere days before Landberg's fraud vis-à-vis WestLB came to light, Landberg asked Barsuk to confirm that his "personal [American Express] bills are current." Barsuk responded that Landberg had over $25,000 in personal bills outstanding and asked if he wanted that paid. Landberg instructed her to pay the bill, and Barsuk took money from a West End account to pay a portion of the bill.

69.     Landberg directed West End to pay Gould and Barsuk six-figure annual salaries.

Kramer Fails to Disclose West End's Fraudulent Practices to Investors

70.     Kramer served as West End's Chief Operating Officer from 2006 through June 2009. In that capacity, from 2007 through 2009 Kramer solicited and obtained at least $25

19

million in investor capital for the West End funds. By at least July 2008, however, Kramer was aware that the West End funds were not performing as he and West End represented to investors.

71.     Landberg made Kramer aware in July 2008 that he was tapping the Interest Reserve Account to satisfy West End's cash shortfalls. For example, Landberg emailed Kramer "we are going to be short this month [in the Interest Reserve Account] and that cannot happen." Tellingly, Landberg added that Kramer was "acting like an ostrich." Kramer responded that he was not: "we are ALL acutely aware of the deadline looming and know what needs to be done. [sic]" Kramer informed Landberg that he was talking to "EVERYONE I know this week [sic]" to try to raise money. Landberg was insistent: "We have to raise $2m. Do you understand the consequences of failing to meet that number?? That is where we are not on the same page. [sic]" Kramer responded by asking for the "shortfall amount." Landberg's reply demonstrates that Kramer knew, or was reckless in not knowing, about Landberg's misuse of funds from the Interest Reserve Account: "I am not ranting. I am trying to get you to focus uber clearly on reality. We need exactly $1.7m for the interest reserve account. Is that clear enough? If we fail, we are dead meat."

72.     Again in August 2008, in connection with asking Kramer to sign a personal guarantee for a loan that West End was obtaining, Landberg informed Kramer that the "[l]oan proceeds are net net to replace the interest reserve that was used to fund loans."

73.     In December 2008, Landberg advised Kramer that "we need a plan [because] [t]he inflow is not keeping up with our obligations." The same month, Landberg and Kramer signed personal guarantees for a $500,000 unsecured bridge loan that Landberg obtained from Herald National Bank ("Herald") to help West End pay various operating expenses.

20

74.    All the while, Kramer continued to solicit investors for the West End funds, using marketing materials touting the funds' steady monthly returns, without disclosing the firm's ongoing financial problems or that West End was going to use their investments to repay money that Landberg unlawfully took from the Interest Reserve Account. In December 2008, Kramer told an investor seeking to withdraw her funds that West End had a reserve to pay investor redemptions, when Kramer knew, or was reckless in not knowing, that no such reserve existed.

75.    From January 24 to March 2, Kramer solicited $313,000 in investments for West End. His solicitation efforts continued despite an email Kramer received from Landberg on February 23, 2009 that "the consequences of not dealing with the absolute minimum we need to fund comittements [sic] is going to be DEVASTATING."

76.    Kramer's solicitation efforts continued virtually until West End collapsed. For example, on March 20, 2009, the same day that Landberg emailed Kramer "we are in deep blankin s..t [sic]," Kramer responded that he was "meeting with a prospect here this evening." Kramer subsequently appeared on a Fox Business News television program on April 7, 2009 and trumpeted the safety of West End's investments.

77.    In addition to his failure to disclose to West End funds' investors the true state of the funds, Kramer attempted to withdraw his personal investments in West End at the same time that Landberg's loan fraud vis-à-vis WestLB came to light. Based on West End records, Kramer and his wife had approximately $2.3 million invested in various West End funds as of April 2009. Kramer learned about Landberg's actions with respect to WestLB on or about April 29, 2009. On the same day, Kramer sought to withdraw two of his investments, and the remaining four investments on May 6, 2009. Although he was not able to actually withdraw his

investments, Kramer sought to escape West End well in advance of virtually all the company's
outside investors.

