| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK**<br>------------------------------------------------------------x<br>In re:<br><br>**WEST END FINANCIAL ADVISORS LLC**<br>*et al.*,<br><br>                            Debtors.<br>------------------------------------------------------------x | Hearing Date: May 24, 2011<br>  Hearing Time: 10:00 a.m.<br><br>Chapter 11<br><br>Case Nos. 11-11152 (SMB)<br>through 11-11167 (SMB)<br>(Jointly Administered) |

## RESPONSE OF ROBINSON BROG LEINWAND GREENE GENOVESE AND GLUCK PC TO THE UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' APPLICATION TO RETAIN ROBINSON BROG LEINWAND GREENE GENOVESE AND GLUCK P.C. AS ATTORNEYS FOR THE DEBTORS

West End Financial Advisors LLC ("WEFA") and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Trustees")[1], by its undersigned proposed counsel, as and for its response (the "Response") to the Objection of the United States Trustee to the Debtors' Application for Authorization to Retain Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("RB") as counsel (the "Objection"), respectfully set forth and allege as follows:

**PRELIMINARY STATEMENT**

---

[1] The estates to be substantively consolidated are the following: West End Financial Advisors LLC (Case No. 11-11152); Amagansett Realty SPV 1 LLC (Case No. 11-11167); Benedek Development Group, LLC (Case No. 11-11155); L/C Family Limited Partnership (Case No. 11-11157); Sentinel Investment Management Corp.(Case No. 11-11153); SIMCO SPV 1 LP (Case No. 11-11158); West End Absolute Return Fund I, LP (Case No. 11-11161); West End Capital Management LLC (Case No. 11-11154); West End Fixed Income Partners LP (Case No. 11-11159); West End Income Strategies Fund LP (Case No. 11-11160); West End Mortgage Finance Fund I LP (Case No. 11-11162); West End Private Client Fund L.P.(Case No. 11-11163); West End Real Estate Fund 1 LP (Case No. 11-11164); West End Special Opportunity Fund II, LP (Case No. 11-11166); West End Special Opportunity Fund, LP (Case No. 11-11165); West End/Mercury Short-Term Mortgage Fund, LP. (Case No. 11-11156).

{00531998.DOC;1 }

1. The Objection contends that RB is ineligible to be retained as Debtors' bankruptcy counsel under section 327(a) of the Bankruptcy Code because RB suffers from a disabling conflict of interest. The Objection also seeks additional disclosures.

2. None of the issues raised by the Objection precludes RB's retention as Debtors' counsel. Certainly, the fact that RB represented the Debtors pre-petition, does not, in and of itself, preclude its employment as Debtors' counsel. *See* 11 U.S.C. § 1107(b).[2] Fees paid to RB have already been scrutinized by the Debtors' management and the D&O insurer. Any further scrutiny of RB's fees can be dealt with through a review of these issues by one of three possible independent parties that will be involved in this case, counsel for the newly formed creditors committee, the plan administrator that will be retained in connection with the Debtors' plan, or the Debtors can retain conflicts counsel specifically to review the pre-petition fees and any alleged preferential payments RB may have received. See, e.g., *In re Enron Corp.*, 2002 WL 32034346, *11 (Bankr. S.D.N.Y. 2002) (listing conflicts counsel as a "procedure to address conflict of interest issues"), aff'd *In re Enron Corp.*, 2003 WL 223455 (S.D.N.Y. 2003); See also, *In re Cook*, 223 B.R. 782, 791 (10th Cir. B.A.P. 1998) (hiring conflicts counsel as effective curative measure at the beginning of the case); *In re O. P. M. Leasing Services, Inc.*, 16 B.R. 932, 939 (Bankr.N.Y.1982)(citing In the Matter of G.E.C. Secs., Inc., 331 F.2d 655, 656 (2d Cir. 1964) (suggesting that special counsel should be retained in the event a disabling conflict may arise); *Katz v. Kilshemer*, 327 F.2d 633, 636 (2d. Cir. 1964) (same).

3. To the extent that there is a determination by an independent third party that RB was the recipient of either "excessive fees" or a preferential payment, RB will agree not to

---

[2] Section 1107(b) provides that "Notwithstanding section 327 (a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

{00531998.DOC;1}

2

challenge the finding of such third party on this issue, to disgorge any excessive fees or preferences and waive any claim related thereto. RB believes that its agreement in this respect fully ameliorates any issue that may be raised by such a claim. *See,e.g., In re Enron Corp.*, No. 2003 WL 223455, * 9 (S.D.N.Y. Feb. 2, 2003) (holding that law firm representing creditors' committee was disinterested despite receipt of potential preferences because law firm waived any rights to challenge examiner's findings of a preference).

