UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

                                                    Chapter 11
In re:

**West End Financial Advisors LLC,**                 Case No.: 11-11152 (SMB)
                                                    (Substantively Consolidated)

                                    **Debtors.**
--------------------------------------------------------X


DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION OF WEST END FINANCIAL
ADVISORS, LLC

---

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL FROM, BUT HAS NOT BEEN APPROVED BY, THE
BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF
ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---


**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue
New York, New York 10022
(212) 603-6300
A. Mitchell Greene, Esq.

**Dated:** New York, New York
          August 31, 2011

## SUMMARY

West End Financial Advisors LLC[1] (as consolidated, the "Debtor"), has filed its *Plan of Liquidation of West End Financial Advisors LLC* dated August 31, 2011 (the "Plan"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This *Disclosure Statement for Plan of Liquidation of West End Financial Advisors LLC* (the "Disclosure Statement") has received the approval of the Bankruptcy Court for use in connection with the solicitation of acceptances of the Plan from holders of claims against and interests in the Debtor pursuant to Section 1125 of title 11 of the United States Code (the "Bankruptcy Code").

A copy of the Plan accompanies this Disclosure Statement. A glossary of terms frequently used in this Disclosure Statement is set forth in Article 1 of the Plan. Words used but not defined herein shall have the meaning ascribed to such terms in the glossary.

The Plan seeks to liquidate the Debtor in order to provide fair, equitable, and reasonable treatment to all creditors of the Debtor. Under the Plan all of the Debtor's assets will be transferred to a grantor trust (the "Post-Confirmation Estate") which will be administered by the Plan Administrator. The Plan Administrator will collect the Debtor's income and monetize its assets over the anticipated five (5) year existence[2] of the Post-Confirmation Estate and pay creditors in accordance with the terms of the Plan.

The Plan is predicated on the following factors: (1) Due to the way the Debtor was operated by William Landberg pre- petition each of the Investors who acquired membership interests (however evidenced) in the Debtor was improperly induced into doing so by the Debtor's pre-petition management. Thus, all of the Investors in the Debtor have, at a minimum, rescission and restitution claims against the Debtor for return of their Investment and are classified as "Investor Creditors" holding Class 4 Investor Unsecured Claims; (2) the Bankruptcy Court determined, after an evidentiary

---

[1] [1]  The Debtor, whose estates have been substantively consolidated by order of the Bankruptcy Court dated July 25, 2011 are the following entities: West End Financial Advisors LLC (Case No. 11-11152); Amagansett Realty SPV 1 LLC (Case No. 11-11167); Benedek Development Group, LLC (Case No. 11-11155); L/C Family Limited Partnership (Case No. 11-11157); Sentinel Investment Management Corp.(Case No. 11-11153); SIMCO SPV 1 LP (Case No. 11-11158); West End Absolute Return Fund I, LP (Case No. 11-11161); West End Capital Management LLC (Case No. 11-11154); West End Fixed Income Partners LP (Case No. 11-11159); West End Income Strategies Fund LP (Case No. 11-11160); West End Mortgage Finance Fund I LP (Case No. 11-11162); West End Private Client Fund L.P.(Case No. 11-11163); West End Real Estate Fund 1 LP (Case No. 11-11164); West End Special Opportunity Fund II, LP (Case No. 11-11166); West End Special Opportunity Fund, LP (Case No. 11-11165); West End/Mercury Short-Term Mortgage Fund, LP. (Case No. 11-11156); West End Cash Liquidity Fund I L.P. (Case No. 11-12774) and West End Dividend Strategy Fund I L.P. (Case No. 11-13247).

[2] Grantor trusts created to liquidate assets under a Plan are limited to a five year life span under the applicable Internal Revenue Code regulations. Under some circumstances, the Plan Administrator may apply to extend the term of the Post-Confirmation Estate for up to eight (8) years.

hearing, that partial substantive consolidation was appropriate and entered an order on July 25, 2011 substantively consolidating the Debtor's estates into one entity; and (3) the recoverable Assets of the Debtor are to be derived from the monetization of the Debtor's interest in the "Hard Money Fund" and the "Franchise Fund" (as hereinafter defined) and of other assets identified in this Disclosure Statement as well as from proceeds recovered from litigation and/or settlements of legal claims owned by the Debtor, including potential equitable subordination claims and fraudulent transfer claims against Investors and others.

In the Debtor's opinion, the treatment of Claims and Interests under the Plan provides a greater recovery for Creditors than that which would be likely to be achieved under other alternatives for the reorganization or liquidation of the Debtor.

**THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN**.

**THE DEBTOR RECOMMENDS THAT THE HOLDERS OF CLAIMS AND INTERESTS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN.**

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof unless otherwise specified herein, and the delivery of this Disclosure Statement does not imply that there has been no change in the information set forth herein since such date. This Disclosure Statement has been prepared by the Debtor. Holders of Claims entitled to vote should read it carefully and in its entirety, and where possible, consult with counsel or other advisors prior to voting on the Plan.

This Disclosure Statement may not be relied upon by any persons for any purpose other than by holders of claims entitled to vote for the purpose of determining whether to vote to accept or reject the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtor, the Committee, or any other party, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the Debtor, the Committee, or on holders of Claims or Interests.

This Disclosure Statement summarizes the terms of the Plan, which summary is qualified in its entirety by reference to the full text of the Plan. If any inconsistency exists

between the terms and provisions of the Plan and this Disclosure Statement, the terms and provisions of the Plan are controlling. Certain of the statements contained in this Disclosure Statement are forward looking projections and forecasts based upon certain estimates and assumptions. There can be no assurance that such statements will be reflective of actual outcomes. All Holders of Claims entitled to vote should read carefully and consider fully the Risk Factors enumerated in this Disclosure Statement.

THE PLAN

The Plan provides for the payment of distributions to Creditors in accordance with the priorities established by the Bankruptcy Code. The creditor distributions shall be funded from the Debtor and/or the Plan Administrator's monetization of its remaining assets, collection of outstanding loans receivable and related fees, pursuit of alleged preference and fraudulent conveyance claims and collection on other claims held by the estate against third parties. On the Effective Date, all of the assets in the estate will be transferred, under the Post-Confirmation Estate Agreement, to the Post Confirmation Estate, a grantor trust created under the Plan, in exchange for such claims. The Post Confirmation Estate, under the aegis of the Administrator of the Post Confirmation Estate, will liquidate all of the Debtor's assets and distribute the proceeds to creditors in the order of priorities provided for in the Bankruptcy Code. As set forth in this Disclosure Statement, the timing of such distributions is not yet certain and will depend principally on the performance of the Debtor's investment portfolio.

The table below provides a summary of the classification and treatment of Claims and Interests under the Plan. The figures set forth in the table below represent the Debtor's best estimate of the total amount of Allowed Claims and Allowed Interests in the Case. These estimates have been developed by the Debtor based on an analysis of the Schedules filed by the Debtor, the Proofs of Claims and Proofs of Interests filed by Creditors and Interest Holders, an analysis of outstanding claims performed by FTI Consulting, Inc. ("FTI"), the Committee's financial advisor, and certain other documents of public record. The Bankruptcy Court set October __, 2011 as the final date for filing Proofs of Claims and Proofs of Interests by Creditors and Interest Holders. See "SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE – General Bar Date and Administrative Bar Date". Accordingly, as this Disclosure Statement is being prepared prior to the passing of the Bar Date, it will not reflect all claims which may be filed against the Debtor's consolidated estate. Although the Debtor believes that the amounts of the claims set forth below are substantially correct, there can be no assurance that Claims and Interests will be allowed by the Bankruptcy Court in the amounts set forth below or that additional claims may be filed before the bar date which are not reflected below:

| Class | Claim/Interest | Treatment of Claim/Interest | Estimated Amount of Allowed Claims or Interests[3] |
|---|---|---|---|
| Unclassified | Administrative Expense Claims | N/A | $ 3,500,000 |
| Unclassified | Priority Tax Claims | N/A | $ 1,000 |
| 1 | Priority Non-Tax Claims | Unimpaired | $ 1,000 |
| 2(a) | Northlight Secured Claim | Impaired | $ 5,200,000 (principal) |
| 2(b) | Iberiabank Secured Claim | Impaired | $ 6,033,842.54 |
| 2(c) | Caplease Secured Claim | Impaired | $ 1,762,068.80[4] |
| 3 | Non-Investor Unsecured Claims | Impaired | $ 13,000,000 |
| 4 | Investor Unsecured Claims | Impaired | $ 67,000,000 |
| 5 | Equity Interests | Impaired | One holder |

CURRENT ASSETS

As of July 30, 2011, the Debtor has the following assets; all of which are listed at an estimated value. Parties in interest are cautioned that these assets **have not been appraised** form purposes of this Disclosure Statement and the amounts ultimately realized by the Debtor or the Post-Confirmation Estate when these assets are sold or liquidated **could differ, perhaps materially, from, the values set forth below.**

| Type of Asset | Estimated Value | Notes |
|---|---|---|
| Cash in Bank | $320,684 | |
| Loans Receivable | $554,660 | From NFA ($97,000 approx.), SJ Foods ($110,309), Raymond O'Dell ($87,351), Robert Beller ($250,000) |

---

[3] The amounts set forth in this schedule are not, and should not be deemed admissions by the Debtor as to the validity or amount of any claim and the Debtor reserves all rights to object to any claim in this case.

[4] Agreed upon amount of CapLease Secured Claim as of August 11, 2011. CapLease has agreed that in the event payment of $1,000,000 is made to CapLease on or before March 1, 2012, the CapLease Secured Claim will be reduced to $1,000,000 and deemed satisfied and paid in full.

| | | |
|---|---|---|
| Mortgage Receivable | $2,816,506 | From Southwood Court Properties ($2,558,000), Chicago Diversified Foods ($208,506), Jannette Goodstein($50,000) |
| Estimated Net Equity Investment in Apartment Collateral | $437,932 | Net of obligation to CapLease of $1,762,068.80 |
| Net Equity Investment in West End Short term Mortgage Fund (Hard Money Fund) | $17,199,848 | Based on book value of investment |
| Net Equity Investment in West End Mortgage Finance Fund | $26,733,089 | Subject to current swap breakage fee of approximately $12,000,000 – See *Hedging Agreements,* infra at pg. 20. |
| Southwood Court Properties Investment | $1,055,000 | Based on amount of Investment |
| Kensington Financial Services Investment | $36,500 | Based on amount of investment |
| West End Cash Liquidity Fund Investments | $357,216 | Based on amount of investment |
| Fusion Telecommunications International Stock | $1,900,000 | Based on current "pink sheet" value of $0.09 per share |
| Employee Receivable | $107,729 | Based on amount loaned to former employee. Collectability is doubtful. |
| Avoidance and Other causes of Action | Unknown | |
| Security Deposit held by landlord | $18,000 | |

## CONFIRMATION OF THE PLAN

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan, on_____, 2011 at ___:00 ___.m, Eastern Standard Time, in the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004. Objections, if any, to Confirmation of the Plan shall be filed and served on or before _____, 2011.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. The Debtor intends to seek Confirmation of the Plan at the Confirmation Hearing. **The Debtor believes that the Plan satisfies all applicable requirements of section 1129(a) and section 1129(b) of the Bankruptcy Code**. Confirmation makes the Plan binding upon the Debtor, their Interest Holders, all Creditors and other parties regardless of whether they have accepted the Plan.

As of the Effective Date, all holders of Claims or Interests will be precluded from asserting any Claim against the Debtor or its assets or other interests in the Debtor based on any transaction or other activity of any kind that occurred before the Confirmation Date except as otherwise provided in the Plan.

ATTENTION ADMINISTRATIVE EXPENSE CREDITORS AND PRIORITY CREDITORS

THE DEBTOR BELIEVES THAT ADMINISTRATIVE EXPENSE CLAIMS OTHER THAN THOSE TO BE PAID IN THE DEBTOR'S ORDINARY COURSE OF BUSINESS WILL CONSIST OF PROFESSIONAL FEES ONLY AND THAT PRIORITY CLAIMS ARE DE MINIMUS AND WILL BE PAID IN FULL ON THE LATER OF THE EFFECTIVE DATE OR THE DATE THAT IS 10 DAYS AFTER THE ALLOWANCE DATE IN ACCORDANCE WITH THEIR PROPOSED TREATMENT UNDER THE PLAN.

PLEASE NOTE THAT THERE CAN BE NO ASSURANCE THAT THERE WILL BE SUFFICIENT AVAILABLE CASH TO SATISFY ALL ADMINISTRATIVE EXPENSE CLAIMS ON THE EFFECTIVE DATE. ABSENT THE ACTUAL OR DEEMED CONSENT OF EACH HOLDER OF ALLOWED ADMINISTRATIVE EXPENSE CLAIM, TO BE PAID OTHER THAN AS REQUIRED BY SECTION 1129(A)(9) OF THE BANKRUPTCY CODE, THE PLAN MAY NOT BE CONFIRMED AS PROPOSED.

IN THE EVENT THAT ONE OR MORE OF THE HOLDERS OF SUCH CLAIMS, WHETHER DISPUTED OR UNDISPUTED, OBJECTS TO ITS TREATMENT UNDER THE PLAN, IT MAY BE THAT A PLAN CANNOT BE CONFIRMED PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. SEE THE PROVISION ENTITLED, "PROVISIONS FOR PAYMENT OF UNCLASSIFIED ADMINISTRATIVE EXPENSE CLAIMS." IN THAT EVENT, IT MAY BE NECESSARY FOR THE DEBTOR TO EITHER CONVERT THIS CHAPTER 11 CASE TO A CHAPTER 7 LIQUIDATION OR OTHERWISE ABANDON OR DISMISS THIS CASE. IN THE EVENT THE DEBTOR IS FORCED TO TAKE SUCH ACTION, THE DEBTOR BELIEVES THAT HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS WILL RECEIVE LESS THAN THEY WOULD RECEIVE UNDER A CONFIRMED PLAN, SEE THE PROVISION OF THE DISCLOSURE STATEMENT, ENTITLED "ALTERNATIVES TO CONFIRMATION AND

CONSUMMATION OF THE PLAN - LIQUIDATION UNDER CHAPTER 7."

