ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.
875 Third Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 603-6300
Facsimile: (212) 956-2164
A. Mitchell Greene

Hearing Date: February 15, 2012
Hearing Time: 10:00 a.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x

In re:

**WEST END FINANCIAL**
**ADVISORS, LLC**

Debtor.
-----------------------------------------------------x

**Chapter 11**
**Case No. 11-11152 (SMB)**
**(Substantively Consolidated)**

## RESPONSE TO OBJECTIONS OF UNITED STATES TRUSTEE AND SECURITIES AND EXCHANGE COMMISSION TO FINAL APPLICATION OF ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C. FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

**TO THE HONORABLE STUART M. BERNSTEIN**
**UNITED STATES BANKRUPTCY JUDGE:**

  **Robinson Brog Leinwand Greene Genovese & Gluck P.C.** ( "RB" or "Applicant"), as

and for its Response (the Response") to the Objection of the United States Trustee Regarding

Applications for Final Compensation and Reimbursement of Expenses (the "UST Objection")

and the Objection of the Securities and Exchange Commission to Fee Application of Robinson

Brog Leinwand Greene Genovese & Gluck P.C. (the "SEC Objection")(collectively, the

"Objections") respectfully sets forth and alleges as follows:

<u>Preliminary Statement</u>

  1.  Unlike the SEC and UST Objections, Applicant does not intend to use this

response as a platform to re-litigate the UST and SEC's unsuccessful motion to  appoint a chapter

11 Trustee (the "Trustee Motion").[1] Applicant believes that the results achieved in this case speak for themselves. In approximately six months from the time the "Independent Monitor" was "frozen" by the District Court, RB conferred substantial and valuable benefits on the Debtors' estate through, *inter alia*, its successful efforts to:

(a) Confirm a plan of liquidation that achieved virtually unanimous support from unsecured creditors, secured creditors and investor unsecured creditors;

(b) Negotiated the resolution of the secured claim of Iberia Bank ("Iberia") resulting in the reduction of the principal amount of its secured claim by more than (seven ($7,000,000) million dollars, a reduction in the interest rate of seven (7%) percent and an extension of the loan term by five (5) years, all without the need for litigation;

(c) Negotiate a three (3) year extension of the term of the secured claim of Northlight Financial ("Northlight");

(d) Obtain the agreement of Northlight to transfer its general partnership interest to a designee of the Debtors which will allow the Debtors to monetize its portfolios without incurring interest rate swap penalties of approximately eleven ($11,000,000) million dollars;

(e) Negotiate a resolution of the secured claim of Caplease, whereby Caplease waived its security interest in the DZ Waterfall, agreed to extend the term of their note by five (5) years at a reduced interest rate and agreed to an over one million ($1,000,000) dollar reduction in the principal amount claim if they are paid by March 2012[2] without the need for litigation;

(f) Successfully defended against a motion for the appointment of a chapter 11 trustee;

(g) Obtain an order neutralizing" the power of the Independent Monitor to approve a plan to distribute the Debtors' assets which had been indefinitely delayed by the Monitor's refusal to act on the plan transmitted to him; and

(h) Substantively consolidating the Debtors' cases over the UST's objection[3],

---

[1]   Similarly, the Debtors and RB will not utilize this response to re-litigate their motion to remove the Independent Monitor or to object to the Fee Examiner's Report. RB's objection to the Fee Examiner's Report was withdrawn and the estate was not charged for any time incurred by Applicant in connection therewith. With respect to the motions that RB litigated—opposing the appointment of the Chapter 11 Trustee and and removal of the Independent Monitor-- the Debtors prevailed in each litigation. No chapter 11 trustee was ever appointed and an order was entered denying the motion. Although the Monitor was not discharged, his role in the case was "fozen" and, most importantly, he was stripped of his power to interfere with the filing of a plan and hence with the progress of this case. As noted herein, these litigation victories paved the way for approval of a plan that gained the consent of nearly every creditor and investor in a remarkably short time frame.

[2]   On February 10, 2012, the sale of certain of the Debtors' membership interests closed and the CapLease claim was satisfied with a $715,000 payment and the Debtors realized their full original investment of $500,000.

[3]   In addition to the costs of defending against the UST's Motion, the UST was the only party to object to substantive consolidation, an opposition which resulted in over $1,000,000 in additional costs being incurred by

enabling the early promulgation of a plan of liquidation.

These items conferred almost $20 million dollars in direct pecuniary benefits on the Debtors' estate, an amount which is <u>over ten times</u> greater than RB's fee request. Significantly, neither the UST nor the SEC deny that RB's efforts, outlined in its Final Fee Application (as supplemented, the "RB Fee Application") resulted in these substantial benefits to the estate and its creditors. Nor do they deny that RB's efforts led to the consensual confirmation of a Plan which achieved almost unanimous consent of the "interests" of investors (the group the SEC purports to represent) in record time for a case of this complexity and contentiousness.