78.     Kramer benefitted from his fraud by earning a salary of at least $250,000 in 2008
and 2009.

## The Fraud Cripples West End

79.     Upon learning in May 2009 of Landberg's fraudulent actions, WestLB issued a
notice of default and cut off West End's access to returns on the mortgage loans made out of the
Hard Money Fund.  Soon after, DZ Bank took similar steps with respect to the Franchise Fund.
The actions of WestLB and DZ Bank interrupted the stream of interest income that had been
flowing to some West End investors.

## Efforts to Determine and Distribute Investor Assets

80.     Of the various Landberg-directed investments, only the Franchise Fund and the
Hard Money Fund are currently generating any significant cash flow, and that cash flow is
dedicated to interest and other payments to lenders and for West End's operating expenses.  West
End estimates that as of December 2010 the funds' net value was approximately $40 million,
compared to approximately $66 million in net principal received from investors.  To date, West
End has not told investors when distributions will resume; how much, if any, investor principal
will be returned; or when either of those events will happen.

81.     Since June 2009, after Landberg's fraudulent activities in connection with the
West End funds came to light, West End has been operated by a new general partner.  Certain
West End investors have complained that the new (current) general partner has: (i) mismanaged
the funds since Landberg was replaced; (ii) paid himself an excessive annual salary; (iii) wasted

22

money on legal expenses; (iv) not provided timely access to the funds' books and records; and

(v) not provided timely information about account balances or holdings, among other concerns.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Landberg, Kramer, Gould, WEFA, WECM, and Sentinel)

82.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 81.

83.     Landberg, Kramer, Gould, WEFA, WECM, and Sentinel in the offer or sale of

securities, by use of the means or instruments of transportation or communication in interstate

commerce, or by the use of the mails, directly or indirectly, singly or in concert, with scienter

have:

      (a) employed or are employing devices, schemes or artifices to defraud;

      (b) obtained money or property by means of untrue statements of material fact or

         by omitting to state material facts necessary in order to make the statements

         made, in light of the circumstances under which they were made, not

         misleading; or

      (c) engaged in acts, transactions, practices and courses of business which operated

         or would have operated as a fraud or deceit upon purchasers of securities.

84.     By reason of the foregoing, Landberg, Kramer, Gould, WEFA, WECM, and

Sentinel, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of

the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**Direct Violations (Landberg, Kramer, Gould, WEFA, WECM, and Sentinel) and Aiding and Abetting Violations (Barsuk) of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

85.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 84.

86.     Landberg, Kramer, Gould, WEFA, WECM, and Sentinel, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, directly or indirectly, singly or in concert, with scienter, have:

> (a) employed or are employing devices, schemes or artifices to defraud;
>
> (b) made untrue statements of material fact or have omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>
> (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

87.     The misstatements and omissions of fact detailed above were material.

88.     By reason of the foregoing, Landberg, Kramer, Gould, WEFA, WECM, and Sentinel, directly or indirectly, violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

89.     By facilitating Landberg's looting of the Interest Reserve Account and his misuse of investor assets, Barsuk, by use of the means or instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted Landberg, Gould, WEFA, WECM, and Sentinel in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

**Direct Violations (Landberg, WEFA, WECM, and Sentinel) and Aiding and Abetting Violations (Kramer, Gould, and Barsuk) of Sections 206(1) and 206(2) of the Advisers Act**

90.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 89.

91.    At all relevant times, Landberg, WEFA, WECM, and Sentinel acted as investment advisers, as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], to the West End funds and also to certain investors in those funds.

92.    Landberg, WEFA, WECM, and Sentinel, by engaging in the acts and conduct alleged above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities, with scienter, have:

      (a) employed devices, schemes, or artifices to defraud investors or prospective investors; or

      (b) engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon investors or prospective investors.

93.    By reason of the foregoing, Landberg, WEFA, WECM, and Sentinel, directly or indirectly, violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

94.    By soliciting West End investors by making untrue statements of material facts, or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, Kramer, by use of the means or

instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted

Landberg, WEFA, WECM, and Sentinel in their violations of Sections 206(1) and 206(2) of the

Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

95.     By facilitating Landberg's looting of the interest reserve account and his misuse

of investor assets, Gould and Barsuk, by use of the means or instrumentalities of interstate

commerce, or of the mails, with scienter, aided and abetted Landberg, WEFA, WECM, and

Sentinel in their violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-

6(1), 80b-6(2)].