4. The right of the debtors to retain the counsel of its choosing is significant and that selection is entitled to deference. As a consequence, disqualification of the Debtors' choice of counsel is a drastic measure and contrary to the public policy favoring the parties right to retain the professionals of their choice. *In re Caldor*, 193 B.R. 165, 170 (Bankr. S.D.N.Y. 1996). Given the importance of the Debtors' right to counsel of its choice and the equally important considerations required to approve the retention of bankruptcy counsel under section 327(a), the Court should strive to accommodate the Debtors' choice of counsel where it can do so with safeguards that do not do violence to the requirements of the Bankruptcy Code. While the Debtors believe that the assertion made by the US Trustee regarding RB's purported conflict of interest do not stand on a firm footing, approving the retention of RB on the conditions outlined herein is appropriate and necessary to the successful prosecution of this chapter 11 case. Accordingly, the retention of RB should be approved.

## RELEVANT FACTUAL BACKGROUND

5. The Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Bankruptcy Court for the Southern District of New York (the "Court") on March 15, 2011 (the "Commencement Date"). The Debtors' cases

{00531998.DOC;1 }

3

are being jointly administered pursuant to an order of this Court. A creditors committee has been appointed by the Office of the United States Trustee.

6. The Debtors have filed an application pursuant to Sections 327(a) and 1107 of the Bankruptcy Code and Bankruptcy Rules 2014(a) and 2016 for Authorization to Employ and Retain Robinson Brog Leinwand Greene Genovese & Gluck P.C. as Attorneys for the Debtors *Nunc Pro Tunc* to the Commencement Date (the "Application"). Application, was accompanied by the Declarations of A. Mitchell Greene of RB in Support of the Debtors' Application Pursuant to Sections 327(a) and 1107 of the Bankruptcy Code for Authority to Employ and Retain RB as Attorneys for the Debtor ("Greene Declaration").

7. The Greene Declaration addressed, *inter alia*, the waiver of fees owed the firm on the Petition Date in the amount of $131,498.50 related to fees incurred in February 2011 and March 1 through March 14, 2011 for matters unrelated to the filing of the Petitions. On May 4, 2011, the United States Trustee for the Southern District of New York (the "UST") filed its Objection.

8. Debtors respectfully refer the Court to the Declaration of Raymond J. Heslin ("Heslin") Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Heslin Decl.") and In Support of First Day Motions, (ECF No. 1)[3] (the "First Day Declaration") and Debtors' Proposed Findings of Fact, (ECF No. 33)(the "Proposed Findings of Fact"), which are incorporated by this reference, for a complete recitation of the extensive background facts of these cases, with which the Court is already familiar.

---

[3] The designation "ECF" indicates the document number of the Court's Electronic Case Filing system, or electronic docket, on the West End Financial Advisors case (Case No. 11-11152).

{00531998.DOC;1}

4

9. William Landberg ("Landberg"), created WEFA in 2000 as an investment and financial management company and exercised total day-to-day control over all of the activities of the various Debtors, whether they were formed as limited partnerships or limited liability companies. Landberg's domination included, but was not limited to, determining the investments each fund would make, what management and investment fees each fund would pay and what distributions each fund would make to its various limited partners. Heslin Decl. at ¶12.

10. Landberg controlled the flow of funds between and among the various Debtors entities and ignored the corporate formalities that should have existed between and among the funds. *Id.* No lawyer at RB ever worked or was at all associated with Landberg.

11. Raymond J. Heslin ("Mr. Heslin"), an attorney for over 35 years and a former senior equity partner at SNR Denton, an international law firm with 1,800 lawyers and offices in the United States and throughout the world who previously, was the managing partner of Gold, Farrell & Marks, LLP, a litigation boutique that had previously merged into SNR Denton and who held positions as Chair of the General Litigation Section of the New York State Bar Association, Chair of the Cooperative and Condominium Committee of the New York County Lawyers Association and as a Member of the New York State Supreme Court, Appellate Division, First Department's Committee on Fee Disputes was recruited by Landberg to join WEFA as General Counsel and Chief Compliance Officer. Mr. Heslin joined WEFA in January 2009, soon became suspicious about the source and use of funds in connection with several loan transactions as well as other apparent improprieties by Landberg in his capacity as the individual who exercised day to day control over the funds' activities (the "Suspicious Transactions").