PLEASE NOTE THAT THE PLAN PROVIDES THAT THE FAILURE OF HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS TO OBJECT TO THE CONFIRMATION OF THE PLAN SHALL BE DEEMED SUCH HOLDERS' AGREEMENT TO RECEIVE TREATMENT FOR SUCH CLAIMS THAT IS DIFFERENT FROM THAT SET FORTH IN 11 U.S.C. § 1129(A)(9).

**VOTING INSTRUCTIONS — SUMMARY**

The following discussion summarizes more detailed voting instructions set forth in the section of this Disclosure Statement entitled "VOTING INSTRUCTIONS." If you have any questions regarding the timing or manner of casting your ballot, please refer to the "VOTING INSTRUCTIONS" section of this Disclosure Statement and the instructions contained on the ballot that you received with this Disclosure Statement.

**General**. The Debtor has sent to all of its known Creditors who are in Classes impaired under the Plan, a ballot with voting instructions and a copy of this Disclosure Statement. Creditors may refer to the above chart to determine whether they are impaired and entitled to vote on the Plan. Creditors should read the ballot carefully and follow the voting instructions. Creditors should only use the official ballot that accompanies this Disclosure Statement.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by (a) the holders of two-thirds in amount and more than one-half in number of claims in each class who actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if (i) the Bankruptcy Court finds that the Plan accords fair and equitable treatment, and does not discriminate unfairly, with respect to the class rejecting it and (ii) at least one impaired class of creditors excluding insiders has accepted the Plan. See "REQUIREMENTS FOR CONFIRMATION" and "EFFECT OF CONFIRMATION."

**As the preceding paragraph makes evident, a successful reorganization depends upon the receipt of a sufficient number of votes in support of the Plan. YOUR VOTE IS THEREFORE EXTREMELY IMPORTANT. Creditors should exercise their right to vote to accept or reject the Plan.**

**Voting Multiple Claims and Interests**. A single form of ballot is provided for each Class of Claims. Any Person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such Person holds Claims. However, any Person who holds more than one Claim in one particular Class will be deemed to hold only a single Claim in such Class in the aggregate amount of all Allowed Claims in such Class held by such Person. Thus each Person need complete only one ballot for each Class.

**Deadline for Returning Ballots**. The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the Debtor, no later than 5:00 p.m., Eastern Standard Time, on _____, **2011** at the following address:

> Robinson Brog Leinwand Greene Genovese & Gluck P.C.
> 875 Third Avenue
> 9th Floor
> New York, New York 10022
> Attn: Lori A. Schwartz

**Voting Questions**. If you have any questions regarding the provisions or requirements for voting to accept the Plan or require assistance in completing your ballot, you may contact Lori A. Schwartz or Fred B. Ringel at (212) 603-6300.

NOTICE TO HOLDERS OF CLAIMS AND INTERESTS

This Disclosure Statement and the accompanying ballots are being furnished by the Debtor to the Debtor's known Creditors pursuant to section 1125(b) of the Bankruptcy Code in connection with a solicitation of acceptances of a plan of liquidation by the Debtor. The Plan is filed with the Bankruptcy Court and is incorporated herein by reference. Parties in interest may view the Plan on the Internet at http://www.nysb.uscourts.gov.[5]

The purpose of this Disclosure Statement is to enable you, as a Creditor whose Claim is in a Class impaired under the Plan to make an informed decision in exercising your right to accept or reject the Plan.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR. THE STATEMENTS AND OPINIONS SET FORTH HEREIN ARE THOSE OF THE DEBTOR, AND NO OTHER PARTY HAS ANY RESPONSIBILITY WITH RESPECT THERETO.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN PROPOSED BY THE DEBTOR. ALL CREDITORS AND EQUITY INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ALL CREDITORS ENTITLED TO VOTE WITH RESPECT TO THE PLAN ARE ADVISED AND ENCOURAGED TO READ AND CAREFULLY

---

[5] A password is necessary for access to view documents on the Internet.

CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE SUMMARIES OF THE PLAN AND THE OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT**.**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE § 1125 AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THIS CASE WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THOSE CREDITORS WHOSE CLAIMS AGAINST THE DEBTOR ARE IMPAIRED UNDER THE PLAN, TO ENABLE SUCH HOLDERS TO MAKE AN INFORMED DECISION ABOUT THE PLAN. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR. ALTHOUGH THE DEBTOR WILL MAKE AVAILABLE TO ALL PARTIES ENTITLED TO VOTE ON THE PLAN SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES THEREOF. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER FULLY THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN THE DEBTOR'S CHAPTER 11 CASE, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS TO ANY PERSON OR ENTITY THAT MAY RESULT FROM CONSUMMATION OF THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN SHALL NEITHER CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION, STIPULATION, WAIVER, EVIDENCE OR FINDING OF FACT, BUT RATHER A STATEMENT OR STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

Notwithstanding any provision of the Plan to the contrary, definitions and descriptions contained herein respecting pre-Petition Date documents, agreements, or claims are provided solely

for the purpose of identification and classification thereof and do not constitute an admission by the Debtor of the existence, validity, allowance, or amount of any such claim, document or agreement. The Debtor expressly reserves the right to challenge the existence, validity, allowance, or amount of any such claim, document or agreement.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein. The delivery of this Disclosure Statement shall not create, under any circumstances, an implication that there has been no change in the facts set forth herein since the date hereof.

No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. No Person has been authorized to use or promulgate any information concerning the Debtor or its business or the Plan, other than the information contained in this Disclosure Statement and the exhibits hereto. You should not rely on any information relating to the Debtor or its business or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

## THE PRE-PETITION STRUCTURE AND OPERATIONS OF THE DEBTOR

### Pre-Petition Structure of the Debtor

On October 26, 2000, William Landberg ("Landberg") created West End Financial Advisors, LLC ("WEFA") a Delaware Limited liability company, to act as an investment and financial management company. The L/C Family Limited Partnership[6] is the sole member and owner of WEFA. Subsequently, Landberg purchased Sentinel Investment Management Corp ("Sentinel") a boutique investment advisory company. Sentinel and WEFA targeted individual private clients for investments in fixed income funds and alternative investment products. The funds were generally structured as limited partnerships.

WEFA was the general partner of many of the limited partnerships created by Landberg and received fees for its administration and management of the limited partnerships. Sentinel was an investment manager for some of the LPs and received additional fees for its role in providing investment advice to the limited partners who invested in the various funds.

LPs invested in the limited partnerships created by Landberg and some LPs received monthly distributions even though the terms of the limited partnership agreements generally did not permit redemptions in this manner.

---

[6] Louise Crandall ("Crandall"), Landberg's wife, owns 99% of L/C Family Limited Partnership

Some of these limited partnerships served as a partial source of funds to borrowers (generally 20% of the total loan) on either mortgage loans or loans to franchisees with the balance of the funding of the borrowers' loans (generally 80%) made by lending banks with which Landberg entered into business arrangements.

Subsequent to the initial formation of WEFA, Landberg created or invested in more than thirty five (35) additional entities. In particular, the West End Mortgage Finance Fund ("WEMFF", also known as the "Franchise Fund") and the West End Mercury Short Term Fund (also referred to as the "Hard Money Fund" or "Mercury") were the primary investment vehicles in which the investments of limited partners were made.

WEFA was the general partner of both the Franchise Fund and the Hard Money Fund, with Landberg exercising primary management and control responsibilities.

The Franchise Fund was engaged in the business of making franchise loans to commercial food service franchisees, whereas the Hard Money Fund was in the business of making short-term real estate mortgage loans.

*THE FRANCHISE FUND (WEMFF)*

WEFA was the General Partner of WEMFF as well as its Investment Manager. WEMFF was the managing member of NFA Funding, LLC ("NFA I") and the sole member of NFA Funding II, LLC ("NFA II"). NFA I was owned by WEMFF and Merrill Lynch Credit Financial Corporation ("Merrill Lynch"). NFA II was wholly owned by WEMFF. WEMFF invested in franchise loans and equipment leases made to franchisees through NFA I, NFA II and NFA Equipment Funding I LP ("NFA Equipment")(collectively referred to as the "Funding Companies"), for which WEFA was also the General Partner or Managing Member (the "Franchise Loans").

The limited partnership interest of NFA Equipment was held by West End Fixed Income Partners LP ("WEFIP"). The Franchise Loans were serviced through National Franchise Acceptance, LLC, which was owned by WEFA and Somerset II, LLC.

NFA I initially had a $500 million dollar credit line facility with Merrill Lynch through which Merrill Lynch agreed to lend NFA I funds used by NFA I to make the Franchise Loans (the "Merrill Lynch Credit Facility"). On October 26, 2007, the Merrill Lynch Credit Facility was partially paid off and DZ Bank AG Deutsche Zentral-Genossenschjaftsbank, Frankfurt Am Main, New York Branch ("DZ Bank") became the new source of funds under a Franchise Loan Origination Agreement (the "DZ Bank Credit Facility") for the Franchise Loans made by NFA II and NFA Equipment.

Under the DZ Bank Credit Facility, DZ Bank agreed to lend NFA II and NFA Equipment up to 80 percent of the total of funds used by these entities to make the Franchise Loans and equipment leases. Pursuant to the DZ Bank Credit Facility, the portion of the loan not funded by DZ Bank was required to be obtained from WEMFF and/or WEFIP (i.e., from funds provided by LPs).

*THE HARD MONEY FUND (MCC)*

WECM is a limited partnership created by Landberg and was the General Partner of Mercury. Mercury was the managing member of MCC Funding, LLC ("MCC"). Under an agreement with WECM, WEFA served as the investment manager of Mercury.

Mercury invested in mortgage loans made to borrowers on select real estate properties through MCC (the "Mortgage Loans"). MCC had a $200 million Revolving Credit and Security Agreement (the "WestLB Credit Facility") with WestLB AG, New York Branch ("WestLB"). Under the WestLB Credit Facility, WestLB agreed to lend MCC up to 80 percent of the total of funds used by MCC to make the Mortgage Loans. Pursuant to the WestLB Credit Facility, the portion of the mortgage loan made by MCC and not funded by WestLB was required to be obtained from Mercury (i.e., from funds provided by LPs).

Landberg was responsible for forming WEFA and WECM and the limited partnerships and limited liability companies in which WEFA and WECM were either a general partner, manager or managing member.

Landberg exercised day-to-day management and control over all of the activities of the limited partnerships and limited liability companies including, but not limited to, what investments each fund would make, what management and investment fees each fund would pay and what distributions each fund would make to its various LPs.

Most critically, Landberg directed the flow of funds between and among the various West End funds.

*RAYMOND HESLIN'S INVOLVEMENT AND INVESTIGATION*

Landberg, recruited Raymond J. Heslin ("Heslin") to join WEFA as its General Counsel and Chief Compliance Officer based upon his substantial experience in the financial services industry and his knowledge of related regulatory matters. Not long after Heslin joined WEFA he became suspicious about the source and use of funds in connection with several loan transactions in the two major funds as well as other improprieties. Heslin discovered the following:

    **a.**    **Movement of Funds:** Landberg moved funds between and among all fund bank accounts on an almost daily basis.

**b.      WestLB Funds:** monies borrowed from WestLB for hard money loans were transferred from MCC's bank account to the bank account of WEMFF and used for loans in this fund and other unauthorized uses. In addition, monies from a reserve account set up to distribute disbursements from real estate closings to WestLB were not being used as intended. Instead of remitting these monies directly to the WestLB account, Landberg directed these monies to and from his various personal accounts and the accounts of other West End funds.

**c.      The Ashley Furniture Transaction:** On or about April 20, 2009, WEMFF (NFA II) closed a franchise loan transaction with an entity known as St. Mar Enterprises, Inc. The transaction generally involved a franchise loan by NFA II and WEMFF. As set forth above, the terms of the credit facility with DZ Bank required that any franchise loan be funded up to 80 percent from funds borrowed by NFA II from DZ Bank and the balance from WEMFF. Previously, Heslin had been aware that it had been difficult for Landberg to raise WEMFF's participation for the St. Mar transaction. After that transaction closed, Heslin learned that WEMFF supposedly contributed approximately $1.68 million as its equity stake. When Heslin did not receive an adequate explanation from Landberg concerning the source of the $1.68 million, he began an investigation into this transaction. As a result Heslin learned that the $1.68 million did not in fact come from funds contributed by WEMFF, but rather $1.64 million came from funds furnished by WestLB that should have been used for a hard money loan that MCC had agreed to make for real property in Alabama (Ashley Furniture) which had not closed. The balance of the funds was used for other purchases and over drafts. Heslin thereafter determined that this use of funds obtained from WestLB was in violation with the terms of the WestLB Credit Facility.

**d.      The Fruitville Loan:** Landberg through an advanced funding request had obtained $3,080,000 from WestLB for a hard money loan to be made by MCC to "Somerset Holdings, LLC" for a property located in Florida. Heslin determined that the managing member of Somerset Holdings, LLC claimed he had no knowledge of the transaction and also learned that $1,951,384.89 of the $3,080,000 was in fact used to pay money owed to Century Bank by WEFA. In addition, Heslin discovered that other amounts from the original $3,080,000 sum had been used to fund WEMFF's equity participation in other unspecified transactions as well as distributions to LPs and Landberg and certain of his family members. Heslin determined that this use of the funds obtained from WestLB was not consistent with the terms of the WestLB Credit Facility.