2. Moreover, the criticism leveled at RB in the Objections is not only unfounded, it makes clear the unremitting bias of the SEC and the UST[4] against the Debtors and their counsel. From the very day that the Debtors concluded that reorganization under title 11 was in its best interests and the interests of the entire estate, a decision borne out by the support received for the Plan by those with an economic interest in the case[5], the UST and SEC embarked on a crusade to punish the Debtor and now its counsel, for the Debtors' rebuke of the SEC's demand that a bankruptcy not be filed and that an equitable receivership in the District

---

the estate to prosecute the motion by *inter alia*, causing the retention of FTI Consulting to do an analysis to support the Debtors' position. The SEC, on the other hand, did not oppose this motion.

[4] The bias is remarkable in that the UST could not find any part of its guidelines which constrained it to object to the fees requested by the Independent Monitor even though (a) there is not one time entry in its application which is not "lumped", (b) it provided no demonstrable benefit to the estate and (c) it requests reimbursement of numerous luxury charges and first class travel charges that plainly violate UST Guidelines. The dual standard can only be attributed to bias or a political arrangement where the Justice Department does not object to fees incurred by the SEC's appointee, and vice-versa.

[5] The Court should take notice that <u>none</u> of the objecting parties have a substantial economic interest in the outcome of this case or have been joined by any party that has such an economic interest in the case. Indeed, the Unsecured Creditor's Committee, as well as WELPAC, whose members have a substantial interest in the outcome of the case, and whose interests are directly impact by the payment of these fees, supports allowance of RB's application in full.

Court be employed to distribute the company's assets. The Debtors believed at the time, and still believe, that the SEC and UST's attempt to impose their misguided and incorrect strategic vision for the case on the Debtors, thereby substituting their judgment in lieu of those with an economic interest in the outcome of the case, was and still is entirely inappropriate and in excess of their respective appropriate role in a case such as this. The SEC and UST's efforts to derail the case were unsuccessful as no trustee was appointed in this case. However the actions of the SEC and UST plainly and vexatiously multiplied the costs of the bankruptcy proceedings. Apparently undeterred by the support received for the plan, the government still believes that the best defense is a good offense. Accordingly, the SEC and UST now seek to deny RB its fees for defending against the motion to appoint a chapter 11 trustee and for pursuing other litigation where the UST and SEC's position were ultimately found unavailing.

> *Defense of the UST's Motion to Appoint a Chapter 11 Trustee was critical to the success of the Chapter 11 Case and the benefits achieved under the Plan.*

3.      The UST's objection to the fees incurred in connection with the defense of the Trustee Motion is totally unfounded on the facts and the law and must be denied. The UST Objection seeks disallowance of <u>all</u> fees for any litigation incurred during the chapter 11 case by requesting a reduction of $615,353.[6] It seeks the disallowance of all litigation fees although it objects only to those fees incurred defending against the Trustee Motion. Rather than specify the amount, the UST simply claims that the defense of the motion constitutes an unspecified but "significant portion" of the total charges for litigation in the case.[7] The UST's objection is that

---

[6]      Apparently the UST cannot take the time to specify the fees its found objectionable. The SEC did not have any issue with specifying the quantum of fees it contends were incurred in connection with defense of the trustee motion.. The UST's position is remarkable because the dates of the evidentiary hearings are known to it and the majority of the work occurred in the first weeks of the case. Identifying the fees is not difficult if the UST was concerned with the accuracy of its pleadings.

[7]      The SEC objects to $210,606 in fees for litigation related to opposing the Trustee Motion.

the litigation fees related to opposition to the motion to appoint a trustee are non-compensable because "[n]othing in the record suggest that the Debtors could not have proposed to proceed promptly with a Plan and Disclosure Statement even before the commencement of the hearing on the UST Motion." UST Objection at ¶27.