## FOURTH CLAIM FOR RELIEF

### Direct Violations (Landberg, WEFA, and WECM) and Aiding and Abetting Violations (Kramer, Gould, Barsuk, and Sentinel) of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder

96.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 95.

97.     At all relevant times, Landberg, WEFA, and WECM, acted as investment

advisers, as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], to the

West End funds and also to certain investors in those funds.

98.     Landberg, WEFA, and WECM, by engaging in the acts and conduct alleged

above, directly or indirectly, through use of the means or instruments of transportation or

communication in interstate commerce, or by the use of the mails, and while engaged in the

business of advising others for compensation as to the advisability of investing in, purchasing, or

selling securities, with scienter, have:

> (a) engaged in acts, practices, and courses of business which were fraudulent,
>
> deceptive, or manipulative; or

26

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in a pooled investment vehicle.

99.   By reason of the foregoing, Landberg, WEFA, and WECM, directly or indirectly, violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

100.   By soliciting West End investors by making untrue statements of material facts, or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, Sentinel and Kramer, by use of the means or instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted Landberg, WEFA, and WECM in their violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

101.   By facilitating Landberg's looting of the interest reserve account and his misuse of investor assets, Gould and Barsuk, by use of the means or instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted Landberg, WEFA, and WECM in their violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## FIFTH CLAIM FOR RELIEF
### (Relief Defendants Louise Crandall and L/C Family Limited Partnership)

102.   The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 101.

103.     Crandall and L/C Family received, directly or indirectly, funds and/or other assets from the Defendants, which either are the proceeds of, or are traceable to the proceeds of, the unlawful activities alleged herein and to which they have no legitimate claim.

104.     Crandall and L/C Family obtained the funds and assets as part of and in furtherance of the securities violations alleged herein and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds and assets, and accordingly, the Relief Defendants have been unjustly enriched by ill-gotten gains.

105.     The Commission is entitled to an order requiring that Crandall and L/C Family disgorge these funds and assets plus prejudgment interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court issue a Final Judgment:

## I.

Permanently restraining and enjoining:

(a)  Landberg, Kramer, Gould, WEFA, WECM, and Sentinel, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(b)  Landberg, Kramer, Gould, Barsuk, WEFA, WECM, and Sentinel, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

(c) Landberg, Kramer, Gould, Barsuk, WEFA, WECM, and Sentinel, and their agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R.§ 275.206(4)-8].

## II.

Ordering Landberg, WEFA, WECM, and Sentinel, jointly and severally liable for disgorgement of any and all ill-gotten gains they received as a result of their violations of the federal securities laws, plus prejudgment interest thereon;

## III.

Ordering Kramer liable for disgorgement of any and all ill-gotten gains he received as a result of his violations of the federal securities laws, plus prejudgment interest thereon;

## IV.

Ordering Crandall and L/C Family liable for disgorgement of any and all ill-gotten gains they received as a result of Defendants violations of the federal securities laws, plus prejudgment interest thereon;

## V.

Ordering Landberg, Kramer, and Gould to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

## VI.

Ordering Landberg, Kramer, Gould, and Barsuk to pay civil money penalties pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the

Advisers Act [15 U.S.C. § 80b-9(e)];

## VII.

Ordering that an independent monitor be appointed with respect to WEFA, WECM, and

Sentinel; and

## VIII.

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       January 20, 2011

By _____
   George S. Canellos
   Regional Director
   Attorney for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
   New York Regional Office
   3 World Financial Center, Suite 400
   New York, New York 10281
   (212) 336-0589
   (Howard Fischer, Senior Trial Counsel)

Of Counsel:
David Rosenfeld
Ken C. Joseph
Howard Fischer
Cynthia A. Matthews
Matthew J. Watkins