12. Heslin commenced an investigation and soon determined that Landberg, amongst other improprieties, frequently utilized funds from an interest reserve account maintained at

Signature Bank to pay overdrafts in other funds, personal expenses and distributions to limited partners; that Landberg transferred funds from a collection account maintained at Signature Bank into other fund accounts and into his personal accounts in violation of applicable bank agreements; and that Landberg diverted funds advanced from a credit facility and failed to provide West End's required equity participation as consideration for the advance. *See, Heslin Decl. at ¶22.*

13. When confronted, Landberg admitted his improprieties and was subsequently terminated from any and all of his involvement in the management and operation of WEFA and its affiliates.

14. Soon thereafter Heslin met with representatives of the United States Attorney's Office, the Securities and Exchange Commission ("SEC") and the Federal Bureau of Investigation to disclose the facts he learned as a result of his investigation concerning the Suspicious Transactions.

15. Landberg's conduct caused notices of default to be sent by the Debtor's lenders in the midst of the "Great Recession" which if not cured would have resulted in the foreclosure of the Funds' collateral and a total loss of limited partners' investments.

16. Mr. Heslin engaged RB a firm, he nor any Debtor entity or employee of the Debtors, had ever worked with prior to May 2009. RB was retained during a crisis that threatened the existence of the debtor entities and the Debtors were facing a total loss of their assets, and the investors' investments, due to defaults caused by the fraudulent actions of Landberg. Accordingly, RB was forced to get up to speed on approximately 48 different funds and special purpose vehicles in a moments notice as the walls around the Debtors were rapidly crumbling.

17. In a series of complex international transactions (referred to as the "9 Party Deal"), detailed in length in the Companies Wells Submission which this Court has previously indicated it has read and is attached to the Heslin Decl., RB engaged in a monumental amount of work to assist the Debtors to consummate transactions involving multiple adverse parties, which salvaged the Debtors' investments and with it, the chances that creditors and investors would see a return of their funds and/or investment. Moreover, these tasks was accomplished during a time when the Debtors' revenue sources were non-existent due to the defaults on numerous loans.

18. During the course of negotiating the 9 Party Deal RB incurred fees and expenses in excess of $1 million dollars. Despite not getting paid regularly, and the real possibility that they may never get paid, the lawyers at RB worked around the clock to consummate the 9 Party Deal.

19. On or around August 22, 2010, certain Debtors were given 10 days by the Securities and Exchange Commission (the "SEC") to file a Wells Submission. RB worked around the clock over the Labor Day weekend and timely filed a Wells Submission with the SEC.

20. RB's bill for the Wells Submission was under $75,000.[4]

21. In October of 2010, RB submitted a claim for reimbursement of fees to the Debtors' insurance carrier Chartis. The bills submitted to Chartis went under extensive review first by the Debtors and later by Chartis. Chartis also requested that RB bifurcate its invoices concerning the SEC to before and after receiving the Wells notification from the SEC. RB

---

[4] Although the Objection claims that Radke stated that the time associated with the Wells Submission was over $400,000, Mr. Radke actually stated during his testimony that he had not quantified how much time was spent by RB on the Wells submission. See April 6, 2011, Hearing Transcript at P.34

following the Chartis request subsequently created two categories for recording Debtors' work which was related to the SEC.

22. On December 22, 2010 the Debtors received a check directly from Chartis for payment of covered professional fees.

23. On January 20, 2011 the SEC filed a complaint ("Complaint") in the United States District Court for the Southern District of New York against certain of the Debtors and their former management in the matter captioned: <u>Securities and Exchange Commission v. William Landberg, Kevin Kramer, Steven Gould, Janis Barsuk, West End Financial Advisors, LLC, et al.</u>, 11 Civ. 0404 (PKC). The case was referred to the Honorable P. Kevin Castel for all purposes.

24. After much negotiating on February 10, 2011, the SEC and certain of the Debtors agreed pursuant to a Stipulation and Order to the appointment of Mark S. Radke, as the Independent Monitor of those entities.

25. On March 22, 2011, the UST filed a Motion for the Appointment for a Chapter 11 Trustee, or, in the Alternative, to Convert the Cases to Chapter 7 of the Bankruptcy Code (the "UST Motion").

26. The hearing on the UST Motion, commenced on March 30, 2011, and continued on March 31, 2011, April 1, 2011, April 6, 2011, April 7, 2011, and April 12, 2011, and May 10, 2011. The hearing has not yet concluded.