**e.      The Interest Reserve Account:** In connection with the making of the mortgage loans by MCC, an interest reserve account at Signature Bank was established into which disbursements from the various closings were deposited to be held in escrow for the payment of such items including interest. Heslin discovered that Landberg frequently utilized funds from this account to pay overdrafts in other funds, personal expenses and distributions to LPs in violation of the applicable agreements with Signature Bank and WestLB.

**f.      The Collection Account:** In addition to the Interest Reserve Account, a separate account at Signature Bank was maintained for the purpose of receiving payments from mortgagors. Heslin discovered that Landberg apparently transferred funds from it into other fund accounts and his personal accounts in violation of the applicable bank agreements.

**g.     The Benedek Loan:** After Landberg's resignation, Heslin began investigating a transaction in which Landberg secured an approximately $3.948 million advance (70% of the investment funds) from WestLB for a land development project. The advance from WestLB was conditioned upon West End contributing 30% as its equity participation. Heslin discovered evidence that Landberg apparently diverted the entire WestLB's $3.948 million advance from the West LB Credit Facility for the project and never provided West End's 30% equity participation.

After discovering these apparent misappropriations of funds, Heslin caused Sentinel, WEFA and all of the Debtors to suspend their normal operations and distributions and conducted an internal investigation that led to discovery of further improprieties. Heslin also immediately suspended Landberg's involvement in the management and operation of the West End funds and notified the various lenders of Landberg's suspected improprieties. Because of the notice, lenders issued notices of default. On June 2, 2009, Heslin secured Landberg and Crandall's global resignation from all West End related entities.

In addition to conducting an internal investigation, Heslin engaged Jeffrey Hoffman, Esq. of Hoffman & Pollack on behalf of the Debtor to conduct a criminal investigation and Heslin promptly met with representatives of the United States Department of Justice, the Securities and Exchange Commission, and the Federal Bureau of Investigation in order to provide full disclosure of the relevant facts and documents. Throughout the ensuing months, Heslin met repeatedly with the governmental authorities, answered their questions, provided access to the Debtor's employees, and turned over documents as requested.

*Secured Creditor Defaults and The "Nine-party" Deal*

As a result of disclosure of Landberg's improprieties, at the height of the credit market freeze, MCC received a notice of default on or about May 11, 2009 from WestLB for, among other things, MCC's use of funds for purposes other than set forth in the WestLB Credit Facility. This primary default noticed by WestLB preceded numerous other defaults including the following:

(I)     On or about June 4, 2009, NFA I, NFA II, NFA Equipment, and WEMFF received a notice of default from DZ Bank of the DZ Bank Credit Facility as the result of WEMFF's failure to deliver audited consolidated financial statements and a change in the Debtor's management.

(II)    On or about June 8, 2009, another of the West End funds, West End Absolute Return Fund, L.P., received a notice of default from Signature Bank as a result of its failure to pay outstanding principal and interest on a promissory note.

(III)   On or about June 8, 2009, another of the West End funds, Amagansett Realty SPV, I LLC, received a notice of default from Signature Bank for its failure to pay principal and interest in the amount of $3,536,093.73.

(IV)    On or about June 9, 2009, Mercury received a notice of default from Century Bank in respect of a certain Amended and Restated Note, dated as of October 20, 2008, for failure to make payments of principal and interest.

These notices of default entitled the identified lenders to pursue their remedies under the various loan agreements including foreclosing on certain secured collateral. The immediate effect of the default notice by DZ Bank was the suspension of the waterfall payments under the banking agreements with WestLB and DZ Bank to WEFA, MCC and/or WEMFF.

As a result of the foregoing, WEFA's main focus upon receiving the notices of default was to arrange for repayment of the funds misappropriated from WestLB and to ensure a resumption of the waterfall payments under the various banking agreements. In the interim, WEFA needed funding to continue its business operations until the Waterfall Payments resumed.

At that time, the most difficult problem was to find a lending source in frozen credit markets which would enable WEFA to return the approximately $11 million in misappropriated funds to WestLB and to secure interim funding thereby allowing WEFA to maintain its business operations.  To that end, WEFA immediately began investigating various funding alternatives and presented potential investment partners to WestLB and to arrange for the sale of the underlying collateral on the Benedek Loan.

Heslin began negotiations with DZ Bank in June 2009 with the goal of restoring the waterfall payments. In order to accomplish this result, the Debtor was required to obtain the consent of DZ Bank, National Franchise Acceptance LLC and Merrill Lynch, WEMFF's former banking partner in NFA I which still had an equity interest in the fund.  Through these tripartite negotiations, the Debtor succeeded in obtaining a three hundred thousand dollar waterfall payment from DZ Bank. DZ Bank, which was the lender for the franchise loans made by NFA II and NFA Equipment, as a condition to indirectly restoring the waterfall payments, did not want WEFA to have any future involvement in future financings or servicing the Franchise Loans through National Franchise Acceptance, LLC.

*The Northlight Loan*

On July 9, 2009, after substantial negotiations, Mercury entered into a letter of intent and term sheet with Northlight Financial, LLC ("Northlight") in which Northlight agreed under certain conditions to provide a secured credit loan to Mercury of up to $6 million (the "Northlight Loan").  The funds loaned by Northlight to Mercury occurred in a series of transactions that closed over the span of several months in August 2009, December 2009, January and February 2010.

The August closing occurred on August 6, 2009 (the "August Closing") and provided loan proceeds of $632,500 to Mercury. The proceeds of this loan were used primarily to maintain the

business operations of WEFA, WECM and the West End funds. This "Bridge Loan" was intended to serve the purpose of keeping WEFA and the West End funds in operation until Northlight had completed its due diligence for its contemplated $6 million loan to Mercury.

The Northlight Loan was made in multiple stages over the course of several months because Northlight's due diligence was a time consuming process which required investigation of the inner workings of the West End funds and the various loan programs related to the mortgage loans and the franchise loans. In addition, the closings involved complex negotiations and agreement on transaction documents with numerous parties including, but not limited to, WestLB, DZ Bank, Merrill Lynch, Somerset, Northlight, Century Bank, Signature Bank, Perella Weinberg Capital Management LP ("Perella Weinberg") and Caplease Servicing Corp. ("Caplease").

Prior to the December Closing, defined below, the Debtor was able to sell two (2) real estate properties that were used for collateral for the Benedek Loan and fully repay WestLB for this loan as well as reduce the principal owed to WestLB.

The transaction which funded the second tranche of the Northlight Loan occurred on December 18, 2009 (the "December Closing"). At the December Closing, loan proceeds of approximately $5.2 million were paid by Northlight directly to WestLB on behalf of MCC to cure its existing default in connection with the funds misappropriated by Landberg.

At the December Closing, Mercury transferred its membership interest in MCC to Northlight Distressed Real Estate Fund LP, which was a condition of the Northlight Loan. Additional conditions of the Northlight Loan were that (a) WEMFF transfer its membership interests in NFA I and NFA II and (b) West End Fixed Income Partners, LP ("WEFIP") transfer its limited partnership interest in NFA Equipment to newly formed limited partnership entities created by Northlight, namely Northlight Food Franchise Fund I LP, Northlight Food Franchise Fund II LP and Northlight Equipment Fund I LP (collectively referred to herein as the "Northlight Limited Partner Entities"). WEMFF and WEFIP received corresponding limited partnership interests in the newly formed Northlight Limited Partnership Entities.

These conditions with respect to the transfer of the entities involved in the Franchise Loans were not satisfied at the December Closing of the Northlight Loan as required by the Northlight Loan Agreement because additional agreements had to be negotiated and drafted and finalized with other parties involved in making the Franchise Loans in order to restore the Waterfall Payments. These conditions were satisfied in the January Closing which occurred on January 26, 2010 (the "January Closing").

After the monetary default of West LB was cured with the payment of approximately $5.2 million from the December Closing, it was necessary for WEFA to satisfy the demands of DZ Bank in order to restore the waterfall payments. The restoration of the waterfall payments indirectly

benefits WEMFF and WEFIP and, in turn, the LPs in the relevant West End funds, through WEMFF and WEFIP's respective limited partnership interests in the Northlight Limited Partnership Entities. Also, a portion of the waterfall payments have, in the sole discretion of Northlight, been paid to WEFA for operating expenses.

The principal demand made by DZ Bank was that WEFA not have any future involvement with the financing and servicing of the franchise loans by National Franchise Acceptance, LLC, which was owned jointly by WEFA and Somerset. After a deadlock was declared by Somerset, it was demanded that National Franchise Acceptance, LLC redeem WEFA's 45% membership interest in National Franchise Acceptance, LLC. In a transaction which occurred contemporaneously with the January Closing, Perella Weinberg is believed to have acquired an interest in National Franchise Acceptance, LLC or a successor entity thereto.

The January Closing accomplished, inter alia, the following: (1) the transfer of WEFA's interest in NFA I, NFA II and NFA Equipment to Northlight Food Franchise Fund I LP, Northlight Food Franchise Fund II LP and Northlight Equipment Fund I LP, respectively; (2) the redemption of WEFA's interest in National Franchise Acceptance, LLC (3) the acquisition by Perella Weinberg of an interest in National Franchise Acceptance, LLC or a successor entity; (4) the issuance of a Second Amended Franchise Loan Origination Agreement by DZ Bank; (5) the sale by WEFA of its membership interest in Venture Restaurant Partners LLC to JBB Partners LLC and, in turn, the apparent sale of the same interest to Perella Weinberg; (6) the sale of certain defaulted franchise loans from the portfolios of NFA I and NFA II to Perella Weinberg; (7) the receipt of consents from DZ Bank and Merrill Lynch for the transfer of the NFA I, NFA II and NFA Equipment to the Northlight Limited Partnership Entities; and (8) an Amended and Restated Purchase Agreement with Merrill Lynch.

*Hedging Agreements*

In connection with the January Closing described above, the Second Amended and Restated Franchise Loan Origination Agreement was executed with DZ Bank and in accordance with the terms of that agreement, as long as the franchise loans constituted any part of DZ Bank's collateral, the Funding Companies (defined to be Northlight Food Franchise Fund I LP, Northlight Food Franchise Fund II LP and Northlight Equipment Fund I LP) were required to hedge the interest rate risk associated with fixed rate franchise loans pursuant to one of more Hedge Agreements, as DZ Bank determined in its sole discretion. The Funding Companies, in which the Debtor holds an equity interest, are responsible for the costs of the Hedging Agreements. In the event of the swap breakage under the Hedge Agreements, the equity the Debtor has in the Funding Companies would be responsible for the breakage fees thereunder.

As of June 30, 2011, the Debtor was advised that the swap breakage fees under the Hedge Agreements total approximately $12,000,000. While the swap breakage fees will decrease

over time as loans in the Franchise Fund are paid off or refinanced, the sale of the Debtor's interest in the Franchise Fund loan portfolio as of the date of this Disclosure Statement would be subject to approximately $12,000,000 in additional costs, thereby dramatically reducing the value of this investment portfolio.

As the result of the complicated negotiation and agreements effectuated at the December Closing and the January Closing, the waterfall payments were restored in February 2011 and initially were utilized to pay expenses arising out of the transactions. Currently the waterfall payments are being used to pay down the Northlight Loan. Eventually, WEFA expects that the Waterfall Payments will generate revenue which will be distributed to the Post-Confirmation Estate and ultimately to creditors under the Plan.

*The SEC Action and Independent Monitor*

On January 20, 2011, the SEC filed a complaint against WEFA, WECM and Sentinel Investment Management Corporation (the "Company Defendants"). For almost two years the Debtor has been actively assisting and cooperating with the SEC's investigation, the United States Attorney's investigation, and the Commodity Futures and Trade Commission's Investigation.

On January 26, 2011, the SEC made an *ex parte* motion for a TRO and a motion for a preliminary injunction appointing an Independent Monitor, Mark Radke, ("Radke") with few restrictions on his fees and powers. The Company Defendants filed a motion to dissolve the *ex parte* TRO, and opposed the SEC's Motion, as, among other reasons, the Debtor has not been engaged in the sales of securities since May 2009. On February 10, 2011, the Company Defendants entered into a stipulation with the SEC which they presented to the Court for "so ordering" whereby Radke would become the independent monitor but where Radke's responsibilities would be limited. Pursuant to the Stipulation and Order, the Company Defendants agreed that in the event that the Company Defendants find themselves as debtors in Bankruptcy Cases then the Company Defendants would make the appropriate application to the court for the continuance of Radke as the Independent Monitor.

On March 15, 2011, after careful consideration of alternatives, the Debtor determined that the commencement of the Bankruptcy Cases will provide the best opportunity to maximize the return for both creditors and LPs of the funds as the protections afforded the funds in bankruptcy court will offer relief, allow for the consolidation of the funds to account for the comingling that occurred under Landberg and permit an equitable result for all the creditors and parties of interest including the LPs.

## SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

### RETENTION OF DEBTOR'S PROFESSIONALS

Section 327(a) of the Bankruptcy Code provides that the Debtor, with the Court's approval, may employ one or more accountants or other professional persons that do not hold or represent an interest adverse to the estate and that are disinterested persons to represent or assist the Debtor in carrying out its duties under the Bankruptcy Code. 11 U.S.C. § 327(a).

The Debtor determined to retain the firm of Robinson Brog Leinwand Greene Genovese & Gluck P.C. as its bankruptcy counsel. On May 4, 2011, the Office of the United States Trustee objected to the retention of Robinson Brog contending that Robinson Brog, who had been the company's counsel from the time that Heslin undertook management of the companies and was counsel during the negotiation and implementation of the "nine-party" deal, had received "excessive" fees which it should be required to disgorge. In addition, the United States Trustee contended that Robinson Brog had received payments in the ninety days prior to the Petition Date which may be preferential and thus the firm was not disinterested and could not be retained as counsel. Robinson Brog filed a response to the objection.