4. This statement is factually and legally incorrect. Under the terms of the Amended Stipulation and Order entered by the District Court, a copy which is annexed hereto as Exhibit "A" (the "ASO"),the Debtors were barred by that federal court order from filing a plan providing for the distribution of its assets without the express written consent of the Independent Monitor. ASO at ¶2(a)("Mr. Radke shall have the following responsibilities as Independent Monitor . . . to review and approve the design of a plan of distribution to liquidate and distribute the Company's assets...").[8]

5. It was not until July 27, 2011, several months after the last hearing on the UST Motion was adjourned, that the Debtor successfully obtained relief from the ASO's bar against filing a Plan, and proposed a Plan on August 30, 2011. Obtaining approval from the Independent Monitor was not an option. The Debtor had been trying for months to obtain approval from Mr. Radke to go forward with a plan. The Debtor had drafted a plan in April[9] and presented the Plan to the Independent Monitor on May 3, 2011. As of the July 27, 2011 hearing before Judge Castel, the Independent Monitor had still <u>not responded</u> to that proposed plan,

---

8    The Debtors believe it is beyond question that had the Debtors filed a plan without the Independent Monitor's approval, it would have been charged with acting in contempt of the ASO.

9    *See*, UST Motion at ¶25 noting a time entry of April 4, 2011 of 6.4 hours for drafting a plan.

either positively or negatively, in the three (3) months since it has been presented to him.[10]

      6.    The fact that the Debtor had submitted a Plan to the Independent Monitor, to which he had not responded, was not lost on Judge Castel. At the hearing, the following colloquy took place[11]:

> THE COURT: Mr. Radke, I have a number of questions for you.
> MR. RADKE: Yes, your Honor.
> THE COURT: The ASO provides in 2(A) the same provision that I questioned company counsel about in the prior sentence: "Mr. Radke shall have the following responsibilities as independent monitor: (A) to review and approve the design of a plan of distribution to liquidate and distribute the company assets." Correct?
> MR. RADKE: Yes, sir.
> THE COURT: That's your central and core responsibility, is it not?
> MR. RADKE: Yes.
> THE COURT: I read in the papers that you received a copy of a draft plan from the company on or about May 3, 2011, is that correct?
> MR. RADKE: Yes, sir.
>        *       *       *
>
> THE COURT: All right. Well, sir, you were appointed by me as an independent monitor. It appears to me that the entity of which you are the independent monitor was the company. And if you receive a communication of that significance from the company, a plan of reorganization, it would seem to me that an independent monitor appointed by this Court would have communicated, at a minimum, "I have received your document. I will be refraining from commenting on it at this juncture." You may or may not wish to disclose that you are refraining, but you at least extend the courtesy of a responsive communication, which you apparently did not.
> MR. RADKE: That's correct, sir, and I apologize.

---

10      Both Mr. Heslin and counsel followed up on the status of the Plan in the 90 day period. No response by Mr. Radke was forthcoming. The Debtors believe that at a minimum, the SEC, and perhaps the UST, were aware of these circumstances. Therefore, the disingenuous nature of the UST's objection cannot be overstated.

11      The SEC included the first seven pages of this transcript as an exhibit to their objection. The colloquy set forth herein appears at pages 18-20. The SEC's attempt to distort the record by omitting the entire transcript, including portions critical of the Independent Monitor is obviously inappropriate and demonstrates a lack of candor with the Court.

Transcript of Hearing, July 27, 2011 at 18-20. A copy of the Transcript is attached hereto as Exhibit "B".The colloquy makes it clear that Mr. Radke's lack or any response whatsoever to the proposed plan, whatever the reason, constituted an intentional disregard of his duties under Judge Castel's order.

7.   As a result of that hearing the "Freeze Order" was entered on July 29, 2011. A copy of the Freeze Order is attached hereto as Exhibit "C". Under the terms of that order, the Debtors were relieved of the obligation to obtain the Independent Monitor's approval before filing a Plan. See, Freeze Order at ¶1 ("The first sentence of paragraph 2(a) [relating to the Monitor's approval of a plan of distribution]of the ASO is deleted.") Relieved of that impediment, the Debtors filed a Plan and Disclosure Statement on August 30, 2011 and confirmed the plan approximately six (6) months later after substantial negotiations with its creditor constituencies. As can be seen, in fact the Debtors did everything possible to pursue a plan as soon as it was legally permitted to do so. Perhaps the UST's inquiry is more appropriately directed to the Independent Monitor and his fee application—an application to which the UST has no objection.[12]

8.   Moreover, even if the ASO had not barred the filing of a Plan until the entry of the Freeze Order on July 29, 2011, the filing of a Plan and Disclosure Statement during the first weeks of the chapter 11 case while the Debtors were undergoing a full scale assault by the UST and SEC would have required the Debtors to forego preparing to oppose the motion and may have seriously jeopardized the entire chapter 11 case. Further, the filing of a Plan before the

---

12   It is respectfully suggested that the Court has to question the UST's objectivity in this case given the obvious violation of the UST Guidelines by Mr Radke's fee application. The Court is respectfully referred to the Creditors Committee's objection to the Independent Monitor's fee application for numerous examples.