27. Since the filing of the UST Motion, RB and the Debtors have made substantial progress both in the District Court case and in these Chapter 11 cases generally and in a global resolution of issues with the SEC. The Debtor have:

- Filed a Motion for Substantive Consolidation of all Debtor entities (ECF No. 110) which also included an affidavit (ECF No. 111 )which detailed the comingling that occurred under Landberg and drafted a plan of liquidation;

- Finalized the initial cash collateral application and proposed interim order with Northlight LLC ("Northlight") a secured lender of the Debtors (ECF No. 109);

- Prepared for the continued hearing of the UST Motion for an 1104 Trustee; and

- Filed 16 separate schedules and statements of financial affairs with the appropriate disclaimers.

**LEGAL ARGUMENT**

28. A bankruptcy trustee's ability to hire professionals is governed by section 327(a) of the Bankruptcy Code, which permits the trustee to employ an attorney to assist in his duties "with the court's approval," so long as the attorney to be hired "do[es] not hold or represent an interest adverse to the estate, and [is a] disinterested person[ ]." 11 U.S.C. § 327(a)

29. The Second Circuit has long held that Trustees may select their own attorneys and other professional persons without interference from creditors. *In re Magna Prods. Corp.* 251 F2d. 423 (2d Cir. 1958). The choice of counsel is entitled to great deference. *See, e.g., Board of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979) ("[D]isqualification has an immediate adverse effect on the client by separating him from counsel of his choice ...."); *A.V. by Versace, Inc. v. Gianni Versace. S.p.A.,* 160 F.Supp.2d 657, 662–63 (S.D.N.Y.2001) ("Disqualification,

however, is a 'drastic measure' that is viewed with disfavor because it impinges on a party's right to employ the counsel of its choice."); *Universal City Studios, Inc. v. Reimerdes,* 98 F.Supp.2d 449, 455 (S.D.N.Y.2000) ("Disqualification also deprives a client of counsel of its choice"); *In re Caldor, Inc.,* 193 B.R. 165, 170 (Bankr.S.D.N.Y.1996) ("Public policy favors permitting parties to retain professionals of their choice."). *In re Enron Corp.,* 01-16034(AJG), 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) *aff'd,* 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003).

30. In exercising its approval function, however, the bankruptcy court should interfere with the trustee's choice of counsel " '[o]nly in the rarest cases,' " such as when the proposed attorney has a conflict of interest, or when it is clear that " 'the best interest of the estate' " would not be served by the trustee's choice. Id. at 108 (quoting *In re Mandell,* 69 F.2d 830, 831 (2d Cir.1934)). Courts give the trustee such deference in choosing special counsel because of the " 'highly confidential' relationship between the special counsel-attorney and the trustee-client." Id. (quoting *Mandell,* 69 F.2d at 831).

31. The standard for approval of professionals in a bankruptcy case is set forth in section 327(a) of the Bankruptcy Code, which provides that a professional may be retained if it does "not hold or represent an interest adverse to the estate" and is "disinterested." 11 U.S.C. § 327(a). The Bankruptcy Code defines "disinterested person" as a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor." 11 U.S.C. § 101(14)(E).

32. In general, the tests of disinterestedness and non-representation of an adverse interest overlap, and courts consider these together. Courts have recognized that there is an

overlap in the two prongs of section 327(a). *In re Envirodyne Indus.* 150 B.R. 1008, 1017 (Bankr. N.D. Ill. 1993) (noting that the part of section 327(a) requiring disinterestedness "overlaps with the requirement that counsel for a debtor-in-possession not represent an interest adverse to the estate"). The two prongs "form one hallmark with which to evaluate whether professionals seeking court-approved retention (or to remain retained by the estate) meet the absence of adversity requirements embodied in the Bankruptcy Code." *In re Vebeliunas*, 231 B.R. 181, 189 (Bankr. S.D.N.Y. 1999).

33. The regulation of the employment of estate professionals under section 327 of the Bankruptcy Code "is designed simply to 'serve the important policy of ensuring that all professionals appointed [to represent the trustee] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.'" *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994)). RB is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code. *See TWI International. Inc. v. Vanguard Oil and Service Co.*, 162 B.R. 672, 675 (S.D.N.Y. 1994) ("to hold an interest adverse to the estate means: to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant.") (quotation omitted); *see also In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987) (the court's inquiry is whether the professional's representation will create "either a meaningful incentive to act contrary to the best interests of the estate and their sundry creditors – an incentive sufficient to place those parties at more than acceptable risk – or the reasonable perception of one."); *In re Caldor. Inc.*, 193 B.R. 165 (Bankr. S.D.N.Y. 1996) (Garrity, B.J.) (same).