The Court held a hearing to consider the retention objection. During the course of the hearing, the United States Trustee made an oral motion for the appointment of an examiner to investigate the issues raised by the United States Trustee in its retention objection. On July 5, 2011, the Bankruptcy Court entered an order authorizing the retention of Robinson Brog as counsel to the Debtor. Contemporaneously, the Court also entered an order authorizing the appointment of an examiner to investigate whether Robinson Brog had collected excessive fees which ought to be disgorged and other matters set forth in the examiner order. The examiner's appointment was subject to a $50,000 cap to complete the investigation and file a report.

The United States Trustee selected Albert Togut, Esq. as the examiner. Mr. Togut has retained the firm of Togut Segal & Segal as his counsel and the retention of the firm has been approved by the Bankruptcy Court. As of the date of this disclosure statement, the examiner has not issued his report.

### FORMATION OF THE OFFICIAL CREDITORS COMMITTEE

On May 3, 2011, the Office of the United States Trustee appointed a five member committee of unsecured creditors consisting of the following members:

Signature Bank
Mr. Thomas Reed

Ms. Doris K. Silverman
Ms. Jayne M. Kurzman
Mr. Darren Conte

Thereafter, the Committee selected Klestadt & Winters LLP as its counsel and FTI Consulting, Inc. as its financial advisors. The retentions of both firms have been approved by the Bankruptcy Court.

**GENERAL BAR DATE AND ADMINISTRATIVE BAR DATE.**

In accordance with the requirements of Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, the Debtor filed their Schedules[7] of their assets and liabilities, including schedules of all of their known creditors and the amounts and priorities of the Claims the Debtor believes are owed to such creditors. Pursuant to Section 501 of the Bankruptcy Code any creditor or interest holder may file a Proof of Claim or Interest and, unless disputed, such filed Proof of Claim or Interest supersedes the amount and priority set forth in the Debtor's schedules. The Bankruptcy Court set October __, 2011 as the last date for filing Proofs of Claim and Proofs of Interest with the Bankruptcy Court by Creditors and Interest Holders ("Bar Date").

**OPERATING REPORTS**

Pursuant to the requirements of the Office of the United States Trustee for the Southern District of New York, the Debtor has regularly prepared and filed monthly operating reports with the Bankruptcy Court detailing the results of the Debtor's ongoing business operations. Copies of such reports may be obtained from the Bankruptcy Court during normal business hours, or may be obtained upon written request made to counsel for the Debtor.

**MOTION TO APPOINT A TRUSTEE**

By application dated March 22, 2011, the Office of the United States Trustee moved for the appointment of a chapter 11 trustee or the conversion of the debtors' cases to cases under chapter 7 (the "Chapter 11 Trustee Motion"). The United States Trustee alleged, among other things, gross mismanagement of the debtors by current management alleging that the debtors had been paying large salaries and expenses (particularly legal fees) and that current management has been unresponsive to requests for information from investors and the Independent Monitor. The Securities and Exchange Commission (the "SEC") joined in the Chapter 11 Trustee Motion.

---

[7] After an initial extension of time to file schedules, each of the debtor entities filed schedules in their respective cases. After the cases were substantively consolidated, the Debtor filed a consolidated Schedule F – Creditors Holding Unsecured Non-Priority Claims, so as to reflect the partial substantive consolidation of the cases.

The Debtor denied the allegations set forth in the Chapter 11 Trustee Motion. The Bankruptcy Court held six days of hearings on the Chapter 11 Trustee Motion during which the United States Trustee presented its case. At the conclusion of the United States Trustee's direct case, the Debtor moved to dismiss the Chapter 11 Trustee Motion. The Court denied the Debtor's motion and scheduled further dates for the presentation of the Debtor's direct case. The next hearing date has been scheduled for _____, 2011.

During the hearings on the Chapter 11 Trustee Motion, the Debtor and the SEC reached preliminary understandings with respect to the contours of a proposed plan of reorganization and the need for substantive consolidation of the debtors' cases. The Court has not conducted further evidentiary hearing on the Chapter 11 Trustee Motion thereby permitting the Debtor and other interested parties to attempt to reach consensus regarding a plan of liquidation.

As of the date of this Disclosure Statement, the Chapter 11 Trustee Motion remains pending before the Court should the parties negotiations breakdown.

### SUBSTANTIVE CONSOLIDATION

On May 4, 2011, the Debtor filed its motion seeking the substantive consolidation of the various related chapter 11 cases (the "Substantive Consolidation Motion"). A declaration was submitted by Raymond Heslin in support of the Substantive Consolidation Motion. Among other things, the Substantive Consolidation Motion alleged that William Landberg co-mingled the debtors assets to such an extent that it was not feasible to unravel its financial affairs.

The United States Trustee filed an objection to the Substantive Consolidation Motion and the Court thereafter scheduled an evidentiary hearing on the Substantive Consolidation Motion.

In connection with the Substantive Consolidation Motion, the Debtor sought the support and consent of the Committee to the relief sought. Before the Committee could take a position on the Substantive Consolidation Motion, it requested its financial advisor, FTI, review the Debtor's books and records and form an opinion as to whether substantive consolidation was proper. Accordingly, FTI, with the Debtor's co-operation, undertook an expedited review in order to reach an opinion on the issue prior to the date for the evidentiary hearing set by the Court.

After reviewing approximately 1,400 transactions whereby cash was transferred among the debtor entities with apparent disregard for legal restrictions on transfer and differing investment objectives of the funds, FTI prepared an extensive report and concluded that substantive consolidation below the Debtor's secured debt was warranted. FTI's report provided examples which demonstrated the varying ways in which money was transferred among the debtor entities on a regular basis to cover the cash needs of the receiving entities as the result of:

Overdrafts in bank accounts of other Entities and of family members of William Landberg;

- Recurring distributions and redemptions made to investors in other funds;

- Investments made by, and in, other Entities;

- Operating expenses of other Entities; and

- Payments to Landberg, Louise Crandall ("Crandall"), wife of Landberg, or their family members.

FTI's report stated that foregoing uses of money transferred among the entities bear the hallmarks of a Ponzi scheme, albeit one combined with investing activities. FTI's report also concluded that the key defining element of a Ponzi scheme was present in that new moneys were used to redeem and make distributions to earlier investors in order to create the appearance of profitability and thereby attract new investors in order to perpetuate the scheme.

The report concluded that there is no doubt that there was extensive commingling of funds among the Entities during the period from at least 2004 to 2009.

Further, the report devoted a significant portion to the exposition and evaluation of the evidence weighing in favor of, and militating against, substantive consolidation under the circumstances found in this case. FTI's investigation to date has uncovered extensive levels of commingling of cash among the entities, as well as instances of incomplete and inconsistent record keeping by the entities, casting doubt on the ability to disentangle the financial affairs of the Debtor, and to accurately determine the ultimate origin of payments. Based upon the information reviewed and analyzed by FTI at the time of the report, it was FTI's professional opinion that, while it might be possible to disentangle the accounts of the Entities, it would be cost-prohibitive to effectively reconstruct the Debtor's business records to give effect to their operations as if each debtor had been segregated and independently operated throughout this period, particularly considering the costs to disentangle the accounts relative to the anticipated recoveries to the unsecured creditors and investors.

On July 6, 2011, the Debtor filed a supplement to the Substantive Consolidation Motion. The principal purpose of the supplement was to clarify that the Debtor was seeking substantive consolidation below the level of secured creditors in this case so that the interests of secured creditors would be neither enhanced nor disadvantaged by the Substantive Consolidation Motion. The supplement was also filed to bring the two later filed cases within the ambit of the Substantive Consolidation Motion.

On July 20, 2011, the Bankruptcy Court conducted an evidentiary hearing on the Substantive Consolidation Motion. The Debtor presented the testimony of FTI, through its Managing Director, Raymond T. Sloane, as an expert witness and moved FTI's report into evidence. The

Debtor also offered the testimony of Raymond Heslin. After cross examination and hearing the arguments of counsel, the Bankruptcy Court determined that partial substantive consolidation in accordance with the Debtor's request was appropriate. To address an issue raised by the United States Trustee concerning the treatment and classification of potential deficiency claims, the rights of all parties concerning the classification and treatment of such claims was preserved.

On July 25, 2011, the Bankruptcy Court entered an order granting the Substantive Consolidation Motion. The Court also fixed August 31, 2011 as the date for the filing of the Debtor's Plan and Disclosure Statement.

SUMMARY OF THE PLAN

The following summary of the terms of the Plan is qualified in its entirety by reference to the provisions of the Plan, a copy of which accompanies this Disclosure Statement and which is incorporated herein by reference.

## A. Provisions For Implementation of the Plan

### 1. Establishment of Post Confirmation Estate

The Plan provides that on the Effective Date, the Debtor, on their own behalf and on behalf of holders of Allowed Claims, shall execute the Post Confirmation Estate Agreement and shall take all other steps necessary to establish the Post Confirmation Estate. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtor shall assign and transfer to the Post Confirmation Estate all assets of the Debtor and its estate (including without limitation all property of its estate, all rights as a trustee or debtor in possession to assert Bankruptcy Causes of Action, and all rights as a trustee or debtor in possession to assert a Director or Officer Action) and all of the right, title, and interest in and to all of the Post Confirmation Estate Assets, notwithstanding any prohibition of assignability under applicable non-bankruptcy law. In connection with the transfer of these assets, including rights and causes of action (including Bankruptcy Causes of Action), any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Post Confirmation Estate shall vest in the Post Confirmation Estate and its representatives, and the Debtor and the Plan Administrator on behalf of the Post Confirmation Estate are authorized to take all necessary actions to effectuate the transfer of such privileges.

### 2. Funding Expenses of the Post Confirmation Estate

As more fully described in the Post Confirmation Estate Agreement, and provided such funding does not conflict with the treatment of the Northlight Secured Claim, the Iberia Bank Secured Claim and the CapLease Secured Claim, the Plan provides that any Cash in the Post Confirmation Estate shall be applied: first, for the fees, costs, expenses and liabilities of the Plan

Administrator, and its professionals; second, to satisfy the allowed administrative expenses of the Estate; and third, to pay the distributions provided for Classes 3 and 4 pursuant to the Plan. The Plan Administrator shall have all of the estate's unencumbered assets (as hereinafter described) available to it to monetize to fund the expenses of the Post-Confirmation estate and the payments to creditors.

## 3.      Limited Liability Company Action

The Plan provides that upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan involving the limited liability company power of the Debtor shall be deemed authorized and approved without any requirement of further action by the Debtor, the Debtor's limited liability company members or the Debtor's boards of managers. The Debtor (and their boards of managers) shall dissolve or otherwise terminate their existence following the Effective Date.

## 4.      Preservation of Rights of Action

a.      Under the Plan, the Plan Administrator, on behalf of the Post Confirmation Estate, retains all rights on behalf of the Debtor and the Post Confirmation Estate to commence and pursue any and all bankruptcy causes of action (under any theory of law or equity, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Debtor's Case) discovered in such an investigation, (other than claims exculpated under the Plan) to the extent the Plan Administrator, on behalf of the Post Confirmation Estate, deems appropriate, in accordance with and subject to the terms of the Post Confirmation Estate Agreement. Potential bankruptcy causes of action currently being investigated by the Debtor, which may but need not have been pursued by the Debtor prior to the Effective Date and by the Plan Administrator, on behalf of Post Confirmation Estate, after the Effective Date to the extent warranted, include, without limitation, the following Bankruptcy causes of action (collectively, the "Bankruptcy Causes of Action"):

i.      Any lawsuits for, or in any way involving, the collection of accounts receivable or any matter related thereto;

ii.      Director and Officer Actions;

iii.      Any and all potential claims for prepetition breaches of fiduciary duty, negligent management and wasting of corporate assets and corporate opportunity and/or arising under the Debtor's Directors and Officers insurance policies against the Debtor's prepetition directors and officers, board manager or manager (as the case may be) and general partner, among others;

iv.    Any and all potential claims against the prepetition members of the Debtor's boards of directors, managers, general partner, officers and/or shareholders, for acts or omissions occurring prior to the Petition Date, including, without limitation, the right to equitably subordinate claims held by such directors, managers, general partners officers, or shareholders pursuant to Section 510(c) of the Bankruptcy Code;

v.    Claims arising out of, and in connection with, the prepetition management, operation and/or reporting of financial and other information against all persons and entities having any responsibility with respect thereto, whether such claims are legal, equitable or statutory in nature;

vi.    Claims to recover amounts improperly awarded to employees under the terms of any prepetition employment or change in control agreement;

vii.    All violations against third parties with respect to prepetition violations of applicable federal or state securities laws;

viii.    All claims or causes of action arising out of or that relate to prepetition acquisitions or financings;

ix.    All claims, counterclaims, cross-claims, third party claims, and affirmative defenses asserted or that could be asserted in any litigation involving the Debtor, whether arising before or after the Petition Date; and

x.    All claims or causes of action for credits; overpayments; overcharges; prepaid deposits and other amounts; adjustments; recoupments; setoffs; and other rights to payment from those Entities who have received payments or other transfers of property of the Estate during the course of the Chapter 11 Case; and

b.    In addition, potential Bankruptcy Causes of Action, which may be pursued by the Debtor prior to the Effective Date and by the Plan Administrator on behalf of the Post

Confirmation Estate after the Effective Date, also include, without limitation the following:

  i.  Any other actual or potential Bankruptcy Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtor's business or operations, including, without limitation, the following: possible claims against vendors, landlords, sublessees, assignees, customers or suppliers for warranty, indemnity, back charge/set-off issues, overpayment or duplicate payment issues and collections/accounts receivable matters; deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, landlord, sublessee, assignee, or other entity; employee, management or operational matters; claims against landlords, sublessees and assignees arising from various leases, subleases and assignment agreements relating thereto, including, without limitation, claims for overcharges relating to taxes, common area maintenance and other similar charges; financial reporting; environmental, and product liability matters; actions against insurance carriers relating to coverage, indemnity or other matters; counterclaims and defenses relating to notes or other obligations; contract or tort claims which may exist or subsequently arise; and

  ii.  Except for the express waiver of certain claims in the Plan, any and all actual or potential avoidance claims pursuant to any applicable Section of the Bankruptcy Code, including, without limitation Sections 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code, arising from any transaction involving or concerning the Debtor.

  c.  In addition, there may be numerous other Bankruptcy Causes of Action which currently exist or may subsequently arise, because the facts upon which such Bankruptcy Causes of Action are based are not fully or currently known by the Debtor and, as a result, cannot be raised during the pendency of the Chapter 11 Case (collectively, the "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action herein is not intended to limit the rights of the Plan Administrator, on behalf of the Post Confirmation Estate, to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtor and/or the Plan Administrator.

  d.  The Debtor is unable to predict the estimated amount of net preference recoveries on account of transfers made within the 90 days prior to the petition date. The Debtor is currently analyzing what potential preferential transfers may not be recoverable because the transferee

may have valid defenses under Section 547( c ) a n d ( i )of the Bankruptcy Code.

      e.     Counsel to the Post-Confirmation Estate shall be selected by the Plan Administrator after consultation with the Plan Oversight Committee ("POC").