Debtors actually did in August would have been unduly premature. At that point the Debtors had not yet undertaken negotiations with its committee[13] or its three secured creditors. Indeed, negotiations towards a plan did not fully commence until after the Debtors had, over the objection of the UST[14], prevailed on the substantive consolidation motion. Simply put, this was too complex a case to rush to file a plan, as the UST suggests, that would have had no chance of succeeding at that juncture of the case.

9. This later point is eloquently echoed by the pleading Northlight Financial submitted in support of Applicant's retention as bankruptcy counsel in this case. Statement of Northlight Fund LP in Support of Debtors' Application for Authorization to Retain Robinson Brog Leinwand Greene Genovese and Gluck P.C. as Attorneys for the Debtors ("Northlight Statement") [Doc No. 153]. In that pleading, Northlight noted that RB's retention was warranted because "RB has a deep reservoir of knowledge concerning the Debtors' financial condition, their assets and capital structure and the complex web of facts and proceedings that lead the Debtors to commence their cases." Northlight Statement at ¶7. Northlight also observed that they had been the cause of the lack of progress in the case. "The UST's pleadings have burdened the Debtors estates with a mountain of legal fees and have prevented the parties in interest from achieving *any* substantive progress towards the negotiation of a plan of reorganization because of the distraction and disruption caused by the dual uncertainties of not knowing whether the Debtors (or a trustee) will retain the authority to shepard the estates in the cases and whether RB

---

[13] In fact, the Official Committee of Unsecured Creditors was not even appointed until May 3, 2011 [Doc. No. 107].

[14] Notably, the UST was the only party to object to substantive consolidation. In light of the overwhelming evidence presented at that hearing, it is unclear why the UST continued to oppose the motion causing the estate to incur over $1,000,000 in fees and disbursements to FTI for its expert report and associated testimony.

will be authorized to act as their counsel." Northlight Statement at ¶11(emphasis in original).

      10.     Accordingly, Northlight, whose principal interest lay in a quick and effective resolution of this case, plainly understood that proposing a plan prior to a resolution of the trustee motion and the retention of counsel, both issues raised by the UST, was simply impossible. Northlight's statement, submitted in connection with RB's retention, presciently underscores another one of many flaws in the UST's Objection.

      11.     Under these circumstances, it is hard to understand how the UST could possibly contend that RB should not be compensated for opposing the appointment of a Trustee in favor of commencing a premature plan process it was stymied from undertaking by a federal court order, the Independent Monitor's refusal to act and the instability caused by the UST's litigating posture on the motion to appoint a trustee and RB's retention. The only answer offered by the Objections is that it would have been proper for Applicant to have abandoned its advocacy for the estate and abandoned its duty to zealously represent its client and simply "rolled over" and consented to a trustee. This is not a rule of law that the Court should countenance.[15]

      12.     For similar reasons, the SEC's objection that the defense of the motion to appoint a trustee should not be compensated because "…the record shows that the purpose of Mr. Heslin's and Robinson Brog's opposition to the Trustee Motion was to perpetuate Mr. Heslin's control over West End for Mr. Heslin's and RB's own financial benefit and not for the benefit of

---

15    The SEC's recitation of the Court's refusal to dismiss the motion on a request for a directed verdict, based on its finding that, with all inferences in its favor and prior to the Debtor presenting any evidence, that a *prima facie* case had been presented, constituted a reason for RB to abandon its defense, citing to *Keene Corporation* and other cases, is totally misplaced. RB believe it would have persuaded the Court that, after presenting its evidence, that the motion was not well taken and would have been denied. The SEC treats the motion as if it were unopposed. The motion, which was eventually dismissed, would have been dismissed as the Debtors had a meritorious defense and the reorganization of the Debtor under chapter 11 was plainly appropriate. As set forth herein, this case is plainly distinguishable from *Keene*. where the counsel prosecuting the complaint later withdrew the claims admitting that the case had no merit.

the estates" is totally without merit. SEC Objection at 3. The fact of the matter is that no trustee was ever appointed in this case and a plan was confirmed with overwhelming support from creditors. If the SEC was honestly convinced that the case was conducted for Mr. Heslin's pecuniary benefit, then it had an obligation to object to the Plan, which included as a necessary element to its confirmation, that the Plan, and its proponent, had complied with the applicable provisions of title 11 and the Plan was proposed in good faith. 11 U.S.C. §1129(a). Neither the SEC nor the UST objected to the Plan, thereby conceding the good faith of the Debtor in the case. The Plan was, of course, the result of the Debtors and its counsel's long and hard concerted efforts to resolve its creditor claims with the greatest possible economic benefit to the estate. In this regard, both the Debtor and its counsel succeeded. [16]