34. RB has a unique familiarity with, and has developed a substantial working knowledge of the Debtors' capital structure, financing documents, and other material agreements, as well as with the Debtors' business affairs and many of the potential legal issues that may arise in the context of these cases. Since day one of this case RB has done everything possible to swiftly move the Debtors through the Chapter 11 process and confirm a plan. To that extent within the short duration that these cases have been in Chapter 11 the Debtors, despite litigation brought on by the UST, have been able to draft a plan of liquidation that has garnered the support of the SEC.

35. It should be noted that no party in interest has joined the Objection.

36. Among other things, the Objection criticizes RB's pre-petition billing because some entries are, according the UST, unduly vague. However, the US Trustee itself notes in its objection that "Robinson Brog was under no obligation to maintain its time records in accordance with any guidelines for pre-petition work" yet the Objection plainly tries to hold RB to the heightened fee application standards of the bankruptcy court for pre-petition non bankruptcy related work.

37. Since RB has been counsel to the Debtors, Mr. Heslin, a lawyer with more than 35 years of litigation experience, has been reviewing RB's invoices. Heslin has extensive experience in the area of fee disputes having been appointed by the New York Courts to a special committee for fee disputes in the Appellate Division, First Department. Accordingly, it cannot be doubted that Mr. Heslin has the appropriate skill set to review RB's bills for excessive legal fees. In that regard, the Objection makes no mention of the fact that RB has provided in excess of $350,000 worth of discounts to the Debtors, a factor that should bear on the propriety of the bills.

38. Mr. Heslin reviewed all billing memorandum and approved the RB bills, Chartis also reviewed the RB bills and did not express any objections thereto.

39. As noted above, an independent entity, whether the Official Committee of Unsecured Creditors, the Plan Administrator or conflicts counsel, will have an opportunity to investigate the work which RB performed, opportunity to investigate the work and fees RB was paid and to determine the appropriate resolution of any claims the estate may have against RB as a result thereof.

40. The Third Circuit as well as others have noted that "the district court may not disqualify an attorney on the appearance of conflict alone." *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir.1998). At first the Bankruptcy Court and then the District Court in *Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron)*, 2003 WL 223455 at *4 (S.D.N.Y.2003) explained in detail, that conflicts counsel or an examiner could discover any action by the firm that would constitute a breach of their fiduciary duty and opined that there is "no adverse interest in Milbank (the law firm) continuing" *Id.* The Debtors deserve the right to be represented by the counsel of their choice.

41. The second allegation of the UST asserts is that RB has a conflict and holds an interest adverse to the estates as a result of the fees billed and paid pre-petition. While RB believes this allegation will prove to be meritless, independent review as set forth herein is sufficient to satisfy the scrutiny required under section 327(a). Similarly, any allegation regarding advice purportedly given by RB can be reviewed by an Independent third party.

42. Disqualification of RB will harm the Debtors' ability to reorganize and, by extension, harm creditors and investors as bringing new counsel up to speed on the different

{00531998.DOC;1 }

13

funds, their respective loan agreements and obligations will cost precious limited estate resources.

**Conclusion**

43. The Debtors and RB recognize the difficulty the Court faces in evaluating retention applications under section 327 of the Bankruptcy Code. As increasingly sophisticated, complex companies seek the protections of the Bankruptcy Code to help them sell assets, renegotiate credit agreements, de-lever their balance sheets, and generally obtain the 'fresh start' afforded to them under Bankruptcy Code, increasingly sophisticated, law firms with a wide breadth of practice areas and clientele are being sought to help guide these companies through the process.

44. The courts and Congress, through creations like the 'Impenetrable Barrier', independent plan administrators, examiners and special conflicts counsel, have sought ways to simultaneously allow, multi-discipline law firms (like the majority of the firms representing all manner of interested parties in this Chapter 11 Case) to provide services in the context of a bankruptcy while balancing the importance of what constitutes the foundation of our entire judicial system — the fairness to all participants through the assurances that all counsel will abide by the ethical canons that guide them.

45. RB, by willingly accepting the conclusions of an Independent Third Party has taken steps to ensure there is no hint of impropriety, has met the standards established by Congress and the courts of this circuit with respect to retention under section 327 of the Bankruptcy Code. In this matter, RB solely represents the Debtors, does not hold or represent an interest adverse to the estates, and is a disinterested person as contemplated by sections 101 and 327 of the Bankruptcy Code.

**WHEREFORE**, the Debtors respectfully request that the Court grant the relief requested in the Application and such other and further relief as the Court may deem just and proper.

Dated New York New York
May 19, 2011

        **ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**
        **Proposed Counsel to West End Financial Advisors LLC, et al,**
        Debtors and Debtors in Possession

By: _/s/ A. Mitchell Greene_
A Mitchell Greene
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.: (212) 603-6300