**Provisions Governing Post Confirmation Estate**

      The following is a brief description of the Plan's treatment of the Post Confirmation Estate, which is a grantor trust established to be the transferee of the Debtor's Assets as of the Effective Date, and from which such Assets, when liquidated into Cash, will be distributed to holders of Allowed Claims entitled to distributions under the Plan.

      1.     **Purpose of Post Confirmation Estate**

      The "Post Confirmation Estate" is a trust to be created on the Effective Date in accordance with the provisions of the Plan and the "Post Confirmation Estate Agreement," a copy of which is annexed to the Plan, for the benefit of holders of Allowed Claims entitled to distributions under the Plan. The Post Confirmation Estate is to be established for the primary purpose of liquidating its assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Post Confirmation Estate. The Post Confirmation Estate shall not be deemed to be a successor of the Debtor. The Post Confirmation Estate is intended to qualify as a "grantor trust" for federal income tax purposes with the beneficiaries there under treated as grantors and owners of the trust. It is anticipated that the Debtor will not incur any federal income tax liability from the transfer of the Post Confirmation Estate Assets to the Post Confirmation Estate.

      2.     **Plan Administrator**

      The Plan provides that _____, shall be designated as the Plan Administrator, who will, not individually, but solely in his capacity as Plan Administrator, act on behalf of and be the representative of the Post Confirmation Estate and be subject to all fiduciary duties attendant thereto. The Plan Administrator will generally be responsible for complying with the Plan and liquidating into Cash (or abandoning) the Post Confirmation Estate Assets for distribution to holders of Allowed Claims entitled to distributions under the Plan in accordance with the Plan and the Post Confirmation Estate Agreement. The Plan Administrator shall take all steps necessary to carry out the Plan, according to the terms set forth in the Post Confirmation Estate Agreement.

### 3. Governance and Administration

The Plan provides that the Post Confirmation Estate will be administered by the Plan Administrator and any replacements thereafter selected in accordance with the provisions of the Post Confirmation Estate Agreement. It is the responsibility of the Plan Administrator to determine in accordance with the Post Confirmation Estate Agreement whether to prosecute, compromise or discontinue any Post Confirmation Estate Claims of the Post Confirmation Estate and the liquidation or abandonment of any Post Confirmation Estate Assets. The powers, authority, responsibilities and duties of the Post Confirmation Estate and the Plan Administrator are set forth in, and shall be governed by, the Post Confirmation Estate Agreement. On or before ten days prior to the Voting Deadline, the Debtor shall file a Statement of Post-Confirmation Governance, which among other things, will disclose the identities of the POC for the Post Confirmation Estate, and serve notice of such filing on those who have requested notice of papers in the Chapter 11 cases pursuant to Fed. R. Bankr. P. 2002.

### 4. Plan Oversight Committee

On the Effective Date, the POC shall be appointed as described in the Post Confirmation Estate Agreement, with the rights and authority described therein. One person designated by the Committee and one person designated by the Debtor shall be the initial members of the POC. These two (2) appointees shall jointly select three (3) additional members to the POC who shall be holders of Investor Unsecured Claims. The POC shall adopt its own bylaws. The POC shall oversee the actions of the Plan Administrator in accordance with the Post Confirmation Estate Agreement.

The Plan Administrator shall not be required to obtain Bankruptcy Court approval with respect to any proposed action or inaction authorized in the Post Confirmation Estate Agreement.

### 5. Transfer of Assets

The Plan provides that the transfer of the Post Confirmation Estate Assets to the Post Confirmation Estate shall be made, as provided herein, for the benefit of the holders of Allowed Claims only to the extent such holders are entitled to distributions under the Plan. On the Effective Date, the Debtor shall transfer title to all of its assets to the Post Confirmation Estate. Upon the transfer of the Post Confirmation Estate Assets to the Post Confirmation Estate, the Debtor shall have no interest in or with respect to the Post Confirmation Estate Assets or the Post Confirmation Estate.

For all federal income tax purposes, all parties (including, without limitation, the Debtor, the Plan Administrator and the beneficiaries of the Post Confirmation Estate) shall treat the transfer of assets to the Post Confirmation Estate in accordance with the terms of the Plan, as a transfer by the Debtor to the holders of Allowed Claims entitled to distributions under the Plan followed by a transfer by such holders to the Post Confirmation Estate, and the beneficiaries of the Post Confirmation Estate shall be treated as the grantors and owners thereof.

### 6. <u>Termination</u>

The Plan provides that the duties, responsibilities and powers of the Plan Administrator will terminate on the date set forth in the Post Confirmation Estate Agreement. In essence, the Post Confirmation Estate will terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, on or prior to the date six (6) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Post Confirmation Estate for a finite period, if such extension is necessary for the liquidation of the Post Confirmation Estate Assets. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least six (6) months prior to the expiration of each extended term; <u>provided</u>, <u>however</u>, that the Plan Administrator receives an opinion of counsel or a favorable ruling from the IRS that any further extension would not adversely affect the status of the Post Confirmation Estate as a grantor trust for federal income tax purposes.

### 7. <u>Post-Confirmation Estate Implementation</u>

The Plan provides that on the Effective Date, the Post Confirmation Estate will be established and become effective for the benefit of the holders of Allowed Claims entitled to distributions under the Plan. The Post Confirmation Estate Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Post Confirmation Estate as a grantor trust and the holders of Allowed Claims as the grantors and owners thereof for federal income tax purposes. All parties (including the Debtor, the Plan Administrator and holders of Allowed Claims) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Post Confirmation Estate.

### 8. <u>Other Assets</u>

On the Effective Date, the Debtor shall also convey to the Post-Confirmation Estate, to the extent such assets have not previously been monetized, all of its other assets held by the estate including but not limited to its equity in the Apartment Collateral, the Sentinel Insurance Policy, the Fusion Stock, the PIMCO Claim, the Chicago Diversified Note and its interest in the Basile Insurance Policy.

CLASSIFICATION OF CLAIMS AND INTERESTS

Classification of claims is governed, in part, by Sections 1122 and 1123(a) of the Bankruptcy Code. Section 1123(a) requires that a plan designate classes of claims, requires that the plan specify the treatment of any impaired class of claims, and requires that the plan provide the same treatment for each claim of a particular class, unless the holder of a claim receiving less favorable treatment consents to such treatment. 11 U.S.C.§1123(a)(1), (3) and (4). Section 1122(a) of the Bankruptcy Code provides, subject to an exception for administrative convenience, that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

As set forth in Article 2 of the Plan, pursuant to Section 1123(a)(1) of the Bankruptcy Code, certain Administrative Claims against the Debtor have not been classified.

Article 3 of the Plan classifies the various Claims against and Interests in the Debtor into six (6) classes of Claims and one (1) class of Interests:

Class 1 -        Priority Non-Tax Claims
Class 2(a) -     Northlight Secured Claim
Class 2(b) -     Iberiabank Secured Claim
Class 2(c)-      Caplease Secured Claim
Class 3 -        Non-Investor Unsecured Claims
Class 4 -        Investor Unsecured Claims
Class 5 -        Allowed Interests

Claims in Classes 2(a), 2(b), 2(c), 3 and 4 and Interests in Class 5 are impaired under the Plan. Holders of Claims in all impaired classes are being solicited and are entitled to vote to accept or reject the Plan. Allowed Interests are deemed to reject the Plan and hence the interests in Class 5 are not being solicited. Holders of Allowed Claims in Class 1 are unimpaired under the Plan and deemed to accept the Plan.

**Class 1 - Priority Non-Tax Claims.** Class 1 consists of Priority Non-Tax Claims.

**Class 2(a) - Northlight Secured Claim.** Class 2(a) consists of the Northlight Secured Claim.

**Class 2(b) - Iberiabank Secured Claim.** Class 2(b) consists of the Iberiabank Secured Claim.

**Class 2(c) - Caplease Secured Claim.** Class 2(c) consists of the Caplease Secured Claim.

**Class 3 – Non-Investor Unsecured Claims.** Class 3 consists of all Non-Investor Unsecured Claims.

**Class 4 – Investor Unsecured Claims.** Class 4 consists of all Investor Unsecured Claims

**Class 5 - Equity Interests.** Class 5 consists of the Allowed Interests in the Debtor.

### TREATMENT OF CLAIMS AND INTERESTS CLASSIFIED UNDER THE PLAN

Article 4 of the Plan provides for the treatment of impaired and unimpaired Claims classified in Article 3 of the Plan as follows:

### Class 1 - Priority Non-Tax Claims.

Class 1 consists of all Allowed Claims, other than Administrative Claims or Bankruptcy Fees, or Priority Tax Claims, to the extent entitled to priority under section 507 of the Bankruptcy Code. Claims that may be classified in Class 1 may include, for example, certain claims of employees of the Debtor for wages, salaries and commissions or contributions to employee benefit plans up to an aggregate amount of $11,725 per employee. Certain Claims for taxes and the payment of expenses incurred by the Debtor subsequent to the Petition Date are entitled to priority under section 507 of the Bankruptcy Code, and are treated elsewhere as non-classified Claims. The Debtor believes that the total claims in this class aggregate approximately less than $1,000.00.

If not paid in full pursuant to a Final Order of the Bankruptcy Court prior to the Effective Date, and except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Priority Non-Tax Claim, if any, against the Debtor shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, Cash equal to the amount of such Allowed Claim on the later of (a) the Effective Date and (b) the date that is 10 days after the Allowance Date.

### Class 2(a) – Northlight Secured Claim.

Class 2 consists of the Secured Claim held by Northlight in the approximate principal amount of 5,200,000. This claim is secured by several items of collateral including:

(i)      A collateral assignment of the Debtor's interest in any management fees or other payments derived from the "Hard Money" Fund, The West End Income Strategies Fund and the "Franchise" Fund.

(ii)      A collateral assignment of the Debtor's interest in various investment properties in East Hampton and Amagansett New York.

(iii)      A collateral assignment of the Debtor's interest in the DZ Bank Franchise Loan Agreement Waterfall and the WestLB Mortgage Loan Agreement Waterfall.

(iv)      A collateral assignment of all the right and interest of West End/Mercury Short-term Mortgage Fund L.P. ("WEMO") in and to the Franchise Loans

(v)      A collateral assignment of the monies received by West End that have not been paid directly to the accountants, attorneys and/or forensic accountants as a result of insurance claims under D&O insurance policies held by WEMO, West End Mortgage Finance Fund LP.("WEMFF") and each of its general partners and fund managers

(vi)      A pledge of WEMFF's interest in and to a Key Man life insurance policy insuring the life of Tony Basile in the face amount of $5,000,000.

(vii)      A pledge of certain termination payments owed top WEMFF with respect to a hedging arrangement that NFA Funding LLC had in place with respect to that certain Franchise Loan Funding Agreement dated October 29, 2004 between NFA Funding LLC, as Borrower and Merrill Lynch Commercial Finance Company.

(viii)      A collateral assignment of the proceeds of any sale of the interest held by the Debtor or WEMFF in Venture Restaurant Partners LLC.

On the Effective Date, Northlight shall receive the New Northlight Note. The Northlight Allowed Secured Claim as evidenced by the New Northlight Note shall be secured with the same priority in the same collateral it held prior to the Petition Date. The New Northlight Note shall bear interest only at the rate of 10% per annum which shall be payable monthly in arrears with a balloon payment consisting of the unpaid principal balance of the New Northlight Note which shall mature on the fifth (5th) anniversary of the Effective Date. The New Northlight Note may be pre-paid at any time without penalty.

### Class 2(b) – Iberiabank Secured Claim

Century Bank F.S.B. ("Century"), Iberiabank's predecessor in interest[8], entered into a loan agreement with West End Mortgage Finance Fund I LP, ("WEMFF"), a Delaware limited

---

[8] On or about November 13, 2009, Century was taken over by the Federal Deposit Insurance Corporation. Thereafter, the FDIC sold certain of Century's assets, including the loan to the Debtor to IberiaBank,

liability company on or about March 2, 2009. On that same date, Century entered into the following agreements with WEMFF: (a) credit agreement, dated as of March 2, 2009 (the "Credit Agreement"), (b) revolving credit note, dated March 2, 2009 in the principal amount of $5,000,000.00 (the "Note"), (c) securities pledge agreement, dated March 2, 2009 (the "Securities Pledge Agreement", and together with the Credit Agreement and the Note, referred to herein as the "Loan").