13. There can be no doubt that RB efforts to defeat the motion for the appointment of a Trustee was of substantial benefit to the estate as it was only through its ability to prevent the appointment of a chapter 11 trustee that the case was stabilized, negotiations successfully undertaken and a Plan confirmed in such a short period of time and with nearly unanimous support. Had a chapter 11 trustee been appointed, the Debtor believed, at the time and still believes, no plan would have been confirmed and the estate would have been saddled with enormous fees from a chapter 11 trustee, or from Mr. Radke, had a liquidation taken place in District Court. [17]

---

[16] Further, the notion that Mr. Heslin's salary, which he voluntarily reduced during the case was excessive, as a reason why a trustee should have been appointed demonstrates the nativity of the SEC. One can only wonder what the costs in terms of additional expense and delay would have been had the SEC and UST succeeded with their motion. The Debtors respectfully submit that they would have exceeded Mr. Heslin's $400,000 annual salary by a substantial amount as demonstrated by Mr. Radke's fee request of nearly $348,000 for only ten (10) weeks worth of work..

[17] At the hearing for the appointment of a chapter 11 trustee, Mr. Radke testified that he expected to be appointed the receiver in the District Court action.

14.     If Mr. Heslin and RB were conducting this case for their own benefit and not for the benefit of the estate, why did the UST, with the SEC's acquiescence, cease prosecution of their motion to appoint a chapter 11 trustee? How could they have not interposed a "bad faith" objection to the Plan? The Debtors think the reason is obvious. The reason is because Heslin and the Debtors' counsel conferred such a substantial benefit on the estate through its skillful maneuvering and negotiating through the chapter 11 process[18], a benefit which will ultimately be worth over $20 million dollars, or <u>ten times the RB fee request</u>, that jeopardizing the substantial benefit to the estate was simply unacceptable, even to the SEC and UST. This fact vindicates the Debtors' and Applicant's strategy for the case and that their actions resulted in a substantial benefit to the estate through their efforts and that this case was not run simply for their own pecuniary benefit.

15.     Further, Mr. Heslin's continuation as the estate fiduciary during the case was plainly necessary. Heslin was the "corporate memory" available to RB who had the background and knowledge of each and every transaction on the Debtors' books necessary to successfully reorganize. Heslin was intimately involved with the defense of the UST Motion and the preparation and marshaling of the evidence utilized by FTI on substantive consolidation. Mr. Heslin was also the Debtors' witness at the substantive consolidation hearing.

16.     Significantly, the SEC is presently utilizing Mr. Heslin as its principal witness in its litigation against the former officers of West End. If Mr. Heslin were as untrustworthy as the Fee Objection makes him out to be, why is the SEC using him as their principle witness and utilizing his testimony to prosecute others? It is clear that Heslin's

18     The Court recognized this fact through its comment at the confirmation hear that counsel had done an "excellent job" in a highly contentious and difficult chapter 11 case.

credibility as an attorney and whistle blower as well as his knowledge of the complex facts and transactions is necessary for the SEC to successfully prosecute its civil litigation agenda. Obviously, one of the reasons for Mr. Heslin's involvement in the chapter 11 case was for the very same reasons that the SEC is now utilizing his services as a witness.

17.     Not only was and is Mr. Heslin valuable to the Debtors and the chapter 11 process, until the Freeze Order was entered, Heslin was Radke's principle contact for information and was responsible for responding to the Independent Monitor's inquiries and assuring compliance with the ASO. Finally, while Mr. Heslin reduced his compensation and benefits during the chapter 11 case in response to a request for the Committee, the Debtors had no doubt that had Mr. Heslin been replaced by Mr. Radke in a District Court action, the fees that the Independent Monitor would have incurred in promulgating a plan of distribution would have been many times more than the professional fees ultimately incurred in this case. This fear is amply borne out by Mr. Radke's present, quite substantial, final fee application.

18.     The cases cited by the SEC in their objection to RB's fees are inapposite and bear no resemblance to the facts in the instant case. For example, one case relied upon by the SEC, *In re Keene Corporation*, 205 B.R. 690 (Bankr. S.D.N.Y. 1997) ("Keene") to assert that prosecution of the defense to the trustee motion was improper bears no factual resemblance to this case.

19.     In *Keene*, the Debtors' counsel, at the direction of Keene's President, incurred over $400,000 in fees pursuing litigation against 27 law firm claiming that certain tort lawyers drove Keene into bankruptcy by filing non-meritorious claims to collect damages and excessive contingency fees. The Debtors sought damages of $400 million (the "Keene 27 Litigation").