Debtor believes that Iberia's claim was not validly perfected under Delaware law and intends to commence an adversary proceeding or motion objecting to Iberia's purported secured claim prior to the Confirmation Hearing.

To the extent it is determined by Final Order to be a Secured Claim, in full satisfaction, settlement and release of, and in exchange for, the Iberia Secured Claim, Iberia shall receive (a) on the Effective Date, the New Iberia Note. The Iberia Allowed Secured Claim as evidenced by the New Iberia Note shall be secured with the same priority in the same collateral it held prior to the Petition Date. Iberia's Allowed Secured Claim shall accrue interest at the rate of five (5%) percent per annum, payable at maturity, and shall mature on the fifth anniversary of the Effective Date. On the maturity date, the principal due with respect to the Iberia Secured Claim plus all accrued interest shall be due and payable, provided however, that the Debtor or Plan Administrator shall be permitted to prepay the Iberiabank Allowed Secured Claim at any time without premium or penalty. Notwithstanding the foregoing, the Debtor or the Plan Administrator shall pay to Iberiabank the net proceeds from the sale of any of its collateral which is sold prior to the maturity date.

### Class 2(c) – Caplease Secured Claim

On the Effective Date, CapLease shall receive the New CapLease Note granting Caplease a first priority lien and security interest in the Apartment Collateral. The New CapLease Note shall have a maturity date of 5 years from the Effective Date and shall bear interest at the rate of five (5%) percent per annum, payable quarterly, in arrears. The Debtor shall have the right to prepay the New CapLease Note without premium or penalty. In the event CapLease is paid the sum of $1,000,000 on or before March 1, 2012, the CapLease Secured Claim shall be deemed paid in full. Notwithstanding the foregoing, the Debtor shall pay to CapLease the net proceeds from the sale of any of its collateral which is sold prior to the maturity date with such net proceeds being applied first to interest outstanding on the date of such payment and the balance, if any, to reduce the then outstanding principal amount of the CapLease Secured Claim.

### Class 3 – Non-Investor Unsecured Claims.

Class 3 consists of Non-Investor Unsecured Claims against the estate. Non-Investor Unsecured Claims are all Unsecured Claims against the Debtor (including (i) any and all Rejection Claims, (ii) any Claims of Vendors, and (iii) claims for good delivered or services rendered in the ordinary course of the Debtor's business, that, in each case are (A) not Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, or Investor Unsecured Claims, and (B) not otherwise entitled to distributive priority under the Bankruptcy Code or an order of the Bankruptcy Court. Except as may otherwise be set forth in the Plan, for purposes of the Plan, Investor Creditors are not deemed to hold a Non-Investor General Unsecured Claim against the Debtor.

These claims are principally trade claims incurred by the Debtor in the ordinary course of business prior to the various Petition Dates that are not eligible for priority or administrative treatment under the applicable provisions of the Bankruptcy Code.

Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Class 3 Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, such holder's Pro Rata share of the Cash distributed from the Post-Confirmation Estate in the time and manner set forth in the Plan and the Post-Confirmation Estate Agreement. There will be no distributions to holders of Allowed Investor Creditor Unsecured Claims unless and until holders of Allowed Non-Investor Unsecured Claims have been reserved for or paid in full.

### Class 4 – Investor Unsecured Claims

Class 4 consists of all Allowed Investor Unsecured Claims, which are all Allowed Claims of Investor Creditors. Except as may otherwise be set forth in the Plan, Class 4 does not consist of any Claims of Vendors or Rejection Claims.

Subject to payment in full of, or reserve for, all Allowed Non-Investor Unsecured Claims, and except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Investor Unsecured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, such holder's Pro Rata Share of the Cash distributed by the Post-Confirmation Estate in the time and manner set forth in the Plan and the Post Confirmation Estate Agreement. No distributions shall be made to holders of Allowed Investor Unsecured Claims against the Debtor until all holders of Allowed Non-Investor Unsecured Claims (if any) against the Debtor have been reserved for or paid, in full.

### Class 5 - Equity Interests.

Class 5 consists of Allowed Interests in the Debtor. These claims are held by L/C Family Trust an entity owned by Louise Crandall, William Landberg's wife.

On the Effective Date, all outstanding Equity Interests in the Debtor shall be canceled and deemed terminated and of no force and effect and the Holders of such Equity Interests shall not be entitled to retain or receive any property on account of such Equity Interest.

## TREATMENT OF NON-CLASSIFIED CLAIMS

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims entitled to priority treatment under Section 507(a)(2) of the Bankruptcy Code or Claims of Governmental Units entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Article 2 of the Plan provides for the manner of treatment of such non-classified Claims.

**Administrative Claims.** Administrative Claims are the costs and expenses of administration of this Case, allowable under Section 503(b) of the Bankruptcy Code, other than Bankruptcy Fees. Administrative Claims include Claims for the provision of goods and service to the Debtor after the Petition Date, the liabilities incurred in the ordinary course of the Debtor's business (other than claims of governmental units for taxes or interest or penalties related to such taxes) after the Petition Date, Claims of professionals, such as attorneys, financial advisors, and accountants, retained pursuant to an order of the Bankruptcy Court, for compensation and reimbursement of expenses under section 330 of the Bankruptcy Code, and tax claims for the period from the Petition Date to the Effective Date of the Plan. Administrative Claims are estimated to total approximately $3,500,000.

The Plan provides that, on the later to occur of (i) the Distribution Date or (ii) the date on which such Claim shall become an Allowed Claim, the Debtor or the Plan Administrator shall (a) pay to each Holder of an allowed Administrative Claim a Pro Rata portion of Cash reasonably determined by the Debtor or the Plan Administrator, as the case may be, to be available based on the amount of available Post Confirmation Estate Assets in the Post-Confirmation Estate at that time, and thereafter, as often as reasonable in the Plan Administrator's sole discretion, make periodic pro rata payments to the holders of Allowed Administrative Claims until such claims are paid in full or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other terms as may be agreed upon by and between the Holder thereof and the Debtor or the Plan Administrator, as the case may be.

Article 2 of the Plan sets a final date for the filing of applications by the Professionals for the approval of compensation and reimbursement of necessary expenses incurred in connection with the Case. The deadline for Professionals to file such applications is 90 days after the Confirmation Date. Any application timely filed shall be deemed an Administrative Claim.

Section 330 of the Bankruptcy Code sets the standard for the determination by the Bankruptcy Court of the appropriateness of fees to be awarded to Professionals retained by the Debtor in a case under the Bankruptcy Code. In general, bankruptcy legal services are entitled to

command the same competency of counsel as other cases. "In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable service other than in a case under title 11." 124 Cong. Rec. H11091 (Daily ed. Sept. 28, 1978).

**The Plan also provides that the failure to object to confirmation of the Plan by a holder of an Administrative Expense Claim shall be deemed to be such holder's agreement to receive treatment for such Claim that is different from that set forth in Section 1129(a)(9) of the Bankruptcy Code. Section 1129(a)(9) of the Bankruptcy Code essentially provides that a court shall only confirm a plan if, among other things, the plan provides that all claims for the actual, necessary costs and expenses of preserving a debtor's bankruptcy estate under Section 503 of the Bankruptcy Code are paid in full in cash on the plan's effective date, unless and to the extent the holders of such claims agree to different treatment of their claims.**

**Bankruptcy Fees.** All fees and charges assessed against the Debtor under Section 1930 of title 28 of the United States Code and Section 3717 of title 31 of the United States Code shall be paid in Cash in full as required by statute until the closing of the Case.

**Professional Fees.** Reasonable compensation due to the Debtor's Professionals pursuant to section 330 of the Bankruptcy Code, as determined by the Bankruptcy Court, shall be payable by the Plan Administrator within 30 days of the date upon which the order relating to any such Professional Fee Claim is entered, provided that the Post Confirmation Estate has sufficient available Cash to pay such claims as determined by the Plan Administrator, or upon such other terms as may be mutually agreed upon between the holder of the Professional Fee Claim and the Debtor and/or the Plan Administrator.

The estimated Professional Fees incurred through July 31, 2011 for professionals retained by the Debtor are as follows:

| Name of Professional | Fees and Expenses incurred as of 7/31/2011 |
|---|---|
| Robinson Brog Leinwand Greene Genovese & Gluck P.C., Counsel to the Debtor | $ 1,314,652 |
| Klestadt & Winters, counsel to the Official Committee of Unsecured Creditors | $ 233,729 |
| FTI Consulting, Inc., Financial Advisors to the Official Creditor's Committee | $1,200,000 |
| Togut Segal & Segal, counsel to the Examiner, Al Togut | Not to exceed $50,000 unless a greater amount is approved by the Court after notice and a hearing |

| Mark Radke, Independent Monitor[9] | $288,000 |
|---|---|

        **Priority Tax Claims.** Priority Tax Claims are those Allowed Claims entitled to payment pursuant to Section 507(a)(8) of the Bankruptcy Code.

        The Plan provides that, on the later to occur of (i) the Distribution Date or (ii) the date on which such Claim shall become an Allowed Claim, the Debtor or the Plan Administrator shall (a) pay to each Holder of an allowed Priority Tax Claim regular installment payments in cash equal to the allowed amount of such claim over a period ending not later than five (5) years from the Petition Date.

        The Debtor estimates the dollar amount of the Allowed Priority Tax Claims relating to income taxes to be negligible based on the fact that the Debtor has operated at a loss.

## DISPUTED CLAIMS AND INTERESTS

        Article 7 of the Plan contains a mechanism for resolving disputes concerning the amount of certain Claims or Interests asserted against the Debtor by any Entity.

        **Time to Object.** Unless otherwise ordered by the Bankruptcy Court, objections to the allowance of any Claim or Interest may be filed no later than the later to occur of (i) 90 days after the Effective Date or (ii) 90 days after the date proof of such Claim or Interest is filed. Until the earlier of (i) the filing of an objection to a Proof of Claim or Interest or (ii) the last date to file objections to Claims or Interests as established by the Plan or by Final Order, Claims or Interests shall be deemed to be Disputed in their entirety if, (i) the amount specified in a Proof of Claim or Interest exceeds the amount of any corresponding Claim or Interest listed in the Schedules; (ii) any corresponding Claim or Interest listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim or Interest has been listed in the Schedules.

## DISTRIBUTIONS UNDER THE PLAN

        Article 7 contains provisions governing the making of distributions on account of Claims and Interests. In general, any payments, distributions or other performance to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest shall be deemed to be timely made if made on or within five days following the later of (i) the Effective Date or (ii) the expiration of any applicable objection deadline with respect to such Claim or Interest or (iii) such other times provided in the Plan and/or the Post Confirmation Estate Agreement, which payments are to be made at the discretion of the Plan Administrator to the extent sufficient Cash is available in the Post Confirmation Estate to support any such distribution. All Cash payments to be made by the

---

[9] Mr. Radke's retention application is pending as of the date of this Document.

Debtor or the Plan Administrator pursuant to the Plan shall be made by check drawn on a domestic bank.

      **Plan Administrator.** The Post-Confirmation Estate created under the Post-Confirmation Estate Agreement shall make distributions under the Plan. The Plan Administrator shall be entitled to compensation for services rendered under the Plan at its usual and customary fee and reimbursement of all expenses incurred in the performance of its duties. The Plan Administrator shall serve without a bond.

      Distributions shall be made: (1) at the addresses set forth on the Proofs of Claim or Proofs of Interests filed by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Plan Administrator after the date of any related Proof of Claim or Proof of Interest; or (3) at the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Plan Administrator has not received a written notice of a change of address. If the distribution to the holder of any Claim or Interest is returned to the Plan Administrator as undeliverable, no further distribution shall be made to such holder unless and until the Plan Administrator is notified in writing of such holder's then current address. The Debtor and/or the Plan Administrator shall not be required to attempt to locate any holder of an Allowed Claim or an Allowed Interest.

### UNCLAIMED DISTRIBUTIONS

      Any Cash or other property to be distributed under the Plan shall revert to the Debtor if it is not claimed by the Entity entitled thereto before the later of (i) 180 days after the Effective Date or (ii) 60 days after an Order allowing the Claim of that Entity becomes a Final Order or is otherwise Allowed, and such Entity's claim shall be deemed to be reduced to zero.

### DISTRIBUTIONS WITH RESPECT TO DISPUTED CLAIMS

      During the pendency of any objection to any Claim or Interest, no distribution under the Plan will be made to the holder of such Claim or Interest. However, at the discretion of the Plan Administrator, and to the extent sufficient Cash is available to make a distribution, the Plan Administrator shall segregate Cash equal to the amount which would be distributed on account of such Disputed Claim if such Claim had been an Allowed Claim but for the pendency of the objection. The Debtor or Plan Administrator may seek an order of the Bankruptcy Court estimating or limiting the amount of Cash or property that must be deposited in respect of any such disputed Claims or Interests. Cash held in reserve for disputed Claims will be held in trust for the benefit of the holders of such Claims.

Until the dispute over the claim is resolved, the Plan Administrator shall also segregate any interest or dividends earned upon such amount it is holding on account of such Disputed Claim.

Within 30 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Plan Administrator shall distribute all Cash or other property held in escrow with respect to such claim, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim. Any segregated amounts remaining after all Disputed Claims and Interests have been resolved will be retained by the Post Confirmation Estate.