20.     In terminating exclusivity in the case, the Court took note of the acrimonious relationship between the Debtors and their bankruptcy counsel on the one hand and the "plaintiff's bar" and the Committee lawyers on the other hand and the wasted time and effort through contentious litigation that ultimately squandered estate assets to the detriment of creditors. 205 B.R. at 694

21.     Ultimately, the Debtors settled the Keene 27 Litigation as part of the plan process with no recovery for the estate. *Id.at 699*. In connection with dismissal of this litigation with prejudice, the Debtors made an offer of proof whereby it acknowledged that the Keene 27 Litigation lacked factual merit and provided no leverage in its plan negotiations with the Committee. Keene later expanded upon its proffer and noted that in response to several motions to dismiss the Keene 27 Litigation, the Debtors undertook expanded factual investigation and legal analysis that "raised new, but extremely serious, concerns about the underlying theories of suit as well as whether the facts necessary to establish liability could be proven. *Id.* The additional factual due diligence, interviewing pre-petition defense counsel, involved only $20,000 to $25,000 of legal time. *Id.*

22.     In reviewing Debtors' counsel's fee application, the Court reduced the fees in connection with the Keene 27 Litigation by $328,000 to $100,000 to compensate the firm for investigating the merits of the underlying claim, but deny counsel any fees in connection with the prosecution of the complaint in the Keene 27 Litigation. The Court determined that Debtors' counsel failed to exercise legal or factual due diligence and failed to weigh the relative costs and benefits of the litigation to the estate. Instead it "launched a 'cutting edge' lawsuit of highly speculative merit, doubtlessly at the insistence of [its President]. Not surprisingly, the lawsuit invoked a counterattack from a well-financed group of defendants who pointed out the

shortcomings that had been overlooked or ignored." *Id.* The Court determined that disallowance of a substantial portion of the fees was warranted because counsel failed to exercise its duties, once it became aware of the additional difficulties with its case, and because it continued to prosecute the litigation, not to benefit the estate, but to vindicate the President's vendetta against the plaintiff's tort bar.

23.     The situation in *Keene* is substantially different from that in this case. In this case, the Debtors were stymied in their ability to pursue a Plan at all by the Independent Monitor who had been brought into the case by the SEC. It is highly disingenuous for the UST and SEC to have purposely set up a barricade to proposing a Plan, and then implement that barricade through its Independent Monitor's refusal to approve a Plan submitted to him by the Debtors, then blame the Debtors for not pursing the Plan process sooner. The Debtors had to neutralize the Independent Monitor through the Freeze Order, since he was intransigent in his unwillingness to review, much less approve the Debtors' Plan, defeat the trustee motion and be retained in the case before a stable platform existed permitting substantive plan negotiations to proceed.

24.     This is not a case where the attorneys abandoned their duties to the estate and pursued litigation solely because it was a way to augment their fees in the case or for some other improper purpose. The Debtors and counsel always believed that, if given a reasonable opportunity to reorganize, despite the contentiousness of the case and the complexity of the financial affairs, it would be able to do so. The Debtors, and its counsel had no other rational choice but to defend against the motion. It was barred from pursuing a plan at the time and to simply give up and not pursue its strategy would have been improper and would have resulted in greater expense and less benefits then have been achieved under the confirmed plan in this case.

The comparison of this case to *Keene* is ludicrous. *Keene* was a situation where a counsel pursued an admittedly non-meritorious claim at great expense with no concomitant benefit to the estate just to satisfy an officer of the debtor. Here counsel pursued a claim where the other side gave up pursuing its motion and their "clients" voted for a plan which conferred a substantial benefit on the creditors of the estate. The only "benefit" RB is receiving is payment at its regular hourly rate, which compares very favorably with equally skilled bankruptcy practitioners in New York City and certainly compares favorable with the fees charged by the the Examiner and his counsel. Similarly, Heslin receives no more than he was otherwise entitled to receive. No one is even seeking a bonus, which would not be uncalled for in a case with such stellar results. Whether the UST and the SEC like it or not, someone has to run the Debtors and someone has to represent the Debtors. It is not unreasonable that the people who do so expect to be paid a reasonable amount for their services.

25.     The SEC argues that RB should somehow be held accountable for not formulating a plan or distribution for the period from January 2010 to January 2011, when the SEC commenced litigation in the District Court. SEC Objection at 3. Putting aside the fact that this concerns a period outside the scope of the fee application, the SEC, again, has its facts wrong.

26.     First, the nine-party deal was not fully closed until late February 2010, not January 2010. Moreover, it was not until May 2010 when the Debtors started receiving payments under the "waterfall" when it knew it had the funding available to pay Northlight and cover its operating expenses. During the period between April 2010 and August 2010, Mr. Heslin was reviewing and analyzing the 150 investor accounts and the banking records for the more thasn

fifty (50) separate bank accounts the debtors maintained between 2000 and 2009 and preparing account reconciliations for each account.