### SURRENDER OF INSTRUMENTS

In accordance with Section 6.6 of the Plan, On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, debentures, certificates and other documents evidencing Claims and all Interests in the Debtor shall be canceled and deemed terminated and surrendered (regardless of whether such notes, instruments, debentures, certificates or other documents are in fact surrendered for a cancellation to the appropriate indenture trustee or such other person), except for purposes of distribution in accordance with the terms of the Plan. On the Effective Date, the indentures shall be deemed canceled as permitted by Section 1123(a)(5) of the Bankruptcy Code.

### COMPLIANCE WITH TAX REQUIREMENTS

In connection with the Plan, the Plan Administrator shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements.

### EFFECTIVE DATE

The Effective Date of the Plan is defined as the first business day that is 30 days after the Confirmation Order becomes a Final Order.

### CONDITIONS TO THE EFFECTIVE DATE

The only condition to the Effective Date is that the Confirmation Order must be a Final Order.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Effective on and as of the Effective Date, any and all of Executory Contracts to which the Debtor is a party which (i) have not expired or terminated pursuant to their own terms, or (ii) have not previously been assumed, or assumed and assigned or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected in accordance with Section 365 of the Bankruptcy Code.

**Rejection Claims**. Allowed Claims arising from the rejection of any Executory Contract of the Debtor pursuant to the Plan (as opposed to a separate order of the Bankruptcy Court) shall, pursuant to Section 502(g) of the Bankruptcy Code, be treated as Non-Investor Unsecured Claims. A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be filed within thirty (30) days after the Confirmation Date. The Debtor or Plan Administrator shall have until the Claims Objection Deadline to object to any such rejection Claims filed in accordance with Section 5.2 of the Plan.

## THE REORGANIZED DEBTOR

The Debtor as the Reorganized Debtor shall cease to exist after the Effective Date upon completion of the transfer of all of its assets to the Post-Confirmation Estate.

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

The Plan provides that upon the completion of the transfers of the Debtor's assets to the Post Confirmation Estate, the committee shall be dissolved and each member of the Committee, and the professionals retained by the Committee, shall be released and discharged from their respective fiduciary obligations.

## VESTING OF ASSETS

On the Effective Date, the Debtor, on its own behalf and on behalf of Holders of Allowed Claims, shall execute the Post Confirmation Estate Agreement and shall take all other steps necessary to establish the Post Confirmation Estate. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtor shall assign and transfer to the Post Confirmation Estate all of the assets of the Debtor and its Estate (including without limitation all property of its estate, all rights as a trustee or debtor in possession to assert causes of action, and all rights as a trustee or debtor in possession to assert a Director and Officer Action) and all of its right, title, and interest in and to all of the Post Confirmation Estate Assets, notwithstanding any prohibition of assignability under applicable non-bankruptcy law. In connection with the transfer of these assets, including rights and causes of action (including Avoidance Actions), any attorney-

client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Post Confirmation Estate shall vest in the Post Confirmation Estate and its representatives, and the Debtor and the Post Confirmation Estate are authorized to take all necessary actions to effectuate the transfer of such privileges.

## TRANSFER TAXES

Pursuant to Section 1146(a) of the Bankruptcy Code, the initial issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan shall be exempt and shall not be subject to tax under any law imposing a Transfer Tax, mortgage recording tax or similar tax as set forth in the Plan. Specifically, the transfer, assignment, conveyance or delivery of the Post Confirmation Estate Assets to the Post Confirmation Estate and the execution of an transfer documents in connection with the Plan, including, but not limited to the treatment of holders of claims in Class 2(a), 2(b) and 2(c) shall not be subject to any transfer or mortgage recording tax.

## REVOCATION OF THE PLAN

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Debtor revokes or withdraws the Plan, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall constitute a waiver or release of any claims by or against, or any Interest in, the Debtor; or prejudice in any manner the rights of the Debtor, or any other party, in any further proceedings involving the Debtor or its Estate.

## RETENTION OF JURISDICTION

The Plan contains detailed provisions providing for the retention of jurisdiction by the Bankruptcy Court over the Case for the purposes of, *inter alia,* determining all disputes relating to Claims or Interests and other issues presented by or arising under the interpretation, implementation or enforcement of the Plan, and to determine all other matters pending on the date of confirmation.

## RISK FACTORS

## RISK FACTORS

The Plan provides for the creation of the Post Confirmation Estate and the liquidation of the Debtor. There can be no assurance that the Plan will be confirmed or that the Effective Date will occur and/or that Post Confirmation Estate and the assets transferred to the Post Confirmation Estate will provide sufficient Cash to satisfy payments to Creditors in the future. Each Creditor, Interest Holder and their respective advisers should consider the following factors (and other risks considered elsewhere in this Disclosure Statement).

Requirement of Compromise by Administrative Expense Claim and Priority Claim Holders

The Plan (subject to certain exceptions described herein) generally provides for the creation of the Post Confirmation Estate, the liquidation of the Debtor's Assets into Cash and then the distribution of that Cash to holders of Allowed Claims. There may not be sufficient Cash available to satisfy the holders of Administrative Claims in full at confirmation.

**The Plan provides that the failure of holders of Administrative Expense Claims to object to the Plan shall be deemed to be such holders' agreement to treatment other than that set forth in Section 1129(a)(9) of the Bankruptcy Code. In the event that one or more of the holders of such Claims, objects to their treatment under the Plan, the Plan may not be confirmed pursuant to Chapter 11 of the Bankruptcy Code. In that event, it may be necessary for the Debtor to either convert the Chapter 11 Case to Chapter 7 liquidation or otherwise abandon or dismiss this Chapter 11 Case and/or proceed with the appropriate liquidation proceeding in the District Court.**

## Risk of Subsequent Reorganization or Liquidation

The Plan provides for the liquidation of the Debtor and the creation of the Post Confirmation Estate.

## CONFIRMATION OF THE PLAN

All distributions to Creditors are contingent on the Plan being confirmed by this Court and the Confirmation Order becoming a Final Order. Otherwise, the Debtor is not obligated, in any way, to make the payments required hereunder.

### Voting Instructions

As noted herein, Claims in Class 1 are not impaired by the Plan. Accordingly, holders of claims in Class 1 are deemed to have accepted the Plan and votes of holders of Claims in Class 1 will not be solicited. In addition the holders of Allowed Interests are deemed to reject the Plan. The holders of Allowed Interests will not be solicited under this Plan.

### Voting Instructions

A Creditor who is entitled to vote may accept or reject the Plan by executing and returning to the Balloting Agent (as defined below) the ballot (a "Ballot") that was sent out with this Disclosure Statement. See below "Who May Vote – In General". The following instructions govern

the time and manner for filing Ballots accepting or rejecting the Plan, withdrawing or revoking a previously filed acceptance or rejection, who may file a Ballot, and procedures for determining the validity or invalidity of any Ballot received by the Balloting Agent.

## DEADLINE FOR RECEIPT OF BALLOTS

The solicitation period for votes accepting or rejecting the Plan will expire at 5:00 p.m., Eastern Standard Time, _____, **2011** (the "Voting Deadline"). A Ballot accepting or rejecting the Plan must be received no later than that date and time or it will not be counted in connection with the Confirmation of the Plan or any modification thereof.

## BALLOTING AGENT

All votes to accept or reject the Plan must be cast by using the Ballot. Executed Ballots should be returned no later than _____, 2011 at 5:00 p.m. to:

> Robinson Brog Leinwand Greene Genovese & Gluck P.C.
> 875 Third Avenue
> New York, New York 10022
> Attn: Lori A. Schwartz

(the "Balloting Agent"). A Creditor entitled to vote who has not received a Ballot, or whose Ballot has been lost, stolen or destroyed, may contact the Balloting Agent at the address indicated above, or call Lori A. Schwartz at (212) 603-6300 to receive a replacement Ballot.

## WHO MAY VOTE - IN GENERAL

Claims in Classes 2(a), 2(b), 2(c), 3 and 4 are impaired under the Plan. Holders of Claims in Classes 2(a), 2(b), 2(c), 3 and 4 are being solicited and are entitled to vote to accept or reject the Plan. Claims in Class 1 are not impaired by the Plan and are deemed to have accepted the Plan. Interests in Class 5 are impaired and deemed to reject the Plan. The Debtor is soliciting the votes of the holders of claims in Classes 2(a), 2(b), 2(c), 3 and 4 to accept or reject the Plan.

**Ballots Executed in a Representative or Fiduciary Capacity**. Ballots executed by the Debtor, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, must indicate the capacity in which such person executed the Ballot and, unless otherwise determined by the Debtor, must submit proper evidence satisfactory to the Debtor of their authority to so act.

**Voting Multiple Claims**. A single form of Ballot is provided for each Class of Claims. Any Person who holds Claims in more than one Class is required to vote separately with

respect to each Class in which such Person holds Claims. However, any Person who holds more than one Claim in one particular Class will be deemed to hold only a single Claim in such Class in the aggregate amount of all Allowed Claims in such Class held by such Person. Thus each Person need complete only one Ballot for each Class.

## DEFECTS OR IRREGULARITIES

**IN THE EVENT AN EXECUTED AND TIMELY FILED BALLOT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, THE BALLOTING AGENT SHALL NOTIFY THE CREDITOR OR INTEREST HOLDER WHICH HAS EXECUTED THE BALLOT SO THAT ALL BALLOTS THAT ARE CAST INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN. IN THE EVENT SUCH CREDITOR OR INTEREST HOLDER DOES NOT RESPOND TO THE DEBTOR'S REQUEST TO CORRECT ITS BALLOT BY THE VOTING DEADLINE, THEN SUCH BALLOTS AND THE AMOUNTS INDICATED THEREON SHALL BE COUNTED AND SHALL BE DEEMED TO HAVE _ACCEPTED_ THE PLAN.**

Where more than one timely and properly completed Ballot is received, the Ballot which bears the latest date will be counted.

The Debtor reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the deadline for filing timely Ballots. Except as set forth above, neither the Debtor, the Balloting Agent, nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification. All questions as to the validity, form, eligibility (including the time of receipt), acceptance and revocation or withdrawal of Ballots will be determined by the Bankruptcy Court, upon motion and upon such notice and hearing as is appropriate under the circumstances. Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots as to which any irregularities have not been cured or waived will not be counted toward the acceptance or rejection of the Plan.

## REVOCATION OF PREVIOUSLY FILED ACCEPTANCES OR REJECTIONS

Any Creditor who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Balloting Agent at any time prior to the Voting Deadline.

A notice of withdrawal, to be valid, must (i) describe the Claim, as the case may be, if appropriate, represented by such Claim, (ii) be signed by the Creditor in the same manner as the

Ballot was signed and (iii) be received by the Balloting Agent on or before the Voting Deadline.  The Debtor reserves the absolute right to contest the validity of any such withdrawals of Ballots.

**CONFIRMATION OF PLAN**

**CONFIRMATION HEARING**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan.  **The Confirmation Hearing is scheduled to commence on _____, 2011, at _____:00 __.m. in the United States Bankruptcy Court, Alexander Hamilton Custom House, 1 Bowling Green, New York, New York.**  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

**Objections, if any, to confirmation of the Plan shall be filed and served on or before _____, 2011**.  Objections must be served upon (i) Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl, New York, NY 10022, Attn.: A. Mitchell Greene, Esq.; and (ii) Klestadt & Winters LLP, 570 Seventh Avenue, 17th Floor, New York, NY 10018, Attn: Fred Stevens, Esq.; and filed electronically in accordance with the Court's ECF procedures.

**REQUIREMENTS FOR CONFIRMATION**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, (iv) the Debtor has made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interests" of all Creditors and Interest Holders, (vi) the Plan is feasible, and (vii) the Plan has been accepted by the requisite number and amount of Creditors or Interest Holders in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances.  The Debtor believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test**

Confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors.  In the context of the Plan, this requires that each holder of an Allowed Claim or Allowed Interest who is entitled to vote for or against the Plan either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than

the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

This analysis requires that the Bankruptcy Court determine what the holders of Allowed Claims and Allowed Interests in each impaired Class would receive if the Debtor's Chapter 11 Case was converted to a Chapter 7 liquidation case and the Debtor's Assets were liquidated in the context of a Chapter 7. In this scenario, the Cash available for the satisfaction of holders of Allowed Claims would consist of the proceeds resulting from the liquidation of the Debtor's unencumbered Assets plus the unencumbered Cash held by the Debtor at the time of the conversion to the Chapter 7 liquidation case. This Cash amount would be reduced by the costs and expenses of the Chapter 7 liquidation case, and by such additional Administrative Expense Claims incurred during the course of the Chapter 7 liquidation case.

Attached to this Disclosure Statement is the Debtor's Estimated Liquidation and Distribution Analysis Pursuant to Chapter 7 (the "Chapter 7 Liquidation Analysis"), which together provide a summary of the proceeds of the liquidation of the Debtor's Assets under the Plan as compared to the proceeds of the liquidation of the Debtor's Assets by a bankruptcy trustee in a hypothetical Chapter 7 liquidation.

The Debtor's costs of liquidation under Chapter 7 would include, among other things, the fees payable to a trustee in bankruptcy, as well as those fees payable to the trustee's attorneys, investment bankers and other professionals, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case, such as compensation for attorneys, financial advisors, accountants, and the costs and expenses of members of any official committees that are allowed in the Chapter 7 case. The fees payable to a Chapter 7 trustee are pursuant to the Bankruptcy Code. In the Chapter 7 Liquidation Analysis, the Debtor estimates that a Chapter 7 Trustee's fees would exceed $_____, but could be greater depending upon the recoveries on claims and causes of action pursued by the trustee. In addition, Claims could arise as a result of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtor during the Chapter 11 Case, and the appointment of a Chapter 7 Trustee may be deemed to be a default under the Northlight Loan documents and/or the Northlight Cash Collateral Stipulation. The foregoing types of Claims, and such other Claims which may arise in the Chapter 7 liquidation case, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay Secured Claims, Administrative Expense Claims, Priority Claims, and Unsecured Claims arising in the Debtor's Chapter 11 Case.