27.     In July 2010, the Debtors met with the SEC and proposed a Plan of distribution. After the meeting, RB commenced work on a solicitation process to obtain consent to the plan it had outlined to the SEC. At subsequent meetings in late summer and early fall, RB further explained to the SEC that it did not expect to obtain 100% votes in favor of its plan and that, in the event it received consent of 2/3's of the interest holders, RB would then commence a chapter 11 case to attempt to bind the dissenting investors to the plan. In November of 2010, new SEC personnel, Alistaire Bambach, joined the discussions for the first time and expressed her plain prejudice against a possible chapter 11 filing and instead insisted that an equitable receivership be pursued in District Court. Ms. Bambach also insisted that an Independent Monitor be appointed for the company. The Debtor nominated three persons for that position but the SEC insisted that Mr. Radke be appointed independent monitor despite the fact that the Debtors' three nominees were extremely well qualified.. Shortly thereafter, the SEC commenced litigation in the District Court, which continued until the filing on March 15, 2011. Therefore, contrary to the SEC assertion, the Debtors were indeed pursuing a methodology to implement a plan during the time subsequent to the closing of the nine-party deal.

28.     The SEC also argues that that it should deny RB all compensation in the case under section 328(c) because of RB opposition to the Fee Examiner's Report. SEC Objection at 9. In light of the fact that there was a good faith basis for the objection, the objection was thereafter withdrawn and that RB has waived all fees incurred by the firm in connection with that issue, the additional and purely vindictive punishment suggested by the SEC should be denied.

29.      RB has no desire to re-litigate this issue. At the time it submitted its objection, it believes that the facts and circumstances, as outlined at length in its objection, to which the Court is respectfully referred, justified its imposition. However, given the over $400,000 reduction in its fees stemming from the Fee Examiner Report, additional denial of compensation is not warranted and unjustified

30.      The SEC's objection proceeds under the mistaken assumption that the Fee Examiner process was implemented for RB's own pecuniary benefit. In fact, RB merely suggested as a procedure that passed muster in the *Enron* case and allowed the Debtors to have the counsel of its choice. It also avoided the delay and expense which would have been occasioned by a change of counsel at that point in the case. Needless to say, if substitute counsel were retained, the Debtors would not have emerged from chapter 11 as swiftly as it did in this case with RB as its counsel. While RB does admit it expected to be paid for the services performed, if that interest is a prohibited adverse interest, then all counsel in future chapter 11 cases will have to be denied compensation because every counsel has that same adverse interest.

31.      The cases cited by the SEC seeking to deny RB compensation are so factually distinguishable, that they do not support the SEC's argument. *See, Fellheimer, Eichen & Braverman P.C. v. Charter Tech. Inc.*, 57 F3d 1215, 1228-29 (3d Cir. 1995)(filing a patently false lawsuit against Debtor's creditors committee warranted a denial of compensation); *Gray v. English*, 30 F.3d 1319, 1324 (10th Cir. 1994)(Trustee that purchased interest in creditors claim ceased being disinterested and was not entitled to compensation); *In re Angelika Films 57th, Inc.*, 246 B.R. 176, 179 (S.D.N.Y. 2000)( Debtor's counsel that moved to assign debtor's lease to principal whom firm also represented was not disinterested and not entitled to compensation). In each case, a violation of the disinterestedness requirement of the Bankruptcy Code actually

occurred under substantially different, and more egregious, circumstances. A total denial of compensation under section 328(c), simply to satisfy the SEC's "sour grapes" arguments is unwarranted here.

32.     The SEC's also argues that RB should be denied compensation in connection with the July 27, 2011[19] hearing whereby the Debtors obtained the Freeze Order. This objection should be denied. This is another motion that RB prevailed on. In fact, it was the relief obtained in this motion that most directly contributed to the successful outcome of this case, the promulgation and confirmation of the Plan. The SEC's argument, that simply because the ultimate relief requested, removal of the Independent Monitor was not granted, there should be no compensation to RB is unfounded. Although the Independent Monitor was not discharged, he was effectively "put on ice". *See*, Transcript of Hearing, July 27, 2011 at 25 (Mr. Radke:"... I guess what I'm saying, your Honor, is I have seen situations where a monitor is basically retained but put on ice during the pendency of a bankruptcy and not formally removed.") Accordingly, it was not until the order resulting from this hearing was entered on July 29, 2011, that the estate was freed from the formal impediment to confirming a plan. As such, the Debtors prevailed on this motion and compensation for RB is appropriate.[20]

33.     Finally, the SEC (but not the UST) argues that RB should be responsible

---

[19]     The SEC only attached the first seven pages of the transcript from this hearing. The full transcript is attached as Exhibit "B" hereto. Presumably the SEC failed to attach the entire transcript to distort the record and because the colloquy critical of Mr. Radke and his failure to respond, for months, to the Debtors' proposed plan appears on pages 18-20.