In addition to Chapter 7 trustee's fees, the Debtor has several advantages over a potential Chapter 7 trustee that will contribute to cost saving and lead to a higher recovery in liquidating the Debtor's Assets. The Debtor estimates that a Chapter 7 trustee and its professionals would take at least 120 days to educate themselves regarding the many complicated facets of the Debtor's Estate. The Chapter 7 trustee and its professionals will have to learn about the former

operations of the Debtor to understand how to best liquidate the Assets and evaluate the value of the Creditor's Claims to such Assets. As currently structured, the Plan Administrator will work in conjunction with the POC whose members are fully familiar with the Debtor and its operations and will be able to advise the Plan Administrator effectively.

The distributions proposed in the Plan provide for a greater recovery than in a Chapter 7 case. There are numerous factors that support the Debtor's conclusion that the Chapter 11 distribution pursuant to the Plan, as contemplated herein, exceed the distributions that would occur in a Chapter 7 liquidation, in addition to the savings realized in a Chapter 11 distribution from not paying Chapter 7 trustee fees. As provided for in the Post-Confirmation Estate Agreement, the Plan Administrator of the Post Confirmation Estate will be _____, who will work in conjunction with the POC whose members are fully familiar with the Debtor and its operations so as to enhance the Plan Administrator's ability to and enable him to realize a higher recovery than would a Chapter 7 Trustee in terms of the amount of assets and the likely recovery for each particular asset.

To determine if the Plan is in the best interests of each impaired Class, the value of the distributions from the proceeds of the hypothetical Chapter 7 liquidation of the Debtor's Assets (after subtracting the amounts attributable to the aforesaid Claims) as provided in the Chapter 7 Liquidation Analysis is then compared with the value offered to such classes of Claims and interests under the Plan as provided under Chapter 11. Moreover, in applying the "best interests" test, it is possible that in Chapter 7, the Claims against and interests in the Debtor may not be classified according to the seniority of such Claims and interests. Rather, in the absence of a contrary determination by the Bankruptcy Court, all pre-Chapter 11 Unsecured Claims which have the same rights upon liquidation would be treated as one Class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the Debtor's hypothetical Chapter 7 case. The distributions from the liquidation proceeds would be calculated on a Pro Rata basis according to the amount of the Claim held by each Creditor. Therefore, certain Creditors might have to seek to enforce the classification contained in the Plan in the Bankruptcy Court. The Debtor believes that in a hypothetical Chapter 7 liquidation of the Debtor's Assets, the rule of absolute priority of distributions would apply. Under that rule, no junior Creditor receives any distribution until all senior Creditors are paid in full with interest, and no shareholder receives any distribution until all Creditors are paid in full with postpetition interest. Consequently, the Debtor believes that in a Chapter 7 liquidation of the Debtor's Assets, holders of Allowed Unsecured Claims would receive less of a distribution than as provided under the Plan.

After consideration of the effects that a Chapter 7 liquidation of the Debtor's Assets would have on the ultimate proceeds available for distribution to the Debtor's Creditors in the Chapter 11 Case, including (a) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a bankruptcy trustee and his professional advisors, (b) the further erosion in value of the Debtor's Assets in a Chapter 7 case due to the expeditious liquidation required under Chapter 7, and (c) the increased amount of Claims that would have to be satisfied on a parity or

priority basis with the Debtor's creditors in the Chapter 11 Case, the Debtor believes that Confirmation of the Plan will provide each holder of an Allowed Claim entitled to distributions under the Plan with more than the amount it would receive pursuant to a hypothetical liquidation of the Debtor's Assets under Chapter 7 of the Bankruptcy Code.

The Debtor also believes that the present value of any distributions from the liquidation proceeds of a hypothetical Chapter 7 liquidation to each Class of Allowed Claims under Chapter 7 would be less than the present value of distributions under the Plan because the distributions in a Chapter 7 case would not occur for a substantial period of time.  It is likely that distribution of Chapter 7 liquidation proceeds could be delayed for at least a year or more after the completion of the liquidation in order to resolve Claims and prepare for distributions.

In light of the foregoing, the Debtor believes it is clear that holders of Allowed Claims entitled to distributions under the Plan will receive under the Plan more than they would receive in a hypothetical Chapter 7 liquidation by a Chapter 7 bankruptcy trustee.

**Liquidation Analysis.**  In a liquidation scenario, while a distribution to unsecured creditors may be possible, the distribution would not be substantial and would be less than is likely under the Plan.  After payment to administrative and priority creditors, the amount of claims asserted against the Debtor's estate in both the unsecured and equity classes would increase significantly as a result of the claims resulting from the administration of the estate in chapter 7 including the commissions of a chapter 7 trustee and the additional fees and expenses of the trustee's professionals.  Accordingly, the Debtor believes that the Plan provides Creditors with at least as much as they would be entitled to receive in a chapter 7 liquidation. A liquidation analysis is attached hereto as an exhibit.

**Feasibility.**  The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  The Plan contemplates that all of the Debtor's Assets ultimately will be liquidated to Cash and all Cash proceeds will be distributed pursuant to the terms of the Plan to holders of Allowed Claims entitled to distributions under the Plan.  Because no further financial reorganization of the Debtor will be possible, the Debtor believes that the Plan meets the feasibility requirement.

**Confirmation With the Acceptance of Each Impaired Class.**  The Plan may be Confirmed if each impaired Class of Claims or Interests accepts the Plan.  Classes of Claims or Interests which are not impaired are deemed to have accepted the Plan.  A Class is impaired if the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified other than by curing defaults and reinstating maturities or by payment in full in cash.

Holders of Claims or Interests impaired by the Plan are entitled to file Ballots accepting or rejecting the Plan.  Holders of Claims or Interests not impaired by the Plan, are deemed

to accept the Plan, and may not vote to accept or reject the Plan. Holders of Claims or Interests that will neither receive nor retain any property under the Plan are deemed to reject the Plan.

The Bankruptcy Code defines acceptance of a plan by a Class of Claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of Claims of that Class. Only those Claims, the holders of which actually vote to accept or reject the Plan, are counted for the purpose of determining whether the requisite number and amount of acceptances have been received.

**Confirmation Without the Acceptance of Each Impaired Class**.

The Debtor will seek to confirm the Plan notwithstanding the nonacceptance or deemed nonacceptance of the Plan by any impaired Class of Claims or Interests. To obtain such Confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to for its Claims or interests. The Debtor believes that the Plan satisfies this requirement.

The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims, Unsecured Claims, and Equity interests.

a.  Secured Claims:

In order for a plan to satisfy the "fair and equitable" test, the plan must provide: (i) that the holders of Secured Claims retain the Liens securing such Claims, whether the property subject to such Liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such Claims, and each holder of a Claim receives deferred Cash payments totaling at least the allowed amount of such Claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;(ii) for the sale of any property that is subject to the Liens securing such Claims, free and clear of such Liens, with such Liens to attach to the proceeds of such sale; or (iii) for the realization by such holders of the indubitable equivalent of such Claims.

b.  Unsecured Claims:

In order for a plan to satisfy the "fair and equitable" test, the plan must provide: (i) that each holder of an impaired Unsecured Claim receives or retains under the plan property of a value equal to the amount of its allowed Claim; or (ii) the holders of Claims and Equity interests that are junior to the Claims of the dissenting Unsecured Claim class will not receive any property under

the plan.

        c.      <u>Equity interests</u>:

        In order for a plan to satisfy the "fair and equitable" test, the plan must provide: (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such stock or (z) the value of the stock; or (ii) that the holders of Equity interests that are junior to the dissenting Equity interest Class will not receive any property under the plan.

        **THE DEBTOR BELIEVES THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN) BECAUSE THE PLAN SATISFIES THE "FAIR AND EQUITABLE" TEST WITH RESPECT TO ANY CLASS OF CREDITORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN WHO IN FACT DO NOT VOTE TO ACCEPT THE PLAN. ACCORDINGLY, IF NECESSARY, THE DEBTOR IS PREPARED TO DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.**

        **EFFECT OF CONFIRMATION**

**INJUNCTION**

        **Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the Debtor's obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim or Interest held as of the date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from property of the Estate that has been, or is to be, distributed under the Plan or the Post Confirmation Estate Agreement, and (ii) the creation, perfection or enforcement of any lien or encumbrance against property of the Estate that has been, or is to be, distributed under the Plan or the Post Confirmation Estate Agreement.**

        **Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act, to collect, recover or offset, from the Debtor, or from property of the Estate, any claim, any obligation or debt that was held by any person or entity as of the Confirmation Date except pursuant to the terms of the Plan.**

Nothing in the Plan or the confirmation order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtor, or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns (the "Released Parties"), nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties referred to herein for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in this Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties referred to herein.

Pursuant to Bankruptcy Code Section 1141(d)(3), the Debtor is not receiving a discharge.

## LIMITATION OF LIABILITY

The Plan contains certain limitations on liability with respect to actions taken in connection with the promulgation, confirmation and dissemination of the Plan. Such limitation is intended to require any person or entity which may desire to assert claims against the Debtor and certain other persons named in section 8.2 to assert such claims prior to confirmation of the Plan or be forever barred from raising such claims at a later date. This provision gives finality to parties involved in the Case with respect to any actions taken in connection with the Plan. Persons or entities who fail to raise such claims prior to confirmation of the Plan shall be deemed to have waived such claims and be forever barred from raising such claims as set forth in the Plan.

Section 1125(e) of the Bankruptcy Code, commonly referred to as the "safe harbor," protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan. Pursuant to section 1125(e), as set forth in Article 8 of the Plan, neither the Debtor, nor any of its respective officers, directors, members, general partner, managers or employees (acting in such capacity), nor any professional person employed by any of them shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any

**contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Case or the Plan except for (i) willful misconduct and gross negligence and (ii) liability of any released person for any debt owed to the United States Government, any state, city or municipality arising under (a) the Internal Revenue Code or any state, city or municipal tax code, (b) the environmental laws of the United States or any state, city or municipality or (c) any criminal laws of the United States, any state, city or municipality. From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability released pursuant to Article 8 of the Plan.**

### ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court the alternatives may include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code or (b) the promulgation and confirmation of an alternative plan of reorganization or (c) proceed with the appropriate liquidation proceeding in the District Court. If the Plan is not confirmed, the Debtor could attempt to formulate a different plan of reorganization. Such a plan might involve a different alternative orderly liquidation of its assets.

The Plan proposes the best opportunity for the payment of a substantial distribution to holders of claims in impaired classes and therefore the Plan provides a recovery to all Creditors and Interest Holders equal to or greater than would be obtainable in a Chapter 7 liquidation.

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following summary of certain U.S. Federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the particular circumstances pertaining to each holder of an Allowed Claim. Each holder of an Allowed Claim is urged to consult his own tax advisors. This summary does not cover all potential U.S. federal income tax consequences that could possible arise under the Plan and does not address the Plan's U.S. federal income tax consequences for any holder of an Allowed Claim that is a partnership (or other pass-through entity) or otherwise subject to special tax rules.

The Debtor has not requested any ruling from the Internal Revenue Service or any other taxing authority with respect to such matters nor will the Debtor, with respect to the federal income tax consequences of the Plan, obtain any opinion of counsel. Consequently, there can be no assurance that the treatment set forth in the following discussion will be accepted by the IRS. The Debtor offers no statements or opinions that are to be relied upon by the creditors as to the treatment of creditors' claims under the Plan. Matters not discussed in this Disclosure Statement may affect the tax consequences of the Plan on any particular holder of a Claim or Equity Interest

This summary is based upon the laws in effect on the date of this Disclosure Statement and existing judicial and administrative interpretations thereof, all of which are subject to change, possibly with retroactive effect. Holders of Allowed Claims should consult their own tax advisors as to the Plan's specific federal, state, local and foreign income and other tax consequences.

The tax consequences to Holders will differ and will depend on factors specific to each Holder, including but not limited to: (i) whether the Holder's Claim (or portion thereof) constitutes a claim for principal or interest; (ii) the origin of the Holder's Claim; (iii) the type of consideration received by the Holder in exchange for the Claim; (iv) whether the Holder is a United States person or foreign person for tax purposes; (v) whether the Holder reports income on the accrual or cash basis method; (vi) whether the Holder has taken a bad debt deduction or otherwise recognized loss with respect to a Claim.

**THERE ARE MANY FACTORS WHICH WILL DETERMINE THE TAX CONSEQUENCES TO EACH HOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE IT IS IMPORTANT THAT EACH HOLDER OBTAIN HIS, HER OR ITS OWN TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER AS A RESULT OF THE PLAN.**

**THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MAY BE IMPOSED ON A TAX PAYER. THE DISCUSSION HEREIN WAS WRITTEN TO SUPPORT THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH HOLDER SHOULD SEEK ADVICE BASED UPON THE HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to (i) the Debtor's counsel, Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl., New York, NY 10022, Attn.: Lori A. Schwartz, Esq. or Fred B. Ringel, Esq., (212) 603-6300 or (ii) may be retrieved from the Court's web site at https://ecf.nysb.uscourts.gov (provided such party has PACER access) by searching case no 11-11152(SMB).

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in this case are on file in the Office of the Clerk of the United States Bankruptcy Court at

Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 5:00 p.m.

**CONCLUSION**

The Debtor believes that the Plan is in the best interests of the Estate.

**DATED:** New York, New York
August 31, 2011

West End Financial Advisors, LLC


By: /s/ Raymond J. Heslin
**Raymond J. Heslin, Managing Member**