[20]     The SEC's assertion that RB is being compensated twice for the same work, once objecting to Radke's fees in the District Court and once for objecting to them here is incorrect. Radke's application before the District Court was substantially different from the application before this court and the time frame and substance of the objections are substantially different. Moreover, since the Committee has also objected to Radke's fees in the bankruptcy case, there is clearly a benefit to creditors from the objection.

for the fees and expenses of the Fee Examiner. The Debtors have submitted an objection to the Fee Examiner's fees and expenses which it believes are unreasonable and may not, in any event, exceed the $110,000 cap. The Debtors believe that imposing these fees against RB would be fundamentally unfair. To avoid unnecessary repetition, paragraphs 49-54 of the Objection to the Final Fee Application of the Fee Examiner and Fee Examiner's counsel, dated February 8, 2012 [ Doc. No. 337] are hereby incorporated by reference.

<u>UST Miscellaneous Objections</u>

34.     The UST Objection contends that RB's Fee Application should be reduced by the time spent objecting to the Fee Examiner's report. RB has already reduced its fee application by almost $200,000 to account for those fees. To address the UST's concern, attached hereto as Exhibit "D" are the relevant time sheets, arranged by date of service, showing the time entries which were excluded from the Final Fee Application. Each applicable entry is indicated by a $0.00 on the fee column. Unfortunately, RB's software does not output this information where fees are printed in project billing category order, only when they are printed out in chronological order. The attached time sheet will allow the UST to match up the entries applicable to the Fee Examiner items and determine that RB's waiver of those items is indeed accurate.

35.     Finally, the UST objects to $97,897.50 of time entries and requests that they be disallowed for vagueness. This objection should not be sustained.

36.     The UST's determination that $97,897.50 of Applicant's time entries are vague is not accurate. The UST has applied the 'vague" label to Applicant's time records randomly and inconsistently.  Applicant submits that time entries such as: "Preparation of and work on sale of LLC interests"; "Review of claims"; "Preparation of  Plan" and "Preparation of

Disclosure Statement" are clear and require no further detail for a reviewer to determine what task the professional was performing.   In fact, in the *CCT* case, the Court noted that the debtor ". . .objects to every time record in which the verb "review" appears, contending that the word "review" is inherently vague.  It obviously means "read" which is perfectly clear." CCT at 18. Applicant submits that it utilizes these descriptions regularly in its time records and that these entries have not been objected to by the UST in previous fee applications filed by Applicant in this court and other courts for the reason that they simply are not vague, as the Court noted in *CCT,* and comport with the UST Guidelines.[21]

37.     In connection with the objection to the entries made by LS for "Preparation of File", Applicant further submits that maintaining a file as large and complex as the West End files requires constant organization and upkeep and is a necessity to properly maintain the records and administer a complex chapter 11 case.  Moreover, the majority, if not all, of these time entries were not charged to the estate, as noted on Exhibit "D".

---

[21]     Other parties applying for fees in this case have utilized similar, if not identical, language in their final fee applications without an objection from the UST. Such applications have not drawn any objection for the reason that the use of such language is not vague under applicable standards and guidelines. In any event, when confronted with entries that a court determines are in fact vague, court disallow only a portion of the applicable fees, not the entire amount. See, e.g. In re Motors Liquidation Inc., 09-50026(REG)(Sept. 11, 2011)(Doc. No. 10814)(Fee Examiner recommended 15% disallowance for vague entries); Rogin v. Harry Macklowe Real Estate Co., 870 F.Supp. 510,521 (S.D.N.Y. 1994)(30% reduction for vague entries); In re CCT Communications Inc., 2010 WL 3386947*8 (50% reduction for vague entries).

**WHEREFORE**, the Debtors respectfully requests for the reasons described herein that the Court overrule the UST Objection and the SEC Objection and grant Applicant's final fee application in the amounts requested.

Dated: New York, New York
February 13, 2012

> **ROBINSON BROG LEINWAND GREENE**
> **GENOVESE & GLUCK P.C.**
> **Attorneys for Debtor**
> **875 Third Avenue**
> **New York, New York 10022**
> **(212) 603-6300**
>
> By: /s/ A. Mitchell Greene
>      A. Mitchell Greene